2015-1863

## IN THE
## UNITED STATES COURT OF APPEALS FOR
## THE FEDERAL CIRCUIT

### IPLEARN-FOCUS, LLC

*Plaintiff-Appellant,*

v.

### MICROSOFT CORP.

*Defendant-Appellee.*

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF CALIFORNIA IN CASE NO. 3:14-cv-00151-JD,
JUDGE JAMES DONATO

### PRINCIPAL BRIEF OF APPELLANT IPLEARN-FOCUS, LLC

Matthew D. Powers
William P. Nelson
Robert L. Gerrity
TENSEGRITY LAW GROUP, LLP
555 Twin Dolphin Drive, Suite 650
Redwood Shores, CA 94065
Telephone:  (650) 802-6000
Facsimile:  (650) 802-6001

*Attorneys for Plaintiff-Appellant*
*IPLearn-Focus, LLC*

September 28, 2015

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

IPLEARN-FOCUS, LLC. V. MICROSOFT CORP.

No. 2015-1863

## CERTIFICATE OF INTEREST

Counsel for Plaintiff-Appellant IPLearn-Focus, LLC certifies the following:

1.    The full name of every party or amicus represented by me is:

    IPLEARN-FOCUS, LLC

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

    Same.

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

    IPLearn LLC is the parent corporation of IPLearn-Focus LLC and there is no publicly held company owning 10% or more of its stock.

4.    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

    Tensegrity Law Group LLP:
    Matthew D. Powers, Steven S. Cherensky, Paul T. Ehrlich, William P. Nelson, Azra M. Hadzimehmedovic, Robert L. Gerrity, Andrew C. Michaels, Yi Chen, and Natasha M. Saputo.

Dated:  September 28, 2015        /s/ *Matthew D. Powers*

                    Matthew D. Powers
                    Tensegrity Law Group LLP

# TABLE OF CONTENTS

STATEMENT OF RELATED CASES .................................................................. 1

JURISDICTIONAL STATEMENT ..................................................................... 2

STATEMENT OF THE ISSUE ON APPEAL ...................................................... 2

STATEMENT OF THE CASE ............................................................................ 2

    A.  Procedural History .................................................................. 3

    B.  The Technology Of IPLF's Asserted Patents ......................... 4

    C.  The Accused Products: Xbox Kinect Video Game Computing
       Systems And Related Games And Services........................... 10

    D.  The District Court's Decision ................................................. 15

SUMMARY OF THE ARGUMENT .................................................................. 16

ARGUMENT..................................................................................................... 16

    A.  Standard Of Review ............................................................... 16

    B.  IPLF's Patents Are Not Directed To An Abstract Idea Under *Alice*
       Step 1..................................................................................... 17

         1.  IPLF's Claimed Inventions Are Not Coextensive With the
            Abstract Idea Of Teaching........................................... 19

         2.  The District Court Erred By Conflating The Scope Of The
            Claims With The Problem To Be Solved In The Specification.. 22

         3.  This Court Should Clarify The Standard For Determining
            Abstraction Under Step 1 By Requiring A Finding Of Pre-
            emption Of A Basic Tool Of Scientific Or
            Technological Work .................................................... 33

    C.  Even If The IPLF Claims Involve An Abstract Idea, They Are Still
       Patentable Under *Alice* Step 2 Because The Claim Limitations As
       Actually Ordered And Combined Were Not Conventional In 1996..... 42

1. Microsoft's Burden Of Proof Is Clear And Convincing Evidence As To Factual Issues Underlying Conventionality ..................... 42

2. Conventionality—Not Novelty—Should Be The Test For Determining Whether Claims Satisfy Step 2 ............................. 45

3. Microsoft Has Not Met Tts Burden Of Proof To Show That IPLF's Claimed Combinations Were Conventional In 1996 ...... 49

D. Even If This Court Adopts Novelty Or Non-Obviousness As The Test For Step 2, Microsoft Still Did Not Meet Its Burden ................... 52

1. Microsoft Bears The Same Clear And Convincing Burden Of Proof As To Factual Questions Of Novelty Or Non-Obviousness.................................................... 52

2. Microsoft Also Has Not Met Its Burden To Show That IPLF's Claims Lack An Inventive Concept Under A Novelty or Non-Obviousness Test ....................................................... 52

3. IPLF Has Presented Substantial Evidence Supporting A Finding That The Asserted Claims Comprise Novel, Non-Obvious, Unconventional Combinations ................................... 54

CONCLUSION ................................................................... 56

# TABLE OF AUTHORITIES

## Cases

*Accenture Global Servs. v. Guidewire Software, Inc.*,
  728 F.3d 1336 (Fed. Cir. 2013) ................................................................. 16, 42

*Alice Corp. v. CLS Bank Int'l*,
  134 S. Ct. 2347 (2014) ............................................................................ *passim*

*Ariosa Diagnostics, Inc. v. Sequenom, Inc.*,
  788 F.3d 1371 (Fed. Cir. 2015) ....................................... 16, 36, 38, 47

*Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*,
  133 S. Ct. 2107 (U.S. 2013) .......................................................................... 37

*Bilski v. Kappos*,
  561 U.S. 593 (2010) ....................................................... 18, 22, 23, 51

*buySAFE, Inc. v. Google, Inc.*,
  765 F.3d 1350 (Fed. Cir. 2014) ............................................................. 46

*Canrig Drilling Technology Ltd. v. Trinidad Drilling Ltd.*,
  4-15-cv-00656 (TXSD September 17, 2015) ..................................... 35

*Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*,
  776 F.3d 1343 (Fed. Cir. 2014) ......................................................... 32

*Diamond v. Chakrabarty*,
  447 U.S. 303, 100 S. Ct. 2204 (1980) ............................................... 37

*Diamond v. Diehr*,
  450 U.S. 175, 188 (1981) ............................................... 18, 31, 46, 48

*Digitech Image Techs., LLC v. Elecs. for Imaging, Inc.*,
  758 F.3d 1344 (Fed. Cir. 2014) ......................................................... 36

*Exergen Corporation v. Thermomedics, Inc.*,
  1-13-cv-11243 (MAD September 15, 2015) ..................................... 35

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys.*, Inc.,
  381 F.3d 1111, 1116 (Fed. Cir. 2004) .............................................. 27

*Internet Patents Corp. v. Active Network, Inc.*,
   790 F.3d 1343, 1347 (Fed. Cir. 2015) .............................................................. 45

*IPLearn, LLC v. K12 Inc.*,
   2014 WL 7206380 (D. Del. Dec. 17, 2014) ....................................................... 26

*Kara Tech. INc. v. Stamps.com Inc.*,
   582 F.3d 1341, 1348 (Fed. Cir. 2009) ............................................................. 27

*KSR Int'l Co. v. Teleflex Inc.*,
   550 U.S. 398, 127 S. Ct. 1727, 167 L. Ed. 2d 705 (2007) ............................... 32

*Leever v. Carson City*,
   360 F.3d 1014, 1017 (9th Cir. 2004) ............................................................... 16

*Mayo Collaborative Services v. Prometheus Laboratories, Inc.*,
   566 U.S. ___, 132 S. Ct. 1289 (2012) ....................................................... *passim*

*McRO Inc. v. Activision Publishing Inc.*,
   2014 U.S. Dist. LEXIS 135152 (C.D. Cal. Sept. 22, 2014) .............................. 36

*Messaging Gateway Solutions, LLC v. Amdocs, Inc.*,
   No. 14-732-RGA, 2015 U.S. Dist. LEXIS 49408 (D. Del. Apr. 15, 2015) ...... 34

*Microsoft Corp. v. i4i Ltd. P'ship*,
   131 S. Ct. 2238 (2011) .................................................................. 17, 43, 44, 52

*Microsoft Corp. v. IPLearn-Focus, LLC*,
   IPR2015-00096, Paper No. 11 (P.T.A.B. Mar. 4, 2015) .................................. 54

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
   134 S. Ct. 2120 (2014) ..................................................................................... 44

*Parks v. Booth*,
   102 U.S. 96, 26 L. Ed. 54, 1880 Dec. Comm'r Pat. 439 (1880) ........................ 32

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) ........................................................... 18, 21, 26

*SRI Int'l v. Matsushita Elec. Corp.*,
   775 F.2d 1107 (Fed. Cir. 1985) ....................................................................... 23

*TDE Petroleum Data Solutions, Inc. v. AKM Enterprise, Inc.*,
   4-15-cv-01821 (TXSD September 11, 2015) ..................................................... 35

*Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc.*,
   135 S. Ct. 831 (2015) ........................................................................... 43

*Ultramercial, Inc. v. Hulu, LLC*,
   722 F. 3d 1335 (Fed. Cir. 2013) .......................................................... 42

*WildTangent, Inc. v. Ultramercial LLC*,
   134 S. Ct. 2870 (June 30, 2014) .......................................................... 42

**Statutes**

28 U.S.C. § 1295 ......................................................................................... 2

28 U.S.C. § 1331 ......................................................................................... 2

28 U.S.C. § 1338 ......................................................................................... 2

35 U.S.C. § 101 ............................................................................... *passim*

35 U.S.C. § 102 .................................................................................. 43, 44

35 U.S.C § 103 .................................................................................... 43, 44

35 U.S.C. § 112 .................................................................................. 20, 44

35 U.S.C. § 282 ....................................................................................... 44

**Administrative Decisions**

*Microsoft Corp. v. IPLearn-Focus, LLC*,
   IPR2015-00096, Paper No. 11 (P.T.A.B. Mar. 4, 2015) ................................... 54

## STATEMENT OF RELATED CASES

No other appeal in or from the same civil action that gave rise to this appeal was previously before this or any other appellate court. No other case is known to counsel for IPLearn-Focus, LLC ("IPLF") to be pending in this or any other court that will directly affect or be directly affected by this Court's decision in the pending appeal.

## JURISDICTIONAL STATEMENT

The United States District Court for the Northern District of California ("district court") had original subject matter jurisdiction over the action on appeal pursuant to 28 U.S.C. §§ 1331 and 1338(a). A108. On July 10, 2015, the district court entered final judgment. A1-A11. On July 16, 2015, IPLearn-Focus, LLC ("IPLF"), timely noticed its appeal. A2018-A2019. This Court has jurisdiction pursuant to 28 U.S.C. § 1295 (a)(1).

## STATEMENT OF THE ISSUE ON APPEAL

Whether the claims of U.S. Patents Nos. 8,475,174, 8,538,320, and 8,538,321 are patentable under 35 U.S.C. § 101.

## STATEMENT OF THE CASE

This dispute revolves around infringement of IPLF's patents by the combination of specialized sensors and associated programming in Microsoft Corp.'s ("Microsoft") Xbox Kinect video game systems and related Kinect games and services. IPLF's asserted claims [1] are directed to hardware systems for providing new and more natural human-computer interfaces using particular

---

[1] Microsoft's Motion challenged the following asserted claims: 174 Patent Claims 2, 18, 22, 39, 41, 48, and 56; 320 Patent Claims 1, 20, 21, 24, 30, 35, 41, 44, 48, 50, 63, and 73; and 321 Patent Claims 1, 4, 5, 12, 13, 26, 27, 28, 34, 37, and 39 (collectively, the "asserted claims"). A1202. Microsoft's motion additionally challenged 321 Patent Claim 52 which was not asserted. A1167-A1168.

2

combinations of hardware and software elements—namely, arrangements of particular types and numbers of sensors to sense and respond to particular types and numbers of user behaviors. A27-A29, A44-A46, and A61-A65.

### A.    Procedural History

On January 10, 2014 IPLF sued Microsoft for infringement of U.S. Patents Nos. 8,475,174 ("174 Patent"), 8,538,320 ("320 Patent"), and 8,538,321 ("321 Patent") (collectively, "the Asserted Patents") based on Microsoft's Xbox Kinect video game systems and related Kinect games and services. A106-A110 (Complaint). Following claim construction briefing, a *Markman* hearing, and substantial fact discovery, Microsoft moved on February 4, 2015 for summary judgment of invalidity arguing that the 30 asserted claims were drawn to unpatentable subject matter. A1167-A1197 (Motion Briefing); A70-A93 (District Court Docket). Microsoft argued IPLF's claims were directed to the abstract idea of "the age-old Socratic method" or other "age-old methods of teaching," required only "purely generic" hardware, "monopolize[d] all possible ways of implementing ancient teaching techniques," could be performed mentally without any computer at all, and did not improve the functionality of computers. A1167-A1187. However, Microsoft's Motion did not include any expert testimony, declaration, or other such analysis of the conventionality of the challenged claims or their limitations. *Id*. On February 18, 2015, IPLF filed its opposition. A1198-

3

A1222. Following Microsoft's February 25, 2015 reply, oral argument was heard on April 15, 2015. A1777, A1778-A1806.

After the completion of fact and expert discovery, briefing of additional summary judgment and *Daubert* motions, and pre-trial submissions for the scheduled August 2015 jury trial, on July 10, 2015 the district court granted Microsoft's motion and entered final judgment in the case. A1-A11, A12 (Order; Judgment). The district court declined to "focus on the minutiae" of the actual text of the asserted claims and instead relied heavily on the specification. A7. Where the district court did consider the claims, it considered only a single claim without a finding of representativeness and did so only using a piecemeal analysis that "put aside" and disregarded many of the claim limitations. A7-9. On July 16, 2015, IPLF timely noticed its appeal. A2018-A2019.

## B.     The Technology Of IPLF's Asserted Patents

IPLF's Asserted Patents claim novel computing systems comprising particular combinations of different types of sensors (*e.g.* optical sensors, non-optical sensors, and imaging sensors) and software programming that allow users to interact with computing systems via more natural user interfaces based on user behaviors (*e.g.* orientation of the head, eye gaze, hand gestures, and voice commands) rather than just the traditional mouse and keyboard (or handheld video game controller) interfaces common in 1996. A13-A65 (Asserted Patents). All

three patents share a similar specification and claim priority to an August 13, 1996 application. A13, A30, and A47. Although the specification describes the problem to be solved by the claimed inventions as improving computer-aided education by developing a system that could better sense and respond to students (*see, e.g.*, A21), nothing in the language of the claims or the specification limits the use of the claimed rich, new sensor apparatuses to the educational context or seeks to claim all of computerized education. *See, e.g.*, A27-A28.

The asserted claims vary primarily by claiming different numbers and types of sensors as well as different numbers and types of sensed user behaviors. A13-A65. For example, 320 Patent, Claim 35 requires a combination of an optical sensor (*e.g.* a camera) that senses the user's head (for example, nodding yes or turning the head to look in a particular direction) and a non-optical sensor (*e.g.* a microphone) that senses something else. A28. The system uses the combination of the measurements from both sensors to decide what to show the user on the display:

35. A computing system comprising:

a display;

an optical sensor to sense a first feature of a user regarding a first volitional behavior of the user to produce a first set of measurements, the optical sensor being detached from the first feature to sense the first feature, the first feature being from the head of the user, and the first set of measurements including an image of the first feature;

a non-optical sensor to sense the user to produce a second set of measurements; and

a processor coupled to the optical sensor, the non-optical sensor, and the display, the processor to:

> analyze at least the first set and the second set of measurements; and

> determine whether to change what is to be presented by the display in view of the analysis.

A28. Dependent Claims 40 and 41 add additional specificity to the system, requiring that the optical sensor be further able to sense multiple facial features of the user (Claim 40) including both a facial orientation and at least one eye of the user (Claim 41). A28. This particular combination of hardware and software elements can be useful to deliver new human-computer interfaces—for example, a user interface based on the use of a camera (an optical sensor) that senses both facial orientation (where the user is looking) as well as a microphone (a non-optical sensor) that senses voice commands from the user.

Claim 1 of the 320 Patent, in contrast, requires just one imaging sensor but requires that in addition to the imaging sensor being able to sense the head of the user, the system (whether using the imaging sensor or another sensor) must also be able to sense another part of the user not related to the head (for example, a hand gesture). A27. Again, the system uses both sets of sensed measurements to decide what to present to the user. Like Claims 35, 40, and 41, Claim 1's system allows for new more natural human-computer interfaces than were possible using prior art computing systems that relied only on a mouse and keyboard—including, for

6

example a user interface based on the combination of facial orientation and hand gestures.

Like the claims of the 320 Patent, the claims of the 321 Patent and 174 Patent also claim systems with a variety of different types of sensors each sensing different things about the user. For example:

- 321 Patent Claim 12 requires an imaging sensor to sense the user's head (including how quickly the user is viewing content on the display) while also requiring the system to be able to sense another feature of the user;

- 321 Patent Claim 34 requires an imaging sensor to sense the user's head to determine whether the user is not paying attention to the content on the display; and

- 174 Patent Claim 37 requires a camera, a display with multiple windows of content, and the ability to sense a user during different sessions using the system and to compare the information from two different sessions.

A27-A29, A44-A46, and A61-A65.

During claim construction, both parties (and both parties' expert declarants) agreed that the relevant field for the Asserted Patents was not education, but was the technical field of human-computer interfaces. A270 (Claim Construction Declaration of Microsoft's Expert Dr. David Forsyth ("Forsyth Decl.")) ("The technology in the Asserted Patents generally relates to computer vision and human-computer interfaces."); A211 (Opening Claim Construction Declaration of IPLF's Expert Mr. David Crane ("Crane Op. Decl.")). As Microsoft's expert declarant Dr.

Forsyth explained, systems in the field of human-computer interfaces (including those claimed by the Asserted Patents) could be useful in a variety of contexts including, but not limited to, computerized education:

> Specifically, the Asserted Patents describe a computer system that displays material to a user, and is equipped with sensors that observe a user's behavior. The system changes what material is presented and how it is to be presented based on the sensor observations. The Asserted Patents describe embodiments where such systems are used in an educational context, but the claims are not limited to education.

A270 (Forsyth Decl.).

The parties and experts similarly agreed that the level of ordinary skill for a person of skill in this field would not require an educational background but instead would include an engineering degree as well as additional graduate training or relevant experience in the technical field of human-computer interface design:

> Based upon my experience in this area, a person of ordinary skill in the art ("POSITA") in this field at the relevant time frame would have had a combination of experience and education in computer vision and the design of human-computer interfaces. This typically would consist of a minimum of a bachelor of science in Computer Science or Electrical Engineering (or a related engineering field) plus either a year of graduate training or 2-4 years of relevant experience. The POSITA also would have been familiar with the design of, theory behind, principles of operation of, intended use of, and the underlying technology used in computer vision and human-computer interfaces.

A270 (Forsyth Decl.); *see also* A211 (Crane Op. Decl.).

During claim construction, neither party proposed construing the claims to be limited to electronic education or teaching. A164:8-20 (Joint Claim

8

Construction Prehearing Statement); A168-A179 (Joint Chart of Disputed Terms). Rather, the parties largely agreed that the claim terms should be construed according to their plain and ordinary meaning with the exception of two disputed terms—(1) the meaning (and definiteness) of the term "volitional" and (2) whether certain claim limitations referencing a "processor to . . ." or "controller to . . ." should be construed to be means plus function terms. *Id*. The district court has not yet ruled on either dispute—finding that neither claim construction dispute affected the Section 101 analysis. A5.

The prior art references asserted by Microsoft in this case were similarly not educational references, but were concrete, technical computing systems for delivering new human-computer interfaces that differed from the mouse and keyboard norm. All seven of the asserted references relied on by Microsoft (Suenaga, Pryor, Krueger, Garwin, Hutchinson, Black, and Starker) were technical academic papers or patents describing computing systems combining hardware and software elements to deliver new forms of human-computer interaction (*e.g.*, eye gaze tracking using an infrared sensor).*See* A2004:1-5 (Joint Pretrial Statement). Microsoft did not rely on any asserted prior art references regarding teaching, business methods, business challenges, or any fundamental economic or longstanding commercial practice. *See id*.

**C.    The Accused Products: Xbox Kinect Video Game Computing Systems And Related Games And Services.**

The Microsoft products accused of infringement in this case are all related to Microsoft's Xbox video game console, games, and services—specifically the use of Microsoft's Xbox 360 video game console and Xbox One video game console with their respective Kinect sensor accessories that allow users to play video games and interact with their Xbox using gesture and voice commands. A2003.

Neither these accused products nor IPLF's infringement theories were directed at algorithms, business methods, business challenges, or any fundamental economic or longstanding commercial practice. Rather, IPLF's infringement allegations, like the asserted claims themselves, revolved around the Xbox Kinect system's use of the specific combinations of sensor hardware, other computer hardware elements, and computer software elements claimed by the Asserted Patents to deliver the improved, more natural human-computer interface contemplated by the inventors and claimed by the Asserted Patents.

Microsoft's own demonstration videos and other promotional materials for Kinect demonstrate how Microsoft's video game system makes use of the rich, new sensor apparatuses and natural human-computer interfaces claimed years earlier by the IPLF Asserted Patents. For example, the Xbox One Kinect sensor includes both infrared and full color optical imaging sensors for sensing users:







A1464-A1466 (excerpts from IPLF's infringement contentions showing stills from a Microsoft demonstration video titled "Behind the eyes of Xbox One Kinect" available at https://www.youtube.com/watch?v=JaOlUa57BWs#). The Kinect also includes non-optical sensors such as a microphone array for sensing voice commands:

 **Real Voice**

Real Voice technology focuses on the sounds that matter, thanks to an all-new multi-microphone array. Advanced noise isolation lets Kinect know who to listen to, even in a crowded room. And, for the first time, you can use your voice to launch any Xbox One experience from anywhere in the system, so you can quickly move from one thing to another.

A1619. The Xbox One processor is able to run specialized programming to analyze measurements from the Kinect sensor to detect and respond to a variety of user behaviors and features such as the position and orientation of the user's body and face, the user's gestures, and other detailed information about the user's face and expression:







A1462-A1463, A1593 (stills from a "Wired" Magazine video interview and demonstration with Microsoft's engineers available athttps://www.youtube.com/watch?v=Hi5kMNfgDS4). This combination of

13

sensors and programming allows users to interact with their Xbox and games using a more natural gesture-based interface—as Microsoft has explained in its commercials, Kinect "literally copies everything you do, as you do it.":





A1471-A1472 (excerpts from Microsoft's website) and A1486-A1487 (still image and quotation from Microsoft's "Kinect for Xbox 360: Kinect is About YOU" commercial available at https://www.youtube.com/watch?v=xAvlGAlko-0).

**D.    The District Court's Decision**

Rather than judging patentability based on the language of IPLF's claims, as the law requires, the district court relied on excerpts from the specification and characterized IPLF's position that the language of the claims governs the Section 101 inquiry as "focus[ing] on the *minutiae* of the physical components, like displays, processors, and sensors, recited by the claims" and as "not the right approach." A7.

Relying on one of its 14 citations to excerpts from the specification,[2] the district court found that IPLF's claims (which never mention learning) "claim the invention of 'learning via a computing device, and more particularly to learning method and system using detached sensor.'" A2. The district court additionally engaged in an improper piecemeal analysis of IPLF's claimed invention in which the court "[p]ut aside the parts [of the claims] reciting standard technology" rather than considering the claims as a whole (A7) and found addressing each of the 30 asserted claims to be "unnecessary" even where representativeness was disputed and neither Microsoft nor the district court demonstrated representativeness (A9).

---

[2] This contrasts with only three passing citations made by the district court to the challenged claims—all to Claim 1 from the 320 Patent and none in support of the district court's findings regarding the scope of the claims. A3 (reciting the language of Claim 1 without analysis), A7 (citing Claim 1 while characterizing IPLF's arguments), and A7-A8 (citing Claim 1 while purporting to rebut IPLF's arguments by "putting aside" parts of the claim to perform a piecemeal analysis).

15

## SUMMARY OF THE ARGUMENT

IPLF's asserted claims are patentable under both *Alice* steps. Under step 1, the claims are not abstract because they do not pre-empt any basic scientific tool and are not directed to the abstract idea of teaching. They are not conventional under step 2 because they claim particular combinations of specific sensor types and specific sensed activities. The district court's decision erred in finding abstractness by finding the claims to cover the ancient idea of teaching, ignoring the limitations of the claims and both parties' positions on claim construction. The district court erred in its step 2 analysis by not considering the claims as a whole, and by ignoring the limitations of the claims that it found to be generic, without any evidence to support that conclusion.

## ARGUMENT

### A.    Standard Of Review

The grant of summary judgment is reviewed de novo. *Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, 788 F.3d 1371, 1375 (Fed. Cir. 2015) (citing *Leever v. Carson City*, 360 F.3d 1014, 1017 (9th Cir. 2004)). The legal question of whether a claim is valid under Section 101 is also reviewed de novo. *Id*. This Court has also acknowledged that the Section 101 inquiry may turn on underlying factual issues. *Accenture Global Servs. v. Guidewire Software, Inc.*, 728 F.3d 1336, 1340-1341 (Fed. Cir. 2013). As addressed further below, although not yet decided in the

context of Section 101, the party challenging the validity of a patent typically bears the burden of proving factual issues underlying its claim of invalidity by clear and convincing evidence. *See Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2242 (2011).

**B.    IPLF's Patents Are Not Directed To An Abstract Idea Under *Alice* Step 1.**

In the first step of the *Alice* inquiry, a court must "determine whether the claims at issue are directed to one of those patent-ineligible concepts." *Alice Corp. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2355 (2014). If and only if a court finds that the claims are directed to an ineligible abstract idea rather than a patent-eligible application of an idea, then the court proceeds to *Alice* step 2 and considers "the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Id.* (quoting *Mayo Collaborative Services v. Prometheus Laboratories, Inc.*, 132 S. Ct. 1289 (2012)). Both steps of the analysis should begin and end with the actual words of the challenged claims. *See Alice*, 134 S. Ct. at 2355 n. 3 ("Because the approach we made explicit in *Mayo* ***considers all claim elements***, ***both individually and in combination***, it is consistent with the general rule that patent claims 'must be considered as a

whole.'") (quoting *Diamond v. Diehr*, 450 U.S. 175 (1981));[3] *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) ("It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude.") (quotations omitted).

*Alice* and *Bilski* illustrate that the step 1 inquiry amounts to a determination of whether the scope of the challenged claims is coextensive with the scope of the purported underlying abstract idea. In *Bilski*, the claims themselves described the underlying idea—"the basic concept of hedging, or protecting against risk"—and were thus coextensive with that "fundamental economic practice." *Bilski v. Kappos*, 561 U.S. 593, 611 (2010); *Alice*, 134 S. Ct. at 2357 ("the claims at issue [in *Bilski*] ***were abstract ideas*** . . ."). Similarly, the Court in *Alice* found that "[o]n their face" the challenged claims were coextensive with the abstract idea of intermediated settlement. *Alice*, 134 S. Ct. at 2356-57.

IPLF's asserted claims, in contrast, are not coextensive with the abstract idea of teaching.[4,5] As explained below, IPLF's claims are both more specific and more

---

[3] Throughout this brief, emphasis has been supplied unless otherwise noted.

[4] Although the district court's decision states that "[IPLF] does not meaningfully dispute that the challenged claims in its patents are directed to the abstract idea of teaching," (A7) that statement is directly contrary to the record. IPLF plainly disputed in its opposition in district court, as in this brief, that the asserted claims are not directed to teaching or any other abstract idea. A1203-A1212.

[5] Like Microsoft's Motion, the district court's order variously describes the purported abstract idea as "teaching," "conventional teaching that not only happens

powerful than that. Though the claims may have been inspired by a problem in the field of teaching, they claim specific technological solutions with diverse application in a variety of fields. This distinction is highlighted by the fact that the district court was only able to find IPLF's claims abstract by improperly disregarding the claim language and instead defining the claimed invention to be the problem the invention sought to solve. *See* A2. An analysis of the actual language of IPLF's asserted claims reveals that they do not claim or pre-empt all forms of computer-assisted teaching and thus do not "risk disproportionately tying up the use of the underlying ideas" (*Alice*, 134 S. Ct. at 2354-55) and are not coextensive with or directed to an abstract idea.

### 1.    IPLF's Claimed Inventions Are Not Coextensive With the Abstract Idea Of Teaching.

In its *Alice* step 1 inquiry, the district court relied almost exclusively on excerpts from the specification to find that the Asserted Patents "claim the invention of 'learning via a computing device, and more particularly to learning method and system using detached sensor.'" A2 (quoting 320 Patent at 1:20-22). Contrary to the specification excerpts relied on by the district court, the text of the

---

in schools across the country every day, but has probably existed as long as there has been formal education"; "the concept of monitored interaction with a participant or audience," and "observing students, analyzing their behavior and reacting accordingly." *See* A1-A11. As explained in this brief, the actual language of the claims reveals that the Asserted Patents are directed to concrete new systems for delivering new human-computer interfaces and are not directed to any of these purported abstract ideas.

challenged IPLF claims reveals that the Asserted Patents are directed to concrete systems—namely new computing systems requiring particular combinations of hardware and software elements that deliver new and improved human-computer interfaces.

Like most patents, the specification and claims of IPLF's Asserted Patents serve different and distinct purposes. The specification lays out a problem to be solved and describes the path to solutions while each claim distinctly sets out an independent technological invention. *See* 35 U.S.C. § 112. The specification will often include a description of an abstract idea or problem to be solved that motivated the invention. In this case, the specification explains that "there is still a need for a [computer-aided education] system and method that could sense a student in a better manner." A21. IPLF's asserted claims, however, do not purport to claim that underlying problem itself—rather, they claim independent technological solutions to that problem.

As already addressed in the Statement of the Case above, each of the asserted claims of IPLF's Asserted Patents is directed at its own specific combination of hardware elements (such as sensors, displays, and processors) and software or hardware elements (such as programming to configure the sensors and processors to be able to sense, analyze, and determine whether to change the display based on the particular claimed combination of user behaviors, features,

attention, actions, speed, etc.). *See* **Statement of the Case Section B**. Though the specification provides examples of how to use certain embodiments of the claims in the context of computer-aided education, that does not mean that the claims are either limited to or coextensive with all of computer-aided education. *See Phillips*, 415 F.3d 1303, 1323 ("One of the best ways to teach a person of ordinary skill in the art how to make and use the invention is to provide an example of how to practice the invention in a particular case.").

Rather than being limited to teaching, IPLF's claimed combinations comprise rich, new sensor apparatuses that can certainly "sense a student in a better manner," but that also solve problems in a wide variety of fields where a user desires a more natural way to interact with a computer. As Microsoft's own use of IPLF's claimed inventions demonstrates, IPLF's improved sensor apparatuses and human-computer interfaces can be used to create new video game playing experiences that involve gesture commands, voice commands, and even games that "literally cop[y] everything you do, as you do it." A1471-A1472; A1486-A1487; *see* **Statement Of The Case Section C**. These more natural interfaces, made possible by IPLF's new sensor apparatuses, can be useful in a wide variety of computer-related tasks from video games and web browsing to 3D modeling and computer-aided design.

The concrete idea captured by IPLF's asserted claims—interconnecting particular novel combinations of sensor hardware and sensing software capabilities to deliver new and improved human-computer interfaces—stands in stark contrast to the abstract ideas underlying the claims found invalid in *Alice* and *Bilski*. *Alice*, 134 S. Ct. at 2355 ("A principle, in the abstract, is a fundamental truth; an original cause; a motive; these cannot be patented . . ."). In both *Alice* and *Bilski*, the Supreme Court found that the claims amounted to no more than an attempt to take known, pre-Internet ideas (intermediated settlement in *Alice* and hedging against the financial risk of price fluctuations in *Bilski*) and to apply them using generic computers known at the time. *Alice*, 134 S. Ct. at 2355-57. The *Alice* and *Bilski* claims neither added to, nor allowed other ways of practicing, these underlying pre-Internet ideas. *See id*. Rather than providing concrete new technological solutions to the problems of "hedging on the Internet" or "intermediated settlement on the Internet," as IPLF's claims do for the problem of improving computer-aided education, the patents at issue in *Alice* and *Bilski* simply claimed the underlying ideas themselves.

> **2.    The District Court Erred By Conflating The Scope Of The Claims With The Problem To Be Solved In The Specification.**

The district court "put aside" claim language numerous times in reaching its decision, relying almost entirely on portions of the specification to find that the

IPLF claims monopolize "teaching." A7-A8.  The district court's failure to credit the actual claim language produced a string of critical errors.

First, the district court dodged performing a Section 101 analysis of the claims by finding that the problem to be solved in the specification was the claimed abstract idea.

The district court found all of the claims were invalid for covering the purpose of "teaching" described in the specification "without actually mentioning that specific application." *Id.* Reliance on the specification rather than claims to decide the Section 101 question was improper.  As this Court has explained, "Specifications teach. Claims claim."  *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1121 n. 14 (Fed. Cir. 1985) (*en banc*).  Patents are often directed to solving abstract, conceptual problems described in the teaching portions of the specification. But the claims set forth the inventions that address these problems, and the patentee's property right is defined by the claim language.  The Supreme Court's Section 101 case law follows this principle, focusing its analysis on the text of the challenged claims, not the specification. *See, e.g.*, *Alice* 134 S. Ct. at 2356 ("Specifically, [in *Bilski*] **the claims described** the basic concept of hedging or protecting against risk." and "On their face, **the claims before us** are drawn to the concept of intermediated settlement . . .") (internal quotations and citations omitted).

23

The district court's reliance on *IPLearn, LLC v K12 Inc.*, No. CV 11-1026-RGA, 2014 WL 7206380 (D. Del. Dec. 17, 2014) highlights the error of treating all claims addressed at a single problem as covering identical subject matter. The District of Delaware decision addressed a different IPLearn patent and found the claims were ineligible for being directed to the abstract idea of teaching. A8. The district court here piggybacked on the District of Delaware's conclusion and found, without analysis, that IPLF's asserted claims are similarly "addressed to fundamental human behavior related to instruction, which is apparent when the steps are summarized without their generic references to [hardware]" and that this is an abstract idea that "probably existed as long as there has been formal education." A8 (quoting *K12*, 2014 WL 7206380 at *6).

However, a comparison of the claims at issue in the *IPLearn v. K12* case with IPLF's asserted claims shows stark differences. Both sets of claims may address, at least in part, the problem of "teaching," but the IPLF asserted claims recite numerous limitations that make them technological, not abstract, and not focused solely on the field of teaching:

| 888 Patent Claim 9 (IPLearn v. K12) | 320 Patent Claims 35, 40, and 41 (IPLF) |
|---|---|
| 9.A computer-implemented learning method regarding learning a subject, which is separated into a plurality of areas, the method comprising: accessing a learner's results on a test; analyzing the learner's test results, | 35. A computing system comprising: a display; an optical sensor to sense a first feature of a user regarding a first volitional |

24

using one or more rules, to determine
at least one weakness in the learner's
understanding on the subject; and
providing guidance to the learner to
target the at least one weakness;
wherein
the analysis is performed by a first
computing device;
a report, based on the analysis and a
report format, regarding the
learner's understanding in at least
two areas of the subject, is allowed
to be presented by a second
computing device, which is
coupled, through a network, to the
first computing device;
the method considers at least a
preference of the learner, other than
the fact that the learner might prefer
to learn the subject;
at least a plurality of areas of the
subject can be individually accessed
via the Internet;
an identifier, which can be entered by
the learner and which is associated
with the learner, is stored and can
be accessed by a computing device;
an identifier, which can be entered by
a person interested in the learner's
understanding in the subject and
which is associated with the person,
is stored and can be accessed by a
computing device;
at least some materials on the
learner's understanding in the
subject is stored in a storage area
that has materials regarding the
learner;
the method allows the person to
search for at least some of the

behavior of the user to produce a first
set of measurements, the optical sensor
being detached from the first feature to
sense the first feature, the first feature
being from the head of the user, and
the first set of measurements including
an image of the first feature;

a non-optical sensor to sense the user to
produce a second set of measurements;
and

a processor coupled to the optical
sensor, the non-optical sensor, and the
display, the processor to:

analyze at least the first set and the
second set of measurements; and

determine whether to change what is
to be presented by the display in
view of the analysis.

40. A computing system as recited in
claim 35, wherein the optical sensor
capable of sensing multiple facial
features of the user.

41. A computing system as recited in
claim 40, wherein the multiple facial
features include a facial orientation and
at least one eye of the user.

| materials in the storage area; and the method allows the learner to search the storage area for at least some of the materials related to the learner, regarding the subject. | |
|---|---|

*IPLearn, LLC v. K12 Inc.*, 2014 WL 7206380, *2 (D. Del. Dec. 17, 2014); A28.[6]

It is plainly error to conclude that these disparate claims somehow both monopolize the concept of "teaching" using computers.

Notably, the district court's attempt to paint all of the claims (in multiple patents) with the same "teaching" brush was done without attempting to perform a proper claim construction.    The district court cited this Court's instruction in *Phillips* that claims "must be read in view of the specification, of which they are a part" (A7 (citing 415 F.3d at 1315)).    But the district court stopped there, failing to identify claim terms that must be defined so as to make the claims coextensive with specific concepts in the specification. Thus, the district court ignored the maxim that "a claim construction analysis must begin and remain centered on the

---

[6] Additionally, the 888 Patent at issue in *IPLearn, LLC v. K12, Inc.* does not share any common parent applications or other patent family relationship with the IPLF patents asserted in this case. *Compare*, A1228-A1240 (the patent asserted in *IPLearn v. K12*, U.S. Patent No. 6,688,888 ("888 Patent")) at A1228 Related U.S. Application Data *with* (A13, A30, and A47 at Related U.S. Application Data). IPLearn, LLC is also separate entity from IPLF. Nor was IPLF a party in the *IPLearn v. K12* case. Although the 888 Patent shares the same two inventors as the IPLF Asserted Patents, it is not uncommon for two different patents, with different specifications, from entirely separate patent family trees, to be directed at very different inventions and ideas.

26

claim language itself, for that is the language the patentee has chosen to particularly point[] out and distinctly claim[] the subject matter which the patentee regards as his invention." *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004) (internal quotation marks and citation omitted); *see also Kara Tech. INc. v. Stamps.com Inc.*, 582 F.3d 1341, 1348 (Fed. Cir. 2009) ("The patentee is entitled to the full scope of his claims, and we will not limit him to his preferred embodiment or import a limitation from the specification into the claims.") (citation omitted).

The district court's reliance on Figure 3 illustrates how its conclusion that the Asserted Patents (at least through the specification) monopolize "teaching" is unsupported by the patent text. Both the district court and Microsoft's motion focused heavily on Figure 3 of the Asserted Patents (below) described as showing "a set of steps to implement ***one embodiment*** of the present invention":



Figure 3

A18. The embodiments actually claimed by the asserted claims (and challenged by Microsoft's motion) (*e.g.* A28 (320 Patent Claims 35, 40, and 41)) have much more in common with the embodiment in Figure 2B (described as showing "one embodiment of a system implementing the present invention"):



Figure 2B

*Compare* A8 and A18 (relying on Figure 3 depicting high-level education method steps) *with* A28 (Claims 35, 40, and 41), A22 (320 Patent at 3:59-67), and A17 (Fig. 2B) (depicting an example computing system with a specific combination of hardware and software components including optical sensor ("DCam 180" a digital camera), non-optical sensor (Keyboard 176 or Mouse 182), and processor 160 and hard disk drive storage 172 for providing the software elements to enable the analyzing and determining of the required combination of user behaviors and features). The limitations of the asserted claims, when actually considered as a whole, go well beyond the flow chart of Figure 3 (and the claims in *K12*), and, like Figure 2B, instead describe specific technological systems that are patent eligible.

29

Additionally, the claim construction evidence confirmed that the claims were not directed to abstract or non-technical concepts like "teaching," but were profoundly technological. Both parties and both parties' expert declarants agreed that the field of the Asserted Patents was the engineering field of human-computer interface design—not teaching—and that a person of ordinary skill would have extensive engineering training. A270 (Forsyth Decl. at ¶ 18); *see also* A211 (Crane Op. Decl. at ¶ 18). Neither party suggested that teaching was the relevant field or that one of ordinary skill would have a background in teaching. *Id*. Not only did the district court fail to support any finding that specific claim language must be construed as directed solely to "teaching," the record is decidedly opposed to such a conclusion.

Second, the district court's decision to put aside claim limitations and evaluate entire claims solely on a handful of limitations runs afoul of the Supreme Court's Section 101 jurisprudence. The district court only considered the claims after first "[p]ut[ting] the parts reciting standard technology ('display,' 'imaging sensor,' processor,' etc.)" aside and considered only those limitations the court deemed to be left—"'sens[ing]' two features of the user to generate measurements, 'analy[zing]' the measurements, and 'determin[ing]' whether to change what is to

be presented by the display in view of the analysis.'" A7-A8.[7] Microsoft's Motion similarly advocated for ignoring those claim elements that Microsoft deemed (without citation to any expert testimony or other support in the record) to be "described in generic and functional ways." A1179-A1180. This "piecemeal" analysis of only sub-portions of the challenged claims in place of a full analysis of the claims as a whole was improper and when IPLF's claims are considered as a whole, they do not claim an abstract idea. *Diehr*, 450 U.S. at 188-89 ("In determining the eligibility of respondents' claimed process . . . their claims must be considered as a whole. ***It is inappropriate to dissect the claims into old and new elements and then to ignore the presence of the old elements in the analysis***.")

The Supreme Court in *Alice* made clear that the two-step inquiry "considers all claim elements, both individually and in combination . . . consistent with the general rule that patent claims must be considered as a whole." 134 S. Ct. at 2355 n. 3 (quotation and citations omitted). In addition, on a fundamental level, the creation of new compositions and products based on combining elements from

---

[7] Notably, the district court did not provide any citation or support for the assertion that even these remaining limitations (e.g. "sensing two features of the user to generate measurements" and "analyzing" and "determining" based on ***both*** sets of measurements) were not a novel and concrete technological improvement over prior art systems. *See* A7-A8. As discussed below in the discussion of *Alice* step 2, the PTAB found precisely the claimed combination of analyzing and determining based on both a first set of imaging/optical measurements of a user's behavior related to the user's head and a second set of measurements of a user behavior not related to the user's head to be novel in view of the prior art. *See* **Argument Section D.3.**

different sources has long been a basis for patentable inventions. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418-19, 127 S. Ct. 1727, 167 L. Ed. 2d 705 (2007) ("[I]nventions in most, if not all, instances rely upon building blocks long since uncovered, and claimed discoveries almost of necessity will be combinations of what, in some sense, is already known."); *Parks v. Booth*, 102 U.S. 96, 102, 26 L. Ed. 54, 1880 Dec. Comm'r Pat. 439 (1880) ("Modern inventions very often consist merely of a new combination of old elements or devices, where nothing is or can be claimed except the new combination.").

Finally, the district court "put aside" so many claim limitations that it was able to treat one claim as "representative" of all others without any reasoning or evidentiary support. A7-A9. The district court relied on *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, 776 F.3d 1343, 1348 (Fed. Cir. 2014) to justify its conclusion that a representativeness analysis was "unnecessary." A9. However, in *Content Extraction*, the patent owner did not dispute representativeness and the district court conducted its own representativeness analysis. 776 F.3d 1343 at 1346, 1348. Neither the district court nor Microsoft's Motion performed such a representativeness analysis here, and IPLF did challenge Microsoft's unilateral selection of an "exemplary" claim in its opposition below. A1218-A1220. As addressed in the Statement of the Case, IPLF's 30 asserted claims cover a variety of different combinations of sensors and behaviors and

Microsoft bears the burden of establishing that each of those claims (as a whole) fails the two step *Alice* patentability test.

It was thus improper for the district court to "put aside" or dismiss as "generic" the very combinations of hardware and software elements that make up IPLF's claimed inventions. When the limitations of the IPLF asserted claims are properly considered as actually ordered and combined, they are not directed to an abstract idea under step 1.

> **3.    This Court Should Clarify The Standard For Determining Abstraction Under Step 1 By Requiring A Finding Of Pre-emption Of A Basic Tool Of Scientific Or Technological Work.**
>
>> **a.    A Clearer Standard Is Required To Prevent All Patents From Being Found Abstract.**

In the same opinion that the Supreme Court opted not "to delimit the precise contours of the 'abstract ideas' category," *Alice*, 134 S. Ct. at 2357, the Court also cautioned that courts should "tread carefully in construing [the Section 101] exclusionary principle lest it swallow all of patent law" because "[a]t some level 'all inventions . . . embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas.'" *Alice*, 134 S. Ct. at 2354 (quoting *Mayo*, 132 S. Ct. at 1289). This language is an acknowledgement by the Court that "[i]f one looks at almost any patent from far enough away, it could arguably claim an abstract idea." *Messaging Gateway Solutions, LLC v. Amdocs, Inc.*, No. 14-732-

RGA, 2015 U.S. Dist. LEXIS 49408 (D. Del. Apr. 15, 2015).[8] Considered from a sufficient distance, Alexander Graham Bell's patent for the invention of the telephone could be recast as claiming the abstract idea of oral communication. *See id.*

The Supreme Court's decision not to "delimit the precise contours" of the step 1 inquiry, together with this concern that all patents can be arguably framed as claiming an abstract idea, has led to considerable uncertainty over how to apply *Alice* step 1. That uncertainty has been coupled with an explosion in the number of decisions considering Section 101. "As of the one-year anniversary of *Alice* on June 19, 2015, there had been 106 Federal Circuit and district court decisions on 101 grounds, with 76 decisions invalidating the patents at issue in whole or in part. Some 65% of challenged patents have been found invalid, and 76.2% of the challenged claims."   Michael Loney, *Data: One Year of Section 101 Decisions Since Alice*, June 22, 2015, available at http://www.managingip.com/Article/3464437/Data-One-year-of-Section-101-decisions-since-Alice.html.

The increase in Section 101 challenges together with uncertainty over the application of the step 1 inquiry has also led to inconsistent results. For example, one district court invalidated a patent to a specialized thermometer able to measure

---

[8] Although this decision was published after the close of briefing before the district court, IPLF submitted it as supplemental authority and the district court accepted it. A1807-26, A1827-28.

a patient's temperature from the surface of the forehead (something previously thought to be impossible), describing the claims as "fundamentally a discovery of a natural relationship between skin temperature and body temperature." *Exergen Corporation v. Thermomedics, Inc.*, 1-13-cv-11243 (MAD September 15, 2015).

As another example, in the United States District Court for the Southern District of Texas, two judges reached opposite results in two cases involving patents related to oil well drilling. In *TDE Petroleum Data Solutions, Inc. v. AKM Enterprise, Inc. DBA Moblize, Inc.*, 4-15-cv-01821 (TXSD September 11, 2015), the court found ineligible a patent related to computer-assisted analysis of the state of oil well drilling operations, but in *Canrig Drilling Technology Ltd. v. Trinidad Drilling Ltd.*, 4-15-cv-00656 (TXSD September 17, 2015) the court found eligible a patent related to computer-assisted rotation of directional oil drilling heads.

This Court should use the opportunity to pick up where the *Alice* Court left off and articulate a clearer standard to guide district courts in applying the *Alice* step 1 inquiry—namely, the pre-emption standard that has long motivated the Section 101 eligibility analysis.

### b.    This Court Should Reaffirm Pre-emption as a Test for Determining Step 1 Abstraction.

The role of pre-emption in the Section 101 analysis has been treated in a variety of ways by different district courts, panels of the Federal Circuit, and the Supreme Court. In some cases, pre-emption has been ignored completely. *See*

*Digitech Image Techs., LLC v. Elecs. for Imaging, Inc.*, 758 F.3d 1344 (Fed. Cir. 2014) (holding claims directed to storing color management information for printer and other digital imaging devices patent ineligible without analyzing or mentioning pre-emption). In others, pre-emption is treated as only a clue as to patent ineligibility. *See Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, 788 F.3d 1371, 1379 (Fed. Cir. 2015) ("While preemption may signal patent ineligible subject matter, the absence of complete preemption does not demonstrate patent eligibility."). At least one district court found admittedly non-pre-emptive claims to nevertheless be patent ineligible. In *McRO Inc. v. Activision Publishing Inc.*, 2014 U.S. Dist. LEXIS 135152 (C.D. Cal. Sept. 22, 2014), the defendants admitted that the patent claims did not cover the animation methods they used, and the court stated that "[i]t is hard to show that an abstract idea has been preempted if there are non-infringing ways to use it in the same field." *Id.* at * 23. Yet the court went on to find the claims ineligible. *Id.* at *38-39.

However, none of these approaches are consistent with the Supreme Court's repeated instruction that pre-emption drives the eligible subject matter analysis:

> We have described the concern that drives [the Section 101] exclusionary principle as one of pre-emption. Laws of nature, natural phenomena, and abstract ideas are the basic tools of scientific and technological work. Monopolization of those tools through the grant of a patent might tend to impede innovation more than it would tend to promote it, thereby thwarting the primary object of the patent laws.

*Alice* 134 S. Ct. at 2354 (quotations and citations omitted); *Ass'n for Molecular*

*Pathology v. Myriad Genetics, Inc*., 133 S. Ct. 2107, 2116 (U.S. 2013); *Mayo*, 132 S. Ct. at 1302; *Diamond v. Chakrabarty*, 447 U.S. 303, 309 (1980). The Section 101 framework introduced in *Mayo* reflects the importance of pre-emption to the analysis. Step 1 asks if a patent claims subject matter that, if monopolized, would "impede innovation more than . . . promote it." *Id*. *Alice* step 2—the search for an inventive concept—ensures that a patent does not claim the "building blocks" of human ingenuity, but rather only an application that "pose[s] no comparable risk of pre-emption, and therefore remain [patent] eligible." *See id*. at 2354-55.

If pre-emption is the rationale for excluding ineligible subject matter, a claim that does not pre-empt a law of nature, natural phenomena, or an abstract idea must be patent eligible—else there is no rationale for excluding it. Whether a claim on a "new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof" (35 U.S.C. § 101) is directed to a non-pre-emptive application of ineligible subject matter, or simply is not directed to ineligible subject matter, the lack of pre-emption establishes that there is no rationale to preclude its patentability.

Although the search for an "inventive concept" articulated in *Alice* step 2 is one way to assess whether a claim directed to ineligible subject matter pre-empts the use of that subject matter, or simply covers an application of that concept, it is not a substitute for the pre-emption inquiry. For example, a panel of this Court in

*Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, 788 F.3d 1371, 1379 (Fed. Cir. 2015), recognized that "the principle of preemption is the basis for the judicial exceptions to patentability," but then called pre-emption concerns "moot" where it had already "deemed [the claims] only to disclose patent ineligible subject matter under the *Mayo* framework."

Such an approach potentially allows courts to declare patents ineligible that in no way monopolize any of the "basic tools of scientific and technological work," begging the question of why such a patent should be ineligible if it does not trigger any of the pre-emption concerns that motivate the eligibility doctrine. *See Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, Case: 14-1139, Amicus Curiae Brief of Intellectual Property Owners Association, D.I. 183 (8/27/2015) at 8-10. To prevent this result, and to provide much needed guidance to the district courts, this Court should clarify that determining whether a patent is directed to an abstract idea under *Alice* step 1 requires a finding that the patent pre-empts a basic tool of scientific or technological work.

### c. IPLF's Asserted Patents Do Not Pre-empt Any Basic Tool Of Scientific Or Technological Work.

That a claimed concrete computing system can be used for delivering computerized educational lessons, playing video games, or browsing the internet does not transform the claim to the concrete system into a claim that pre-empts the idea of computerized education, playing video games, or browsing the internet.

Whether the purported abstract idea is articulated to be "age-old teaching methods" or the process of "observing, analyzing, and reacting" to a user, IPLF's challenged claims do not pre-empt either of these fields or any other basic tool of scientific or technological work.

As discussed in the Summary of the Case section above, the IPLF claims are directed to computing systems that combine particular hardware and software elements to provide the ability to sense, analyze, and respond to very particular combinations of user behaviors, features, actions, attentiveness, etc. *See* **Statement of the Case Section B**. As acknowledged in briefing and argument before the district court (and in the specifications), computing systems that relied only on a mouse and keyboard (or only on any set of attached sensors) would not be pre-empted by IPLF's Asserted Patents (whether used for teaching methods; observing, analyzing, and reacting to a user; or any other purpose). A1209:21-A1212:6 (IPLF's Opposition); A1781:8-A1782:4, A1788:2-A1790:19 (Hearing Transcript).

Although the district court found that this "disclaimer of preemption smacks of false modesty" because "[a]t a time when computers and interactive technology are moving rapidly away from the use of wires, cables and other hard connections, [IPLF's] quitclaim for systems physically attached to a subject is hardly generous" (A11), this imports improper hindsight bias. It is undisputed that the priority date for the Asserted Patents is August of 1996—nearly 20 years ago—when physically

connected input devices (that is, mice, keyboards, and hand-held gamepad controllers that all had to be physically in contact with the user to sense the user) were widespread. Neither Microsoft nor the district court identified any support for the notion that moving to combinations of detached sensors as claimed by IPLF's Asserted Patents would have been obvious in 1996.[9]

Nor do IPLF's Asserted Patents pre-empt all computing systems that make use of detached sensors. To the contrary, IPLF's asserted claims require particular combinations of functionality in addition to the use of particular sensor types. As addressed below in **Section D.3.**, the PTAB found that none of the prior art references asserted by Microsoft in its 320 Patent IPR petition disclosed the particular sensing requirements of the asserted claims of the 320 Patent (including a system for tracking certain head movements (one Suenaga embodiment), a system for tracking both certain hand gestures and certain voice commands (a second Suenaga embodiment), and a silhouette-based gesture detection system (Krueger)). A1746-A1761 (denial of institution); A1865-A1870 (denial of request for rehearing). Thus any of these prior art systems (in addition to the other prior art

---

[9] Notably, the motion controller interface of the Nintendo Wii (discussed at oral argument regarding Microsoft's Motion, A1788:2-A1790:19) was praised as revolutionary when it was released in November of 2006—more than 10 years after the Asserted Patents. Its motion controllers still had to be held by the user and so, as explained at oral argument, it represents an example of a computing system with a non-mouse and keyboard interface that would not be pre-empted by IPLF's Asserted Patents. A1788:2-A1790:19.

systems asserted by Microsoft in the litigation, each of which is distinguishable from IPLF's Asserted Patents as explained by Mr. Crane in his May 12, 2015 responsive expert report regarding validity) exemplify the wide variety of computing systems that are not pre-empted by the IPLF Asserted Patents.[10]

Because IPLF's asserted claims allow for numerous other systems for providing computer-aided education, and similarly do not pre-empt any of Microsoft's or the district court's other articulations of the purported abstract idea, this Court should find that IPLF's claims are not directed to an abstract idea under *Alice* step 1.

---

[10] The PTO has also recently allowed similarly structured claims (that is, claims to computing systems comprising particular novel combinations of hardware and software elements for delivering improved human-computer interfaces) in related IPLF patent applications under the PTO's post-*Alice* guidelines on patent subject matter eligibility. This further confirms that IPLF's Asserted Patents, properly considered as a whole, are directed to patent-eligible subject matter. *See* A1207-A1208; A1241-A1282 (PTO's Notice of Allowance of Related IPLF U.S. Appl. No. 14/017,599 (now issued as U.S. Patent No. 9,123,255) on January 23, 2015); and A1283-A1299 (the PTO's Interim Guidance on Patent Subject Matter Eligibility).

**C.    Even If The IPLF Claims Involve An Abstract Idea, They Are Still Patentable Under *Alice* Step 2 Because The Claim Limitations As Actually Ordered And Combined Were Not Conventional In 1996.**

**1.    Microsoft's Burden Of Proof Is Clear And Convincing Evidence As To Factual Issues Underlying Conventionality.**

**a.    Evaluating Conventionality Under Alice Step 2 Implicates Underlying Factual Issues.**

While the ultimate question of whether a claim is valid under Section 101 is a legal one, that inquiry may turn on underlying factual issues. The Court in *Accenture* acknowledged that "[t]his legal conclusion [Section 101 validity] may contain underlying factual issues." *Id.* at 1341 (citing *Ultramercial, Inc. v. Hulu, LLC*, 722 F. 3d 1335, 1339 (Fed. Cir. 2013) (certiorari granted, vacated, and remanded sub nom. *WildTangent, Inc. v. Ultramercial LLC*, 134 S. Ct. 2870 (June 30, 2014))). *Accenture* addressed the subsequently vacated opinion in *Ultramercial*, so the viability of its explanation of underlying factual issues vis-à-vis Section 101 is subject to question. While unsettled, the better view that should be explicitly adopted by the Federal Circuit is that Section 101 can turn on underlying questions of fact, just as obviousness and claim construction do. As the Supreme Court has explained, "[t]o receive patent protection a claimed invention must, among other things, fall within one of the express categories of patentable subject matter, 35 U.S.C.S. § 101, and be novel, 35 U.S.C.S. § 102, and nonobvious, 35 U.S.C.S. § 103. . . . In evaluating whether these and other statutory conditions have been met,

PTO examiners must make various factual determinations—for instance, the state of the prior art in the field and the nature of the advancement embodied in the invention." *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2242 (2011) (citations omitted). Further, "[w]hile the ultimate question of patent validity is one of law, the same factual questions underlying the PTO's original examination of a patent application will also bear on an invalidity defense in an infringement action." *Id.* at 2242-43 (citations and quotations omitted). Similarly, the Supreme Court in *Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc.*, recognized that the claim construction process, though ultimately a question of law, can turn on underlying questions of fact. 135 S. Ct. 831, 837-839 (2015). Accordingly, while unsettled, and notwithstanding that the Court in *i4i* addressed Section 102 and in *Teva* addressed claim construction, it logically follows that while Section 101 questions are questions of law, they can turn on underlying facts.

In the context of the *Alice* step 2 inquiry, whether the limitations of IPLF's asserted claims, as ordered and combined, claim merely "well-understood, routine, conventional activity previously engaged in by those in the field," *Mayo*, 132 S. Ct. at 1299, raises factual questions regarding, at a minimum, whether the particular sensors and sensed behaviors required by each of IPLF's asserted claims (individually and as combined) were so well understood in the art in 1996 as to have been considered to be conventional means of controlling a computer.

43

**b.    The Clear And Convincing Evidentiary Standard Should Apply To Facts Underlying The Section 101 Inquiry.**

The issue of whether the clear and convincing evidence standard applies to factual issues underlying a Section 101 analysis has not been expressly addressed by this Court. However, the clear and convincing standard applies to factual issues pertaining to other types of invalidity challenges, and there is no principled reason why it should not also apply to a Section 101 analysis. The Supreme Court in *i4i* wrote: "We consider whether § 282 requires an invalidity defense to be proved by clear and convincing evidence. We hold that it does." *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2242 (2011). Further, in *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2130 n.10 (2014), the Court wrote that the "presumption of validity does not alter the degree of clarity that §112, ¶2 demands from patent applicants; to the contrary, it incorporates that definiteness requirement by reference" (citing 35 U.S.C. § 282, ¶2), while also "leav[ing . . .] for another day" the question of "whether factual findings subsidiary to the ultimate issue of definiteness trigger the clear-and-convincing-evidence standard[.]" *Id.* Particularly because, as discussed in *Nautilus*, *id.*, the Section 112 requirements are treated separately in § 282, whereas Section 101, like Sections 102 & 103, are not, there is reason to conclude its subsidiary questions of fact are subject to the clear and convincing evidence standard of proof.

### 2.    Conventionality—Not Novelty—Should Be The Test For Determining Whether Claims Satisfy Step 2.

District courts and patentees also need guidance regarding the requirements of *Alice* step 2. While the Supreme Court has provided that *Alice* step 2 entails an examination of "the elements of the claim to determine whether it contains an 'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent-eligible application,'" *Alice*, 134 S. Ct. 2357 (citation omitted), in application, *Alice* step 2 has often resembled analyses under Sections 102 and 103. *See, e.g.*, *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1347 (Fed. Cir. 2015) ("pragmatic analysis of § 101 is facilitated by considerations analogous to those of §§ 102 and 103 as applied to the particular case.").

But novelty or non-obviousness should not be the tests for determining patent eligible ***subject matter*** for at least the reason that such tests would render Section 101 redundant of Sections 102 and 103. As this Court is aware, analyses of anticipation and obviousness under Sections 102 and 103 also routinely require substantial expert discovery regarding the state of the art, further complicating the Section 101 analysis if step 2 is to be evaluated under a novelty or non-obviousness standard. In addition, novelty or non-obviousness should not be used because *Diehr*—reaffirmed in *Mayo*, 132 S. Ct. at 1298 and *Alice*, 134 S. Ct. at 2358—made clear that "a new combination of steps in a process may be patentable even though all the constituents of the combination were well known and in

45

common use before the combination was made." *Diehr*, 450 U.S. at 188. The *Diehr* claims were directed to a temperature-testing regime implemented on a generic computer, using generic prior-art measurement tools, applying the well-known Arrhenius equation, and addressing the problem of having to guess about the optimal time to cure rubber. *See Diamond v. Diehr*, 450 U.S. 175, 177-178 (1981). The *Diehr* Court explained (as has been acknowledged recently by this Court) that the inventive concept in *Diehr* was the added functionality of "constantly measuring the actual temperature inside the mold." *Id.* at 178, 179 n.5. *See also buySAFE, Inc. v. Google, Inc.,* 765 F.3d 1350, at n.1 (Fed. Cir. 2014). That the claims in *Diehr* used only generic computers and known hardware to improve the rubber curing process was thus not dispositive of patentable subject matter eligibility.

Rather than using novelty or non-obviousness, Appellant respectfully requests that the Court adopt a different standard—that of conventionality. Although cases have not explicitly used conventionality as the test for *Alice* step 2, such a test is consistent with *Mayo*. In *Mayo*, the Supreme Court explained, "[s]imply appending conventional steps [to the abstract idea], specified at a high level of generality," was not "enough" to supply an "inventive concept." 132 S. Ct. 1289 at 1292. The three steps of the method claims in *Mayo* did not include an inventive concept because those steps merely specified "well-understood, routine,

conventional activity previously engaged in by those in the field," 132 S. Ct. at 1299. The "'conventional activities' in *Mayo* were the very steps that doctors were already doing—administering the drug at issue, measuring metabolite levels, and adjusting dosing based on the[m]. Accordingly, the addition of the unpatentable law of nature in *Mayo* did not actually change the conventional method in any way other than telling doctors to consider the natural phenomenon itself." *Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, Case: 14-1139, Appellants' Petition for Rehearing En Banc, D.I. 101 (8/13/2015) at 8-9 (citation omitted). Thus, "[a] faithful reading of *Mayo* leads to the conclusion that a process comprises patent eligible subject matter provided it differs in at least one material element from what was routine, conventional and well-understood in the art." *Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, Case: 14-1139, Amicus Curiae Brief of the Coalition for 21st Century Medicine, D.I. 160 (8/27/2015) at 8-9.

"Focusing on the unconventional nature of the combined method is absolutely critical for the reasons Chief Justice Rehnquist explained in *Diehr*. Every method is a combination of known techniques—indeed, if one of the techniques was itself previously unknown, it would be a separate patentable invention." *Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, Case: 14-1139, Appellants' Petition for Rehearing En Banc, D.I. 101 (8/13/2015) at 9.

Conventionality, like any standard adopted for *Alice* step 2 should be determined by analyzing the claim as a whole. *See Diamond v. Diehr*, 450 U.S. 175, 188 (1981) ("[i]n determining the eligibility of respondents' claimed process . . . under §101, their claims must be considered as a whole."); *see also Alice*, 134 S. Ct. at 2355 (quoting *Mayo*, 132 S. Ct. at 1294) (defining 'inventive concept' as "an element or ***combination of elements*** that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'") (brackets in original).

Under a conventionality test for *Alice* step 2, Microsoft would bear the clear and convincing evidence burden as to questions of whether each limitation of each asserted claim (individually and as combined) was a conventional means of controlling a computer as of 1996. Example questions underlying that conventionality inquiry would include:

- Whether interacting with a computing system using an optical sensor sensing the head of a user was conventional in 1996 (*e.g.* 320 Patent Claim 35);

- Whether interacting with a computing system using a non-optical sensor sensing the user was conventional in 1996 (*e.g.* 320 Patent Claim 35);

- Whether interacting with a computing system using an imaging sensor sensing the head of a user was conventional in 1996 (*e.g.* 320 Patent Claim 1);

- Whether interacting with a computing system using an optical sensor sensing multiple facial features of a user was

48

conventional in 1996 (*e.g.* 320 Patent Claim 40);

- Whether interacting with a computing system using an optical sensor sensing facial orientation and at least one eye of a user was conventional in 1996 (*e.g.* 320 Patent Claim 41);

- Whether interacting with a computing system using information from both an imaging sensor sensing the head and other information not related to the head was conventional in 1996 (*e.g.* 320 Patent Claim 1);

- Whether interacting with a computing system using an imaging sensor sensing how quickly the user is viewing content on the display was conventional in 1996 (*e.g.* 321 Patent Claim 12);

- Whether interacting with a computing system using an imaging sensor sensing whether the user is not paying attention to the display was conventional in 1996 (*e.g.* 321 Patent Claim 34);

- Whether interacting with a computer system using measurements from both an optical sensor sensing the head of a user and a non-optical sensor sensing the user was conventional in 1996 (*e.g.* 320 Patent Claim 35).

A27-28, A44-45.

Microsoft would bear the clear and convincing evidentiary burden as to similar factual questions regarding novelty or non-obviousness of the claimed limitations (both individually and as combined) should this Court find that conventionality is not the correct test for the "inventive step" inquiry of step 2.

### 3.    Microsoft Has Not Met Its Burden Of Proof To Show That IPLF's Claimed Combinations Were Conventional In 1996.

Even if one accepts, as Microsoft argued and the district court agreed, that IPLF's Asserted Patents claim only the use of an abstract idea (teaching) combined

with known and conventional system components (a display, processor, and sensors), IPLF's Asserted Patents should still be found to claim patent eligible subject matter under *Alice* step 2 and *Diehr* because the components as ordered and combined in the claims were not conventional in 1996. As explained further below, Microsoft has not shown that the particular combinations of different types of sensors sensing different combinations of behaviors were "well-understood, routine, conventional activity previously engaged in by those in the field," *Mayo*, 132 S. Ct. at 1299, and, in fact, the PTAB's rejection of Microsoft's IPR petition and Microsoft's decision not to challenge the novelty of the 320 Patent are evidence that these combinations were not conventional. *See* **Argument Section D.3.**

For example, although the parties did not dispute that interacting with a computer using a mouse and keyboard was conventional in 1996, Microsoft did not even assert (let alone prove by clear and convincing evidence), that the use of optical sensors, imaging sensors, facial orientation, gestures, voice commands, or any of the other individual limitations of the asserted claims were ***conventional*** ways for users to interact with computing systems in 1996. *See* A1179. Nor did Microsoft make any assertion or showing that these limitations as actually combined in the claims were conventional in 1996. *Id*. In fact, the Nintendo Wii's use of motion and gesture based controls to interact with a computing system was

considered unconventional at the time of its release a decade later. *See* A1788:2-A1790:19 (hearing transcript).

IPLF's claims are also distinguishable from *Alice* and *Bilski*-style claims that merely embrace a pre-internet or pre-computer idea and recite nothing more than "do it on a generic computer." Indeed, the premise of IPLF's claimed inventions is that the existing conventional computers of 1996 lacked the desired sensor hardware and other capabilities required to deliver the improved, more natural user interfaces contemplated by the inventors. IPLF's patents identify and explain particular, new combinations of individually-known sensors, sensing capabilities, and other hardware and software elements that can be combined to deliver unconventional new computing systems that allow improved human-computer interactions.

Like the claims in *Diehr*, IPLF's claims thus fall into the category of patent claims that "integrate the building blocks [of human ingenuity] into something more, thereby transforming them into a patent-eligible invention" and that pose "no comparable risk of pre-emption, and therefore remain eligible for the monopoly granted under our patent laws." *Alice*, 134 S. Ct. at 2354-55 (quotations and citations omitted).

**D.    Even If This Court Adopts Novelty Or Non-Obviousness As The Test For Step 2, Microsoft Still Did Not Meet Its Burden.**

**1.    Microsoft Bears The Same Clear And Convincing Burden Of Proof As To Factual Questions Of Novelty Or Non-Obviousness.**

For the same reasons articulated above with respect to a conventionality test for *Alice* step 2, should this court adopt a novelty or non-obviousness test for step 2, those tests would also turn on underlying questions of fact for which Microsoft bears a clear and convincing burden of proof. In fact, should this court adopt a Section 102 novelty analysis, then *i4i* would require that result. *See* **Argument Sections C.1.a.-b.**

**2.    Microsoft Also Has Not Met Its Burden To Show That IPLF's Claims Lack An Inventive Concept Under A Novelty or Non-Obviousness Test.**

Although Microsoft's motion and the district court's decision assert without expert opinion or other evidentiary support that many of the components of IPLF's claimed systems were individually known in the art, neither makes any showing that the ***combinations as claimed*** were known in the art, let alone well-understood, routine, and conventional. A7-A8, A1179. By failing to address the underlying factual question of the novelty, non-obviousness, or any other articulation of "inventiveness," of the claim limitations as combined, Microsoft has, at a minimum, failed to satisfy its burden on summary judgment of demonstrating that there is no genuine dispute of fact regarding the step 2 inquiry.

In its analysis of whether the claims of the Asserted Patents include an inventive concept, the district court stated without citation that: "The only novelty [IPLF] asserts is to implement traditional teaching practices on a generic computer platform. None of the claims or specifications in the patents describes any hardware or software beyond commonly available computer processors, sensors, and displays." A9. The district court also stated without citation in its step 2 analysis that "the core issue addressed by the [IPLF] patents is pedagogical, not technological . . . Nothing in the patents solves a technological problem." A10. The district court's decision did not point to any expert testimony, evidence of record, or conventionality, novelty, or obviousness analysis as support for any of these statements. A9-A11.

These findings by the district court are unsupported by, and in fact contrary to, the record. IPLF did assert in its opposition, just as in this brief, that the claimed combinations of sensor types and sensed behavior types (if not also the individual limitations) are novel, unconventional technical improvements over the prior art systems. A1214-A1215, A1217-A1220. The district court's assertion that the individual hardware components—processors, cameras, sensors, displays—were "commonly available" also fails to address the *Alice* step 2 inquiry under any standard. That these components existed does not address the question of whether the use of those components, as specifically combined and configured in the

53

asserted claims, was conventional, novel, or otherwise inventive. In addition, as addressed with respect to step 1 above, when the text of the asserted claims is analyzed in place of conflating the scope of the invention with the problem described in the specification, it is also clear that IPLF's asserted claims are technological inventions, not pedagogical ideas.

### 3.    IPLF Has Presented Substantial Evidence Supporting A Finding That The Asserted Claims Comprise Novel, Non-Obvious, Unconventional Combinations.

IPLF presented evidence in the record that, at a minimum, establishes a genuine dispute of fact regarding whether IPLF's asserted claims claim novel, non-obvious, unconventional combinations of hardware and software elements.

While neither the district court nor Microsoft conducted any analysis of the conventionality or novelty of IPLF's claims as a whole, the PTAB recently affirmed the novelty of the 320 Patent by denying Microsoft's request for *inter partes* review ("IPR"). A1756-A1761 (*Microsoft Corp. v. IPLearn-Focus, LLC*, IPR2015-00096, Paper No. 11, at *2 (P.T.A.B. Mar. 4, 2015)). The PTAB panel found that a limitation present in all of the challenged claims of the 320 Patent (analysis of both image sensor measurements of a user's head and measurements of a user not related to the head) was missing from the systems in all of the prior art references relied on by Microsoft in its petition. A1754-A1756, A1759-A1760. In finding this limitation to be novel in view of the prior art (and thus certainly not

routine or conventional), the PTAB expressly considered Claim 1 of the 320 Patent (*id.*)—the same claim that Microsoft and the district court relied on as purportedly representative of all of the IPLF asserted claims across all three Asserted Patents. A3, A7-A9; A1173. Microsoft subsequently filed a request for rehearing of the decision denying the 320 Patent IPR, but the PTAB denied that request and reiterated the novelty of this claim limitation on April 17, 2015. A1865-A1870.[11]

Following the PTAB's rejection of Microsoft's 320 Patent IPR petition, and to resolve how that IPR petition and decision would be referenced by the parties at trial, Microsoft stipulated that it "will not assert invalidity under 35 U.S.C. §§ 102 or 103 at trial with respect to the '320 patent." A1985. As a result, even Microsoft no longer challenges the novelty of the claims of at least the 320 Patent.

The PTO has also allowed claims similar to the asserted claims in related IPLF patent applications as recently as 2015, including allowing the claims of U.S. Appl. No. 14/017,599 on January 23, 2015 (now issued as U.S. Patent No. 9,123,255) under the PTO's Interim Guidance on Patent Subject Matter Eligibility developed based on the Supreme Court's *Alice* decision. A1207-A1208, A1241-A1282 (PTO's Notice of Allowance), and A1283-A1299 (the PTO's Interim Guidance on Patent Subject Matter Eligibility).

---

[11] Microsoft's petitioned-for *inter partes* reviews of the 174 and 321 Patents are still ongoing and the PTAB has not yet made a final decision in those proceedings. *See* A1719-A1755, A1830-A1861.

Although these factors are not necessarily dispositive of the step 2 inquiry, they are at least cognizable evidence of record that were presented to the district court and that support a finding of unconventionality (and even novelty)—and thus patent eligibility—of IPLF's asserted claims under *Alice* step 2. At a minimum, these factors establish a genuine dispute of material fact regarding the step 2 inquiry sufficient to defeat Microsoft's motion for summary judgment.

## CONCLUSION

Because the challenged claims of IPLF's Asserted Patents (U.S. Patents Nos. 8,475,174, 8,538,320, and 8,538,321) pass both steps of the *Alice* inquiry, the district court's order granting Microsoft's Motion should be reversed, IPLF's Asserted Patents should be found to claim patent eligible subject matter under 35 U.S.C. § 101, and this case should be remanded back to the district court for further proceedings.

Dated: September 28, 2015          Respectfully submitted,


                                    /s/    Matthew D. Powers
                                    Matthew D. Powers
                                    William P. Nelson
                                    Robert L. Gerrity
                                    TENSEGRITY LAW GROUP, LLP
                                    555 Twin Dolphin Drive, Suite 650
                                    Redwood Shores, CA 94065
                                    Phone:  (650) 802-6000
                                    Fax:  (650) 802-6001

                                    *Attorneys for Plaintiff-Appellant*
                                    *IPLearn-Focuss, LLC*

1
2
3
4                                UNITED STATES DISTRICT COURT
5                              NORTHERN DISTRICT OF CALIFORNIA
6
7    IPLEARN-FOCUS, LLC,                          Case No.   14-cv-00151-JD
                         Plaintiff,
8
9         v.                                      **ORDER RE SUMMARY JUDGMENT**
10   MICROSOFT CORP.,
                         Defendant.
11
12
13                                   **INTRODUCTION**
14         Plaintiff IPLearn-Focus, LLC ("IPLearn") owns three patents related to learning by means
15   of a computer with a detached sensor.  The gist of the alleged inventions is that the computer uses
16   the sensor to monitor a student's behavior for signs of inattention or lack of concentration, and
17   when needed provides responsive cues.  Defendant Microsoft Corp. moves for summary judgment
18   of invalidity for all three patents under 35 U.S.C. § 101.  The Court grants the motion and
19   dismisses the case.
20                                   **BACKGROUND**
21         IPLearn alleges that Microsoft infringes three of its patents: the 8,475,174 ('174) patent,
22   the 8,538,320 ('320) patent and the 8,538,321 ('321) patent.[1]  Dkt. No. 1.  IPLearn filed the patent
23   application that issued as the '174 patent on May 26, 2012, but that patent claims priority to a
24   patent application filed 16 years earlier.  '174 patent, Dkt. No. 1-3.  The patent applications that
25   issued as the '320 and '321 patents were filed on March 14, 2013, and those patents claim to the
26
27   _____
     [1] IPLearn asserts that Microsoft infringes these claims: '174 claims 2, 18, 22, 39, 41, 48 and 56;
28   '320 claims 1, 20, 21, 24, 30, 35, 41, 44, 48, 50, 63 and 73; and '321 claims 1, 4, 5, 12, 13, 26, 27,
     28, 34, 37, 39 and 52.  Dkt. No. 73 at 2.

1   same August 13, 1996 priority date as the '174 patent.  '320 patent, Dkt. No. 1-1; '321 patent, Dkt.

2   No. 1-2.

3          The three patents have similar specifications and very similar background and summary

4   statements, and are for the most part overlapping.  The patents claim the invention of "learning via

5   a computing device, and more particularly to learning method and system using detached sensor."

6   '321 patent, 1:20-22; *see also* '174 patent, 1:19-21; '320 patent, 1:20-22 (same).  In all of the

7   patents, IPLearn states that "at home and in schools, the computer is gradually becoming a major

8   medium for education."  *See, e.g.,* '321 patent, 1:23-24.  The specifications describe harnessing

9   the ubiquity of computers in service to "very personalized" computer-aided education based on

10  monitoring a student's concentration and attention levels with a detached sensor.  *Id.* at 1:23-33.

11  As the '174 patent explains, living and breathing teachers have long relied on their "'intuition,'

12  based on years of . . . teaching experience" to recognize when a student's concentration was

13  flagging.  '174 patent, 1:39-40.  One "intuition" is that a student with dilating pupils "has lost

14  focus."  *Id.* at 1:41-42.  Another "intuition" is that a student with a frown "is concentrating."  *Id.* at

15  1:42-43.[2]  "A good instructor constantly observes such concentration-sensitive behavior, and

16  dynamically adjusts her teaching materials and styles accordingly."  *Id.* at 1:44-46.  These

17  adjustments include telling the student "a joke" or asking a question "to 'wake her up.'"  *Id.* at

18  1:46-51.  The patents claim the use of a computer and detached sensor to monitor a student's

19  concentration levels based on these intuitions and react accordingly.  In essence, they claim a

20  computer-implemented method of the tried-and-true practice of teachers in every culture and

21  throughout history: keep an eye out for a wandering mind and, when necessary, motivate the

22  student to focus.

23         The technical description of the invention is straightforward.  As described in the '320

24  patent's Abstract, one embodiment typical of all three of the patents involves:

25         a computer-implemented system helping a user learn using a
26         detached imaging sensor…Through monitoring the user's volitional
           or involuntary behavior, the system determines whether to change

27

28  _____
    [2]  The patents do not say why pupil dilation and frowning are strictly correlated to these attention
    levels.  It seems equally likely they may signify other states of mind.

2

United States District Court
Northern District of California

A2

United States District Court
Northern District of California

what is to be presented by the display.  The change could include providing rewards, punishments, and stimulation; or changing the materials.

'320 patent, Abstract.

More specifically, claim 1 of the '320 patent, which is also typical of the asserted claims in all the patents, reads:

> 1.   A computing system comprising:
>
> a display;
>
> an imaging sensor to sense a first feature of a user regarding a first volitional behavior of the user to produce a first set of measurements, the imaging sensor being detached from the first feature to sense the first feature, the first feature relating to the head of the user, and the first set of measurements including an image of the first feature, wherein the system further to sense a second feature of the user regarding a second volitional behavior of the user to produce a second set of measurements, the second feature not relating to the head of the user; and
>
> a processor coupled to the imaging sensor and the display, the processor to:
>
> > analyze at least the first set and the second set of measurements; and
> >
> > determine whether to change what is to be presented by the display in view of the analysis.

All the asserted claims describe systems, devices or methods that are substantially similar to this one.  The patents have some marginal differences in the type of sensor to be used (*e.g.,* optical vs. non-optical), the user features to be monitored (*e.g.,* eyes or facial orientation), and whether the system is connected to a network, but their claims largely overlap.

Microsoft contends that the patents are invalid under 35 U.S.C. § 101, as applied in *Alice Corp. Pty. Ltd v. CLS Bank Int'l*, ___ U.S. ___, 134 S. Ct. 2347 (2014), because the claims are directed to the abstract idea of teaching coupled to a generic computer implementation.  Dkt. No. 73.  In Microsoft's view, the patents do nothing more than purport to use a basic computer platform for the time-honored practice of making sure students are engaged.  Dkt. No. 73 at 1.

3

A3

# DISCUSSION

## I.    LEGAL STANDARDS

Under Rule 56 of the Federal Rules of Civil Procedure, a "court shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Bascom Research, LLC v. LinkedIn, Inc.*, No. 12-CV-06293-SI, 2015 WL 149480, at *3 (N.D. Cal. Jan. 5, 2015) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)). The moving party, however, has no burden to disprove matters on which the non-moving party will have the burden of proof at trial. *Id.* The moving party need only demonstrate to the Court that there is an absence of evidence to support the non-moving party's case. *Id.*

Once the moving party has met its burden, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by [the] depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (quotations omitted). A dispute is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Bascom*, 2015 WL 149480, at *4 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radios Corp.*, 475 U.S. 574, 586 (1986). "If the [opposing party's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50. "[I]nferences to be drawn from the underlying facts," however, "must be viewed in the light most favorable to the party opposing the motion." *Matsushita*, 475 U.S. at 587.

Resolving a question of patent eligibility is perfectly appropriate on summary judgment and does not need to wait on claim construction. Construing disputed claim terms is not a mandatory precondition to determining Section 101 eligibility. Rather, patentability is a threshold issue that a court may consider prior to claim construction. *See Bancorp Servs. v. Sun Life*

United States District Court
Northern District of California

1    *Assurance Co. of Canada*, 687 F.3d 1266, 1273 (Fed. Cir. 2012) (finding "no flaw in the notion

2    that claim construction is not an inviolable prerequisite to a validity determination under § 101,"

3    although the court went on to construe some of the terms); *see also Open Text S.A. v. Box, Inc.*,

4    No. 13-CV-04910-JD, 2015 WL 269036, at *1 (N.D. Cal. Jan. 20, 2015).  And Section 101

5    questions should be resolved as early as practicable in a case.  As Judge Mayer of the Federal

6    Circuit has stated:

7    
8    > From a practical perspective, there are clear advantages to
    > addressing section 101's requirements at the outset of litigation.
    > Patent eligibility issues can often be resolved without lengthy claim
    > construction, and an early determination that the subject matter of
9    > asserted claims is patent ineligible can spare both litigants and
    > courts years of needless litigation.

10

11   *I/P Engine, Inc. v. AOL Inc.*, 576 F. App'x 982, 996 (Fed. Cir. 2014) (Mayer, J., concurring); *see*

12   *also Bilski v. Kappos*, 561 U.S. 593, 602 (2010) (patent eligibility is a "threshold" issue);

13   *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 717-20 (Fed. Cir. 2014) (Mayer, J., concurring).

14   Claim construction is particularly unnecessary in this case because the basic character of the

15   claimed subject matter is readily ascertainable from the face of the patent, and the parties' disputed

16   constructions in no way affect the Court's analysis.  Moreover, Microsoft has agreed to spot

17   IPLearn the benefit of its proposed claim constructions if needed for this motion.  Dkt. No. 73 at

18   11, n. 3.  That will not be required but underscores the ripeness of the Section 101 determination

19   without full claim construction.

20        *Inter partes* review of the patents is also no reason to tap the brakes in this case.  In

21   October 2014, Microsoft petitioned the Patent Trial and Appeal Board ("PTAB") to institute *inter*

22   *partes* review of all asserted claims of all three patents on obviousness and anticipation grounds.

23   Dkt. No. 44, Exs. I, J, K.  After this summary judgment motion was fully briefed, the PTAB

24   declined to review any of the claims of the '320 patent, but did review a subset of the asserted

25   claims of the '321 patent and all asserted claims of the '174 patent, and determined that Microsoft

26   established a reasonable likelihood of prevailing on its challenges to the claims as either obvious

27   or anticipated.  Dkt. No. 87, Ex. A, B; Dkt. No. 96, Ex. A.  Neither party has requested a stay of

28

5

United States District Court
Northern District of California

1  this motion while the PTAB process goes forward, and the Court sees no reason to impose a stay

2  or delay ruling on the motion.

3        Since the Supreme Court's decision in *Alice Corp. Pty. Ltd v. CLS Bank Int'l*, ___ U.S.

4  ___, 134 S. Ct. 2347 (2014), the test for determining patent eligibility under Section 101 is crystal

5  clear.  "Under the now familiar two-part test described . . . in *Alice*," the Court "'must first

6  determine whether the claims at issue are directed to a patent-ineligible concept,' such as an

7  abstract idea." *OIP Techs., Inc. v. Amazon.com, Inc.*, ___ F.3d ___, 2015 WL 3622181, at *2

8  (Fed. Cir. June 11, 2015) (quoting *Alice Corp.*, 134 S. Ct. at 2355).  If so, the Court "must then

9  'consider the elements of each claim both individually and 'as an ordered combination' to

10  determine whether the additional elements 'transform the nature of the claim' into a patent-eligible

11  application.'" *Id*. (quoting *Mayo Collaborative Servs. v. Prometheus Labs.*, 132 S. Ct. 1289,

12  1298, 1297 (2012)).

13        The second step of this test has been described "as 'a search for an 'inventive concept.''"

14  *Internet Patents Corp. v. Active Network, Inc.*, ___ F.3d ___, 2015 WL 3852975, at *2 (Fed. Cir.

15  June 23, 2015) (quoting *Alice Corp.*, 134 S. Ct. at 2355).  It is the make-or-break step for patent

16  eligibility because claims that are directed to excluded subject matter like abstract ideas, laws of

17  nature or natural phenomena may still be patentable if they have "an element or combination of

18  elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than

19  a patent upon the [ineligible] concept itself.'" *Id*. (quoting *Alice Corp.*, 134 S. Ct. at 2355)

20  (alteration in original).  While "the boundary between abstract and patent-eligible subject matter"

21  is not always easy to define, the Court must undertake a "pragmatic analysis" of eligibility under

22  Section 101 to ensure the presence of an inventive concept so that the claim does not broadly

23  preempt practical uses of the abstract idea.  *Id*. at *3.  As the Supreme Court and the Federal

24  Circuit have made perfectly clear, merely implementing an abstract idea on conventional computer

25  technology is not enough.  "The statement that the method is performed by computer does not

26  satisfy the test of 'inventive concept.'" *Id*. at *5; *see also Bilski*, 561 U.S. at 610-11 (limiting use

27  of an abstract idea "to a particular technological environment" insufficient for eligibility);

28  *Intellectual Ventures I LLC v. Capital One Bank (USA)*, ___ F.3d ___, 2015 WL 4068798 at *2

1   (Fed. Cir. July 6, 2015) ("simple instruction to apply an abstract idea on a computer is not

2   enough"); *OIP*, 2015 WL 3622181, at *3 ("relying on a computer to perform routine tasks more

3   quickly or more accurately is insufficient to render a claim patent eligible").

## II.        THE CLAIMS ARE NOT PATENT ELIGIBLE

### A.        The Claims are Directed to an Abstract Idea

6          IPLearn does not meaningfully dispute that the challenged claims in its patents are directed

7   to the abstract idea of teaching.  A plain reading of the patents as a whole establishes beyond any

8   reasonable dispute that they seek to implement on a computer the watchful eye of a good teacher,

9   "who constantly observes[] concentration-sensitive behavior, and dynamically adjusts her teaching

10   materials and style accordingly." '174 patent, 1:44-46.  This concept of a monitored response to

11   presentations is an abstract idea, pure and simple.

12          IPLearn argues that any reliance on the specification to determine whether the asserted

13   claims are directed at abstract ideas is inappropriate, and that the Court should focus on the

14   minutiae of the physical components, like displays, processors, and sensors, recited by the claims.

15   *See, e.g.*, '320 patent, claim 1.  That is not the right approach.  Claims "must be read in view of the

16   specification, of which they are a part."  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir.

17   2005) (en banc).  And in *Alice Corp.* and *Bilski*, the Supreme Court took a big-picture view that

18   characterized the asserted patents based on the intrinsic evidence of the general concept they were

19   directed to; it did not fixate on the specifics of the claim language.  *See Alice Corp.*, 134 S. Ct. at

20   2352 (finding asserted claims directed at "mitigating settlement risk" despite the fact that the

21   claims did not mention those words); *Bilski*, 561 U.S. at 599 (finding claims directed at "hedging

22   risk" though those words were not found in claims).

23          Moreover, even if the Court were to follow IPLearn's theory and ignore the specification, a

24   review of the asserted claims reveals that they are written in even more abstract terms.  Take

25   Claim 1 of the '320 patent, excerpted above, for example.  Put aside the parts reciting standard

26   technology ("display," "imaging sensor," "processor," etc.), and what is left is "sens[ing]" two

27   features of the user to generate measurements, "analyz[ing]" the measurements, and

28   "determin[ing] whether to change what is to be presented by the display in view of the analysis."

United States District Court
Northern District of California

7

'320 patent, claim 1.  In essence, the claim follows several steps involved in the abstract idea of teaching, though without actually mentioning that specific application: the sensor observes students and the processor analyzes their behavior and reacts accordingly.  The steps are an abstraction, "addressed to fundamental human behavior related to instruction, which is apparent when the steps are summarized without their generic references to [hardware]." *IPLearn, LLC v. K12 Inc.*, No. CV 11-1026-RGA, 2014 WL 7206380, at *6 (D. Del. Dec. 17, 2014).

The specification simply confirms the abstractness of the claims.  Figure 3 of all three patents exemplifies this abstraction:



Whether taken individually or as an ordered combination, the claims are plainly directed at implementing the simple and abstract ideas described in Figure 3 -- namely the abstract idea of conventional teaching that not only happens in schools across the country every day, but has "probably existed as long as there has been formal education." *IPLearn,* 2014 WL 7206380, at *6.

United States District Court
Northern District of California

1    This finding applies with equal force to all of the asserted claims in the '174, '320 and

2    '321 patents because they are all directed to this same abstract concept.  "Addressing each claim

3    of the asserted patents" is therefore "unnecessary."  *Content Extraction & Transmission LLC v.*

4    *Wells Fargo Bank, Nat. Ass'n*, 776 F.3d 1343, 1348 (Fed. Cir. 2014) (internal citations omitted).

5    All asserted claims recite the same basic system, device or method, and any variations in the

6    claims do not change each claim's fundamental reliance on the abstract idea discussed above.

7    IPLearn points to no asserted claim that would change the Court's Section 101 analysis.  There is

8    no meaningful distinction between Claim 1 and the remaining asserted claims, which are

9    "substantially similar and linked to the same abstract idea."  *Id.*

10   **B.    The Claims Lack An Inventive Concept**

11    No inventive concept rescues the claims from ineligible abstraction.  The only novelty

12   IPLearn asserts is to implement traditional teaching practices on a generic computer platform.

13   None of the claims or specifications in the patents describes any hardware or software beyond

14   commonly available computer processors, sensors, and displays.  In fact, the entire premise of the

15   patents is the ubiquity of standard computer technology "at home and in schools."  *See, e.g.,* '321

16   patent, 1:23-27.

17    To overcome the absence of an inventive concept in the patents themselves, IPLearn leans

18   heavily on *DDR Holdings, LLC v. Hotels.com, L.P.*, ___ F.3d ___, 2014 WL 6845152, at *12

19   (Fed. Cir. Dec. 5, 2014), for an eligibility lifeline.  In that case, the Federal Circuit recognized the

20   possibility that solving a technological problem unique to the Internet could lead to patent

21   eligibility.  IPLearn tries to run with that decision to contend that *DDR Holdings* supports

22   eligibility for any claimed invention that purports to solve a problem involving computers.  *See*

23   Dkt. No. 76 at 13-18.  But as the Federal Circuit recently explained, *DDR Holdings* is far more

24   specific and limited:

25         The patent at issue in [*DDR Holdings*] dealt with a problem unique
           to the Internet: Internet users visiting one web site might be
26         interested in viewing products sold on a different web site, but the
           owners of the first web site did not want to constantly redirect users
27         away from their web site to a different web site. The claimed
           solution used a series of steps that created a hybrid web page
28         incorporating "look and feel" elements from the host web site with

9

commerce objects from the third-party web site. The patent at issue in *DDR* provided an Internet-based solution to solve a problem unique to the Internet that (1) did not foreclose other ways of solving the problem, and (2) recited a specific series of steps that resulted in a departure from the routine and conventional sequence of events after the click of a hyperlink advertisement. The patent claims here do not address problems unique to the Internet, so *DDR* has no applicability.

*Intellectual Ventures*, 2015 WL 4068798, at *6. In exactly the same way, IPLearn's claims fail to recite or disclose any non-routine or unconventional method for solving a uniquely Internet-based problem. IPLearn does not identify any way in which the claims "purport to improve the functioning of the computer itself" or "effect an improvement in any other technology or technical field." *See Alice Corp.*, 134 S. Ct. at 2359. Instead, the patents describe a routine computer-based application of the process of monitored instruction. This process "is not deployed to solve a specific Internet-centric problem. On the contrary, the patents just claim using it. That does not satisfy part two of the *Mayo/Alice* test." *Open Text*, 2015 WL 269036, at *5. As with the claims at issue in *Intellectual Ventures*, *DDR Holdings* is inapposite.

Moreover, the core issue addressed by the IPLearn patents is pedagogical, not technological. The patents are directed to monitoring and responding to student concentration, and this pedagogical issue does not exist exclusively or even predominantly in the computer realm. To the contrary, it is a problem that arises every day in every teaching situation in the world. Nothing in the patents solves a technological problem.

IPLearn's patents also threaten broad preemption of an abstract concept. *Alice* cautioned courts to "distinguish between patents that claim the building blocks of human ingenuity and those that integrate the building blocks into something more." *Alice Corp.*, 134 S. Ct. at 2354 (quotations and citation omitted). Here, the claims potentially preempt much of a building block of human ingenuity -- the concept of monitored interaction with a participant or audience. As Microsoft notes, this building block underlies countless methods for presenting interactive content to an audience in a dynamic and engaging way -- in online educational services, for example, or in delivery of a wide variety of entertainment content, or in business meetings and events, just to name a few sizable areas of potential preemption. The fact that the patents describe a wide variety of alternative configurations of generic hardware only underscores their potential to preempt

10

United States District Court
Northern District of California

1    virtually all practical implementations of the concept.  Such broad claims jeopardize future

2    innovation disproportionately "relative to the contribution of the inventor."  *Mayo*, 132 S. Ct at

3    1303.

4         While IPLearn claims its patents do not preempt all methods of computerized teaching

5    because the claims do not cover the use of a mouse and keyboard or an attached sensor (as

6    opposed to a detached sensor), the prohibition against patenting "abstract ideas 'cannot be

7    circumvented by attempting to limit the use of [the idea] to a particular technological

8    environment,' despite the fact that doing so reduces the amount of innovation that would be

9    preempted."  *Open Text S.A.*, 2015 WL 269036, at *4 (quoting *Alice Corp.*, 134 S. Ct. at 2358);

10   *see also OIP*, 2015 WL 3622181, at *3 ("that the claims do not preempt all price optimization or

11   may be limited to price optimization in the e-commerce setting do not make them any less

12   abstract.").  And IPLearn's disclaimer of preemption smacks of false modesty.  At a time when

13   computers and interactive technology are moving rapidly away from the use of wires, cables and

14   other hard connections, IPLearn's quitclaim for systems physically attached to a subject is hardly

15   generous.

16                                    **CONCLUSION**

17        Because the claims of the '174, '320, and '321 patents do nothing more than recite the

18   abstract idea of observing students, analyzing their behavior and reacting accordingly, along with

19   an instruction to implement the idea using various pieces of generic computer hardware, the

20   claims are not directed to patentable subject matter.  Consequently, the Court grants the motion for

21   summary judgment with prejudice and directs the clerk to enter judgment for Microsoft and to

22   close the case.

23        **IT IS SO ORDERED.**

24   Dated: July 10, 2015

25

26                                    _____

27                                    JAMES DONATO
                                      United States District Judge

28

11

A11

United States District Court
Northern District of California

1
2
3
4              UNITED STATES DISTRICT COURT

5            NORTHERN DISTRICT OF CALIFORNIA

6

7   IPLEARN-FOCUS, LLC,                    Case No. 14-cv-00151-JD

            Plaintiff,

8
        v.                                  **JUDGMENT**

9
10  MICROSOFT CORP.,

            Defendant.

11

12

13       **( ) Jury Verdict.**  This action came before the Court for a trial by jury.  The issues have

14  been tried and the jury has rendered its verdict.

15       **(X) Decision by Court.**  This action came on a summary judgment motion before the

16  Court and a decision has been rendered.  All three IPLearn-Focus, LLC patents at issue -- the

17  8,475,174 patent, the 8,538,320 patent and the 8,538,321 patent -- are invalid under 35 U.S.C. §

18  101.

19       The case is ordered closed.

20       **IT IS SO ORDERED.**

21  Dated: July 10, 2015

22

23

24                                    Richard W. Wieking, Clerk
                                      By: Lisa R. Clark, Deputy Clerk

25

26

27

28

A12



US008538320B2

(12) **United States Patent**
    Ho et al.

(10) **Patent No.:**     **US 8,538,320 B2**
(45) **Date of Patent:**     **\*Sep. 17, 2013**

(54) **LEARNING METHOD AND SYSTEM USING DETACHED SENSOR**

(71) Applicant: **IpLearn-Focus, LLC**, Mountain View, CA (US)

(72) Inventors: **Chi Fai Ho**, Palo Alto, CA (US); **Peter P. Tong**, Mountain View, CA (US)

(73) Assignee: **IpLearn-Focus, LLC**, Mountain View, CA (US)

( \* ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **13/831,547**

(22) Filed: **Mar. 14, 2013**

(65) **Prior Publication Data**

US 2013/0201318 A1     Aug. 8, 2013

**Related U.S. Application Data**

(63) Continuation of application No. 13/481,821, filed on May 26, 2012, which is a continuation of application No. 10/694,706, filed on Oct. 28, 2003, now Pat. No. 8,398,407, which is a continuation of application No. 10/050,578, filed on Jan. 14, 2002, now Pat. No. 6,699,043, which is a continuation of application No. 09/385,795, filed on Aug. 30, 1999, now abandoned, which is a continuation of application No. 08/689,678, filed on Aug. 13, 1996, now Pat. No. 5,944,530.

(51) **Int. Cl.**
    *G09B 3/00*     (2006.01)
(52) **U.S. Cl.**
    USPC ............................. **434/350**; 434/322; 434/323
(58) **Field of Classification Search**
    USPC ......................................... 434/350, 322, 323
    See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| 3,573,359 A | 4/1971 | Guisinger |
| 3,685,169 A | 8/1972 | Blau et al. |
| 4,006,539 A | 2/1977 | Slomski |
| 4,037,332 A | 7/1977 | Petrusinsky |
| 4,089,124 A | 5/1978 | Burtis et al. |
| 4,464,121 A | 8/1984 | Perelli |
| 4,705,479 A | 11/1987 | Maron |

(Continued)

FOREIGN PATENT DOCUMENTS

JP     11276461 A     10/1999

OTHER PUBLICATIONS

Kanade, Takeo, *Computer Recognition of Human Faces*, 1977, cover and 2 additional pages, pp. i-iv, 1-87, 89-91, 93-96, and 2 additonal pages at the end.

(Continued)

*Primary Examiner* — Robert J Utama

(57)     **ABSTRACT**

One embodiment includes a computer-implemented method using a window environment of a display, with a detached imaging sensor, to enable a user to learn. Another embodiment includes a computer-implemented system helping a user learn using a detached imaging sensor. In yet another embodiment, a computer-implemented system monitors automatically more than once a user's behavior while the user is working on materials. Through monitoring the user's volitional or involuntary behavior, the system determines whether to change what is to be presented by the display. The change could include providing rewards, punishments, and stimulation; or changing the materials. The system can also react by asking the user a question. Based on the user's response, the system may change to more appropriate materials, or different presentation styles.

**73 Claims, 6 Drawing Sheets**



**US 8,538,320 B2**

Page 2

(56)　　　**References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 4,706,072 A | 11/1987 | Ikeyama |
| 4,798,543 A | 1/1989 | Spiece |
| 4,867,685 A | 9/1989 | Brush et al. |
| 4,894,777 A | 1/1990 | Negishi et al. |
| 5,035,625 A | 7/1991 | Munson et al. |
| 5,211,563 A | 5/1993 | Haga et al. |
| 5,267,865 A | 12/1993 | Lee et al. |
| 5,286,036 A | 2/1994 | Barabash |
| 5,295,491 A | 3/1994 | Gevins |
| 5,306,154 A | 4/1994 | Ujita et al. |
| 5,320,538 A | 6/1994 | Baum |
| 5,333,272 A | 7/1994 | Capek et al. |
| 5,339,826 A | 8/1994 | Schmidt et al. |
| 5,362,069 A | 11/1994 | Hall-Tipping |
| 5,370,399 A | 12/1994 | Liverance |
| 5,372,507 A | 12/1994 | Goleh |
| 5,437,553 A | 8/1995 | Collins et al. |
| 5,458,494 A | 10/1995 | Krohn et al. |
| 5,494,444 A | 2/1996 | Thayer et al. |
| 5,535,422 A | 7/1996 | Chiang et al. |
| 5,546,598 A | 8/1996 | Yamaguchi et al. |
| 5,577,919 A | 11/1996 | Collins et al. |
| 5,595,488 A | 1/1997 | Gozlan et al. |
| 5,597,312 A | 1/1997 | Bloom et al. |
| 5,681,170 A | 10/1997 | Rieber et al. |
| 5,724,987 A | 3/1998 | Gevins et al. |
| 5,727,950 A | 3/1998 | Cook et al. |
| 5,730,604 A | 3/1998 | Jay et al. |
| 5,738,527 A | 4/1998 | Lundberg |
| 5,774,591 A | 6/1998 | Black et al. |
| 5,788,504 A | 8/1998 | Rice et al. |
| 5,797,754 A | 8/1998 | Griswold et al. |
| 5,807,114 A | 9/1998 | Hodges et al. |
| 5,829,983 A | 11/1998 | Koyama et al. |
| 5,900,827 A | 5/1999 | Graham et al. |
| 5,944,530 A | 8/1999 | Ho et al. |
| 5,987,302 A | 11/1999 | Driscoll et al. |
| 6,034,652 A | 3/2000 | Freiberger et al. |
| 6,053,739 A | 4/2000 | Stewart et al. |
| 6,149,438 A | 11/2000 | Richard et al. |
| 6,149,441 A | 11/2000 | Pellegrino et al. |
| 6,162,060 A | 12/2000 | Richard et al. |
| 6,186,794 B1 | 2/2001 | Brown et al. |

OTHER PUBLICATIONS

Restriction Requirement for U.S. Appl. No. 08/689,678, dated Sep. 15, 1997.
Office Action for U.S. Appl. No. 08/689,678, dated Jan. 8, 1998.
Office Communication for U.S. Appl. No. 08/689,678, dated Nov. 9, 1998.
Notice of Allowance for U.S. Appl. No. 08/689,678, dated Mar. 15, 1999.
Office Action for U.S. Appl. No. 09/385,795, dated May 10, 2000.
Notice of Abandonment for U.S. Appl. No. 09/385,795, dated Dec. 21, 2000.

Notice of Allowance for U.S. Appl. No. 09/385,795, dated Oct. 15, 2001.
Notice of Abandonment for U.S. Appl. No. 09/385,795, dated May 16, 2002.
Office Action for U.S. Appl. No. 10/050,578, dated Oct. 9, 2002.
Notice of Allowance for U.S. Appl. No. 10/050,578, dated Feb. 10, 2003.
Notice of Allowance for U.S. Appl. No. 10/050,578, dated Jul. 17, 2003.
Corrected Notice of Allowance for U.S. Appl. No. 10/050,578, dated Sep. 2, 2003.
Supplemental Notice of Allowance for U.S. Appl. No. 10/050,578, dated Jan. 21, 2004.
Restriction Requirement for U.S. Appl. No. 10/694,706, dated Jun. 21, 2004.
Office Action for U.S. Appl. No. 10/694,706, dated Dec. 1, 2004.
Notice of Non-Compliant Amendment for U.S. Appl. No. 10/694,706, dated Mar. 8, 2005.
Office Action for U.S. Appl. No. 10/694,706, dated Apr. 10, 2006.
Final Office Action for U.S. Appl. No. 10/694,706, dated Feb. 5, 2007.
Office Action for U.S. Appl. No. 10/694,706, dated Jun. 6, 2007.
Final Office Action for U.S. Appl. No. 10/694,706, dated Oct. 16, 2007.
Notice of Allowance for U.S. Appl. No. 10/694,706, dated Dec. 18, 2007.
Office Action for U.S. Appl. No. 10/694,706, dated Aug. 5, 2008.
Final Office Action for U.S. Appl. No. 10/694,706, dated Dec. 24, 2008.
Notice of Allowance for U.S. Appl. No. 10/694,706, dated Jun. 19, 2009.
Office Action for U.S. Appl. No. 10/694,706, dated Nov. 2, 2009.
Notice of Allowance for U.S. Appl. No. 10/694,706, dated Jul. 19, 2010.
Office Communication for U.S. Appl. No. 10/694,706, dated Aug. 20, 2010.
Notice of Allowance for U.S. Appl. No. 10/694,706, dated Dec. 17, 2010.
Notice of Allowance for U.S. Appl. No. 10/694,706, dated May 3, 2011.
Corrected Notice of Allowance for U.S. Appl. No. 10/694,706, dated May 25, 2011.
Notice of Allowance for U.S. Appl. No. 10/694,706, dated Jul. 11, 2011.
Notice of Allowance for U.S. Appl. No. 10/694,706, dated Feb. 15, 2012.
Notice of Allowance for U.S. Appl. No. 10/694,706, dated Apr. 9, 2012.
Response to Rule 312 Communication for U.S. Appl. No. 10/694,706, dated Apr. 26, 2012.
Notice of Allowance for U.S. Appl. No. 10/694,706, dated Oct. 1, 2012.
Office Action for U.S. Appl. No. 13/481,821, dated Jun. 29, 2012.
Notice of Allowance for U.S. Appl. No. 13/481,821, dated Feb. 20, 2013.



Figure 1



Figure 2A



Figure 2B

A17



250

Present Study Materials     ⌐ 252

Monitor Student's Behavior     ⌐ 254
through Sensor

Analyze Monitored     ⌐ 256
Results with Rules

Provide Indication on     ⌐ 258
Student's Concentration

React According to     ⌐ 260
the Indication

Figure 3



Figure 4



Figure 5

US 8,538,320 B2

**1**

# LEARNING METHOD AND SYSTEM USING DETACHED SENSOR

## CROSS-REFERENCE TO RELATED APPLICATIONS

This is a continuation of co-pending U.S. patent application Ser. No. 13/481,821, filed on May 26, 2012, which is a continuation of co-pending U.S. patent application Ser. No. 10/694,706, filed on Oct. 28, 2003, which is a continuation of U.S. Pat. No. 6,699,043, filed on Jan. 14, 2002, which is a continuation of U.S. patent application Ser. No. 09/385,795, filed on Aug. 30, 1999, since abandoned, which is a continuation of U.S. patent Ser. No. 08/689,678, filed on Aug. 13, 1996, now U.S. Pat. No. 5,944,530; all incorporated by reference into this application.

## BACKGROUND OF THE INVENTION

The present invention relates generally to learning via a computing device, and more particularly to learning method and system using detached sensor.

Both at home and in schools, the computer is gradually becoming a major medium for education. There are many different reasons for this trend. One is the tremendous reduction in the price of a computer, causing it to permeate into almost every household. Though the price of a computer has been dropping, its computation and memory capacity have increased many folds, leading to computer programs with significantly more intelligence and improved user-friendliness. Another reason is that a computer-aided-education system can be very personalized; it can be tailored to the strengths and weaknesses of individual students. This is very hard to achieve in today's educational environment, in part due to the increase in the students-per-instructor ratio. Though computer-aided education system could be very useful, there is still a need for a system and method that could sense a student in a better manner.

## SUMMARY OF THE INVENTION

One embodiment of the invention includes computer-implemented method and system using a window environment of a display, with at least one detached sensor, to enable a user to learn. Another embodiment provides learning methods and systems that help a user learn using at least one detached imaging sensor. In yet another embodiment, the present invention provides a computer-aided-educational system and method that automatically consider a student's concentration-sensitive behavior while the student is working on materials.

In one embodiment, the present invention includes a display, a processor, and a detached imaging sensor to sense a first feature from the head of a user regarding a first volitional behavior of the user to produce a first set of data. The embodiment is further configured to sense a second feature of the user regarding a second volitional behavior of the user to produce a second set of data, the second feature not from the head of the user. The processor is configured to analyze the first set and the second set of data, with the analyzing being depending on the display, and to determine whether to change what is to be presented by the display in view of the analyzing to enable the user to learn.

In one embodiment, the present invention includes a presenter, a non-intrusive sensor, a controller and an indicator. The presenter presents study materials on a subject to the student; the non-intrusive sensor automatically monitors

**2**

more than once the student's concentration-sensitive behavior while the student is working on the materials; the controller analyzes the student's concentration-sensitive behavior based on one or more rules; and the indicator provides an indication on the student's concentration level based on the analysis. In another embodiment, the present invention reacts according to the indication.

There are a number of examples of the concentration-sensitive behavior that the sensor can monitor. In one embodiment, the sensor monitors the student's volitional behavior, such as his inputs into the computer, his facial expressions, his facial orientations and his eyes. In another embodiment, the sensor monitors the student's involuntary behavior, such as the sizes of his pupils.

The controller analyzes one or more of the above behavior based on one or more rules. These rules are similar to the instructor's "intuition." For example, one rule is as follows: The student has lost concentration in the study materials if for a predetermined period of time, the student's inputs through a mouse have been in a window that does not contain study materials. Another rule is that if the student is not looking at the monitor showing the study materials for a predetermined period of time, the student has lost concentration in the study materials. From the analysis, the system provides an indication on the student's concentration level.

Based on the indication, the system could react accordingly. Different reactions are applicable. Some examples include rewards, punishments, stimulation, and changing the study materials.

In another embodiment, due to the indication, the system asks the student a question, which can stimulate the student and can assess the student's understanding level in the study materials. From the student's response to the question, the system may change to more appropriate study materials and/or presentation style.

The question-asking approach in the above embodiment does not have to be a reaction to the indication. In one embodiment, as the system is presenting study materials to the student, unexpected by the student, the system asks the student a question. After the student responds to the question, the system resumes back to present study materials to the student. In such an embodiment, the question tends to increase the concentration level of the student in the study materials.

In yet another embodiment, the present invention also includes a calibrator, which calibrates the student's concentration-sensitive behavior before the behavior is being monitored to show concentration. One type of calibration establishes the student's behavior when the student is paying attention, and compares it with the student's behavior when the student is working on the study materials. Calibration typically improves the accuracy of the system.

Other aspects and advantages of the present invention will become apparent from the following detailed description, which, when taken in conjunction with the accompanying drawings, illustrates by way of example the principles of the invention.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** shows one embodiment of the present invention.

FIGS. **2**A-B show one embodiment of a system implementing the present invention.

FIG. **3** shows a set of steps to implement one embodiment of the present invention.

FIG. **4** shows examples of volitional behavior monitored by the sensor in the present invention.

US 8,538,320 B2

**3**

FIG. **5** shows another embodiment of the present invention.

Same numerals in FIGS. **1-5** are assigned to similar elements in all the figures. Embodiments of the invention are discussed below with reference to FIGS. **1-5**. However, those skilled in the art will readily appreciate that the detailed description given herein with respect to these figures is for explanatory purposes as the invention extends beyond these limited embodiments.

DETAILED DESCRIPTION OF THE INVENTION

FIG. **1** shows one embodiment of a computer-aided-educational system **100** of the present invention. As an overview of some of its components, the system **100** includes a selector **102**, which selects study materials from a study-materials storage medium **108** to be presented to a student through a presenter **106**. While the student is working on the study materials, a non-intrusive sensor **110** monitors the student's concentration-sensitive behavior, and sends its results back to a controller **104**. Then the controller **104** based on one or more rules from a rules storage medium **112** analyzes the monitored results to provide through an indicator **114**, an indication on the student's concentration level. In another embodiment, the selector is **102** also connected to the controller **104** to keep track of the study materials presented to the student.

FIG. **2A** shows one embodiment of a system **150** implementing the present invention, preferably in software and hardware. The system **150** includes a server computer **152** and a number of client computers, such as **154**, which can be a personal computer. Each client computer communicates to the server computer **152** through a dedicated communication link, or a computer network **156**.

FIG. **2B** shows one embodiment of a client computer **154**. It typically includes a bus **159** connecting a number of components, such as a processing unit **160**, a main memory **162**, an I/O controller **164**, a peripheral controller **166**, a graphics adapter **168** and a network interface adapter **170**. The I/O controller **164** is connected to components, such as a harddisk drive **172** and a floppy disk drive **174**. The peripheral controller **166** is connected to peripheral components, such as a keyboard **176**, a mouse **182**, and a digital camera **180**. The graphics adapter **168** is connected to a monitor **178**; and the network interface adapter **170** is connected to the network **120**. The network can be the Internet, an intranet, the world wide web and other forms of networks.

Different components of the present invention can be in different elements shown in FIGS. **2A-B**. For example, the presenter **106** and the sensor **110** can be in a client computer; the selector **102**, the controller **104**, the study-materials storage medium **108**, the rules storage medium **112** and the indicator **114** can be in the server computer **152**. In another embodiment, the selector **102**, the controller **104** and the indicator **114** are also in a client computer. Different components can be in different elements in the above description. Nonetheless, there is no restriction preventing all components to reside in one element, such as a client computer. A number of operations in the present invention can be implemented by software, which is controlled, for example, by the processing unit **160**. In yet another embodiment, the number of operations implemented by software can be stored in a storage-medium, which can be, for example, the main memory **162** or a CD read-only-memory.

The present invention is applicable to teach any subject or materials that can be taught by a computer. The teaching period may last one semester or a year, or just one class session. The materials may cover inter-disciplinary areas, such as electrical engineering and thermodynamics, or com-

**4**

puter networking and programming techniques. The materials may just be for training a field engineer on a new product. In the following, mathematics is the subject used to illustrate the present invention.

In one embodiment, the subject is divided into major-topics, with each major-topic subdivided into minor-topics, and with each minor-topic further subdivided into line-items. Each line-item typically covers one well-defined area in the subject. In another embodiment, the subject is further divided into more levels below the line-items; and in a third embodiment, the subject is just divided into line-items.

As an example of line-items, if the major-topic is high school algebra, then it can be divided into the following line-items, with bracketed terms served as comments:

High School Algebra (the major-topic)
(Minor-topics under the major-topic)
Decimal Numbers
Polynomials
Linear Equations
Quadratic Equations
. . .
Integers
(Line-items under the minor-topic of integers)
Addition & Subtraction (Difficulty level 1)
Multiplication (Difficulty level 2)
Division (Difficulty level 2)
Prime Numbers (Difficulty level 3)
Factorization (Difficulty level 3)
Common Divisor (Difficulty level 4)
. . .
Fractions
(Line-items under the minor-topic of fractions)
Addition & Subtraction (+/−) with Common Denominator (Difficulty level 3)
+/− with Integers (Difficulty level 4)
+/− without Common Denominator (Difficulty level 5)
Multiplication and Divisions (*,/) with Integers (Difficulty level 5)
*,/ with fraction (Difficulty level 6)
Compound Fractions (Difficulty level 6)
Fraction Reduction (Difficulty level 7)
Ratios and Proportions (Difficulty level 7)
. . .

Another example with the minor topic being differential calculus is as follows:

Calculus (major topic)
Differential calculus (minor topic)
Fractions (Difficulty level 1)
Polynomials (Difficulty level 1)
Exponential Functions (Difficulty level 1)
Differentiation (Difficulty level 2)
Differentiate a sum (Difficulty level 3)
Differentiate a product (Difficulty level 3)
Differentiate a quotient (Difficulty level 4)

In one embodiment, each line-item has a difficulty level. The bracketed difficulty level next to each line-item in the above example indicates how difficult one line-item is relative to other line-items in the subject, or how significant one is relative to another. A line-item with a low difficulty level is a relatively easy line-item or a relatively less important line-item. Typically, a student learning a subject starts from learning line-items at the lowest difficulty level.

The lists of items in the above examples are generated based on expert knowledge on the subject of mathematics. With the proper instruction, such as through reading the present specification, generating such lists with the difficulty

A22

US 8,538,320 B2

<table>
<tr><td>5</td><td>6</td></tr>
</table>

levels should be obvious to experts in the subject. The more knowledgeable the expert, the more complete the sets of items.

In one embodiment, each line-item is represented by a line-item root, which includes the line item and its root. In the above example, the root of a line-item includes its subject, its major topic and minor topic.

In one embodiment, the selector **102** starts the learning process by selecting a line-item with the lowest difficulty level. If there are a number of those, one of them is randomly selected. Study materials for that line-item are retrieved from the study-materials storage medium **108** to be presented to the student. After presentation, the selector **102** selects another line-item with the lowest difficulty level among all the unselected line-items, and the process repeats. For this embodiment, each line-item also includes a mode attribute, which is changed from the un-selected to the selected mode after the study materials for that line-item has been selected to be worked on by the student.

To select a set of study materials from the study-material storage medium **108**, the selector **102** sends the line-item root to the storage medium **108** to retrieve the corresponding study materials. Typically, there are a number of sets of study materials in the storage-medium **108**, and they can be in the following format:

(line-item root, mode, study materials)

The following serves as examples of study materials for differentiating polynomial:

First, the system teaches the approach to generate derivatives based on the basic principle in differentiation, such as:

$$df(x)/dx = lim_{h \to 0}((f(x+h)-f(x))/h)$$

Then the system teaches the generalized equation, such as:

$$((d\Sigma a_i x^i)/dx) = (\Sigma i * a_i x^{i-1})$$

Finally, the system teaches the importance of and the way to find optima and minima by solving the following equation:

$$((d\Sigma a_i x^i)/dx) = 0$$

Based on the line-item root, and with one set of study materials per line-item, the selector **102** retrieves from the study-materials storage-medium **108**, the corresponding set of study materials. Creating study materials on a subject should be obvious to experts in the subject, and will not be further discussed in this application.

The selector **102** then sends the retrieved study materials to the presenter **106**. The study materials can be a document with no questions, arranged as a list of screens. The presenter **106** typically includes the monitor **178**, which presents the study materials to the student, who can go from one screen to another with the keyboard **176**, or the mouse **182**. In another embodiment, the study materials are broadcast through a radio. As the student is working on the study materials presented through the radio, the student's concentration-sensitive behavior is monitored automatically.

In another embodiment, the study materials only have questions. Typically, students gain a better understanding on a subject through actively working on questions than through passively reading study materials. In one embodiment, each question is embedded in a question entry, which is of the following format:

(line-item root, mode, question-body, answer)

The term "question-body" describes the body of a question. The following serves as an example:

    Subject: Mathematics.
    Major-topic: High School Algebra.
    Minor-topic: Fraction.

Line-item: +/− with common denominator
Mode: Un-selected
Answer Question-body
28/37 What is the sum of 2/37, 3/37, 8/37 and 15/37?
−2/43 17/43-25/43+6/43=?

The selector **102** sends to the study-materials storage medium **108** the line-item root to retrieve the set of questions with the same line-item root.

An example of study materials with questions are for the line-item of differentiating exponential functions. A number of questions are generated, including the question on expanding an exponential function based on Taylor expansion, the question on differentiating the Taylor-expanded exponential function, whose answer is the original Taylor-expanded exponential function, and the question on differentiating the exponential function, whose answer is the exponential function.

In another embodiment, the study materials include study materials with questions and study materials without questions.

Note that the formats of the study materials may change as the student progresses. The student can learn one line-item based on questions, and another based on study materials with no questions. As an example, for differential calculus, of the different line-items, all of them can be learnt through either study materials with or without questions, except for the line-item of differentiation, which is typically learnt without questions. That study-materials cover the general differentiation concept, such as the following:

$$df(x)/dx = lim_{h \to 0}((f(x+h)-f(x))/h)$$

FIG. **3** shows a set of steps **250** to implement one embodiment of the present invention. First, the presenter **106** presents (step **252**) the selected study materials to the student. As the student is working on the study materials, the sensor **110** monitors (step **254**) more than once the student's concentration-sensitive behavior, and feeds those monitored results to the controller. The controller **104** analyzes (step **256**) the results based on one or more rules to provide (step **258**) an indication on the student's concentration. Based on the indication, the system reacts (step **260**) accordingly.

A type of concentration-sensitive behavior is a type of behavior that is sensitive to one's concentration. As one's concentration changes, such a type of behavior changes accordingly. The behavior can be physical, psychological, biological, emotional and physiological.

In the step of monitoring (step **254**), the sensor automatically monitors more than once the student's concentration-sensitive behavior while the student is working on the study materials. Instead of just monitoring once to determine concentration level, monitoring more than once increases the accuracy in determining the student's concentration level. For example, a student is concentrating on the study materials. A mosquito lands on the back of his right hand. As the student is trying to hit the mosquito, the system monitors him. The indication based on that image alone is a correct indication of the student's concentration level in the study materials at that specific instant. However, the single measurement is not a good indication of the student's actual concentration level in the study materials—that single measurement is an outlying point that should be deleted. Instead of just one single result, this embodiment monitors more than once the student's behavior, which enhances identifying a pattern to eliminate outlying points.

The monitoring step does not have to stop after monitoring twice. The monitoring step can continue in a periodic manner, such as once every two seconds. In the embodiments of moni-

US 8,538,320 B2

7                                                                                    8

toring more than once or monitoring periodically, the results can be analyzed to identify patterns.

The behavior monitored more than once can be of the same type, or can be of different types. In one embodiment, in monitoring more than once, the sensor monitors the same type of behavior each time. In another embodiment, in monitoring more than once, the sensor monitors more than one type of behavior; for example, a first monitoring process is on one type of behavior, and a second monitoring process is on another type of behavior. In monitoring more than one type of behavior, the sensor may include more than one type of sensor, which can monitor more than one type of behavior substantially simultaneously. Monitoring more than one type of behavior is similar to monitoring one type of behavior more than once, in the sense that both approaches increase the accuracy in determining the student's concentration level.

FIG. **4** shows examples of different types of concentration-sensitive behavior, which are volitional **300**. In one embodiment, the sensor **110** monitors the student's volitional inputs entered into the computer (box **302**). One type of volitional inputs is entered through the keyboard **176** or the mouse **182**. The study materials can be presented to the student through the monitor **178**. As the student works on the study materials, he enters commands through the keyboard **176** or a position-pointing device, such as the mouse **182**, or arrow buttons of the keyboard **176**. The inputs may be the downward or upward arrows on the keyboard or the mouse, or may be the typing speed through the keyboard.

In one embodiment, the sensor **110** monitors the speed of inputs by the student as a function of time. There are different ways to monitor the speed of inputs, such as polling periodically the corresponding devices of those inputs. Such monitoring process should be obvious to those skilled in the art, and will not be further described.

As the student starts working on the study materials, the inputs are entered at a certain speed. As the student gets tired, or as the student loses concentration, this speed typically decreases. In this embodiment, the student's input speed is compared with a reference speed to identify changes.

There are a number of methods to determine the reference speed. In one embodiment, this reference speed is set through randomly sampling many students. Based on the students' responses on similar study materials, a reference speed is determined. In another embodiment, the student's initial speed becomes the reference speed. This initial speed may be found through averaging the student's speed across five minutes, such as from the first one minute to the first six minutes of the student's usage.

Different types of study materials typically have different reference speeds. For example, if the study materials include no pictures, the input speed may be slow because the student has to read an entire screen of text. If the student has to compose a sentence, the speed is likely to have frequent short pauses because the student has to think to compose the sentence. To accommodate such variations, in one embodiment, the reference speed is a function of the difficulty level of the study materials. As the student progresses in working on the study materials, the difficulty level of the study materials typically increases. In one embodiment, the reference speed is divided by the following factor:

(The difficulty level of the study material*a constant).

With the above equation, as the difficulty level increases, the reference speed decreases accordingly. In this embodiment, the reference speed tracks the difficulty level of the study materials.

As discussed above, by monitoring the speed of the student's inputs, the system **100** can provide an indication of the student's concentration. Thus, one rule is as follows:

If the speed of the student's volitional inputs across a predetermined period of time is significantly lower than the reference speed, the student has lost concentration in the study materials.

In one embodiment, the predetermined period of time is two minutes; and more than three times slower is considered as significantly lower.

In another embodiment, the study materials are presented through a multi-windows environment. The student enters inputs into the system, such as through a position-pointing device, like the mouse **182**, or through the keyboard **176**. In one embodiment, the sensor **110** in this embodiment is implemented through software, which periodically, such as every two seconds, polls the operating system or the device drivers of the position-pointing device. The polling determines if there have been any inputs. Writing such software to monitor such inputs to the system should be obvious to those skilled in the art, and will not be further described in this application. In such an embodiment, one rule is as follows:

If for a predetermined period of time, the inputs have been entered outside the window where the study materials reside, the student has lost concentration in the study materials.

In yet another embodiment, the study materials are presented in a window environment that has a focus window, and the sensor **110** can sense the focus window, for example as in the above embodiment. In such an embodiment, one rule is as follows:

If the study materials are not in the focus window for a predetermined period of time, the student has lost concentration in the study materials.

In one embodiment, the predetermined amount of time is more than one minute. If monitoring is performed every three seconds, in one minute, the system would have performed 20 measurements.

In yet another embodiment, the sensor **110** senses another type of volitional behavior, which is based on the student's face. In this embodiment, the monitor **178** presents study materials. The sensor **110** including the digital camera **180** are positioned adjacent to the monitor **178**, as shown, for example in FIG. **2A**. With the camera positioned where it is, when the student is looking at the monitor to work on the study materials, the digital camera **180** could take digital images of the student's face. Taking the digital images to generate numerous bits of data should be obvious to those skilled in the art and will not be further described in this application.

To improve the performance of this embodiment, before the step of monitoring, the present invention includes the step of calibration through imaging. One calibration technique enters the student's image before the student works on the study materials, and uses that image as the reference to compare with other images. For example, before the student starts working on the study materials, he is asked to look at the monitor **178** with a message box having a message such as "LOOK AT ME," and with a picture of two eyes staring at the student. Then, the digital camera **180** takes a reference image of the student's face, who typically looks at the two eyes.

The reference image should be analyzed. That image includes not only the student's face, but also background information, such as the wall of a room. In one embodiment, the controller assumes that the student's two eyes are looking at the two eyes in the monitor. Based on this assumption, the student's face is determined. Such image recognition techniques are disclosed for example in "Computer Recognition

US 8,538,320 B2

**9**

of Human Faces," written by Takeo Kanada, and published by Birkhauser Verlag, Basel and Stuttgart, in 1977. Even if the distance between the monitor and the student's face increases, the relative distances among different features on his face remain the same. In one embodiment, the monitoring step focuses on relative distances to re-calibrate the student's face. Such image recognition techniques should be obvious to those skilled in the art, and will not be further described in the present application.

One type of facial information is the facial orientation (box **304**). The controller **104** connected to the digital camera **180** calibrates the facial orientation when the student is looking at the monitor **178**. This reference image could be just the oblong shape of the face. After calibration, when the student starts working on the study materials, the digital camera **180** regularly captures the facial image, such as once every few seconds. All information in that image is removed leaving behind the orientation of the face. These orientations are compared with the reference image to check for differences. The distance between the monitor and the student's face may change. To compensate for such changes, in one embodiment, the controller uses the ratio of the longest horizontal to the longest vertical distance of the oblong shape. If the captured facial orientation is significantly different from the reference facial orientation, the student is not looking at the monitor. The student may be looking away from the computer or drooping while falling asleep. In such an embodiment, one rule is as follows:

If the student's facial orientation is significantly different from its reference image as shown in two consecutive monitoring processes, the student has lost concentration in the study materials.

In one embodiment, two images are considered significantly different if their horizontal-to-vertical-distance ratios differ by more than 20%.

Another type of facial information is the condition of the eyes (box **306**). If the eyelids are covering significant portions of the irises, the student's eyes are closing. In such an embodiment, one rule is as follows:

If the eyelids cover more than 60% of the irises as shown in two consecutive monitoring processes, the student has lost concentration in the study materials.

Another type of facial information is the student's facial expressions (box **308**), such as whether the student is frowning or not. In such an embodiment, one rule is as follows:

If the student frowns in two consecutive monitoring processes, the student is concentrating on the study materials.

Concentration-sensitive behavior can be involuntary. In one embodiment, the sensor **110** monitors the sizes of the student's pupils, assuming that a student's pupil dilates if the student loses focus and concentration. In such an embodiment, one rule is as follows:

If the average size of the student's pupils dilates by more than 20% as compared to the average size of the reference image for a predetermined amount of time, the student has lost concentration in the study materials.

Other examples of involuntary concentration-sensitive behavior include the student's heart beat, breathing rate, body temperature and whether the student's sweat has increased. With appropriate sensors and rules, these involuntary behavior can be monitored to provide indications on whether the student has lost concentration in the study materials.

There are many other types of concentration-sensitive behavior. Different types of behavior coupled with their corresponding sensors and rules should be able to indicate the student's concentration level.

**10**

More than one type of the student's concentration-sensitive behavior can be monitored by one or more sensors. In fact, one type can be volitional, with the other type involuntary. Including different types of behavior tends to increase the accuracy of identifying the student's concentration level. With more than one type of behavior being monitored, the system may not have to monitor each type of behavior more than once to identify the student's concentration level. An example of a rule for such an embodiment is as follows:

If the student's facial orientation is different from the reference image by more than 20% while the student's eyelids are covering more than 60% of the irises, the student has lost concentration in the study materials.

Such rules should be obvious to experts in the field of human perception, and will not be further described in this application.

The above embodiments describe whether the student has lost concentration or not. However, the invention is also applicable to indicate the student's degree of concentration, such as ranging from low, medium to high. For example, if the student has not lost concentration in the study materials for a long period of time, the student's concentration level is high. Another example is that if the student's eyes are wide open with his inputs through the mouse moving down the study materials in a fairly constant speed for a long duration of time, such as five minutes, the student's concentration level is also high.

In another embodiment, if the controller **104** decides that the student has not lost concentration for a long period of time, such as ten minutes, the controller **104** averages the captured results during that time frame—with outlying points removed—and treats the averaged results as the reference, which will be used to compare with subsequent captured results, to determine if the student has lost concentration in the study materials. The reference can be a reference image, such as the student's face, or the student's input speed, as appropriately modified by the study materials' difficulty level, or other monitored results. As the student continues working on study materials, this reference can be updated regularly by averaging it with subsequent captured results, which also show that the student has not lost concentration. Unlike many of the previously described references, which are static, this type of reference is typically not a constant, and is known as a dynamic reference. It is usually more closely tailored to the student. With more data used to generate the dynamic reference, its accuracy is typically better than the static references.

In yet another embodiment, the system **100** asks for the student's identity, such as the student's name, when the student starts working on the study materials. After the student enters his identity, it is stored in the system **100**. The student's reference information, whether static or dynamic, is stored with the student's identity in the memory of the system **100**, such as its harddisk. After the first working session, if the student wants to work on study materials through the system **100** again, the system retrieves from its memory the student's reference information. For such an embodiment, the retrieved reference information can replace the step of calibration. If the reference is of the dynamic type, the retrieved information is regularly updated.

Based on one or more of the above concentration-sensitive behavior coupled to one or more appropriate rules, the indicator **114** provides an indication on the student's concentration (step **258**), or the student's degree of concentration. Such indication can be as simple as changing the state of a register—a high logic level indicates the student has not lost concentration, while a low logic level indicates the student has.

US 8,538,320 B2

11

Another indication can be printing a report indicating that the student's degree of concentration in the study materials for a period of time.

In one embodiment, the system reacts according to the indication (step **260**). Some examples of reactions include stimulation, rewards, punishments or changing the study materials.

If the indication is that the student has lost concentration in the study materials, one way the controller **104** can help the student to re-focus on the study materials is through stimulation. This includes presenting a real-life application of the study materials that the student has lost concentration in. The stimulation can be through sound. It can be visual effects, including changing the screen temporarily and then restoring to the previous screen.

Another type of stimulation includes allowing the student to play a game. This stimulation is applicable if the student has been working on the study materials for a long duration of time, and should have a break. Thus, after the student has worked for a long period of time, such as 45 minutes, and is losing concentration in the study materials, the controller can pose the student a question, such as, "Do you want to take a break and play a game?" If the student wants to, in one embodiment, the controller accesses a game from the study-materials storage medium, which includes a number of games. The game serves as a diversion. Not only does it distract the student's mind for some time, the game also relaxes and entertains the student. After the game, presentation is resumed on the study materials.

Another form of reaction is a reward. If the student has been concentrating for a long period of time, at the end of a section in the study materials, the system reacts by praising the student audibly through a speaker, or visually through the monitor with words like "TIME FOR A SNACK!" Other examples of rewards include playing a short piece of music, presenting a joke, a factoid on an interesting subject, or playing a short animation or video clip.

A further form of reaction is punishment. This includes generating a report indicating that the student has lost concentration for a long period of time so that the student's supervisor can punish the student accordingly. Another punishment may be an audible reprimand, such as "PAY ATTENTION!"

The system can also change the study materials according to the monitored results. If the student has lost concentration in working on the study materials for a predetermined amount of time, the system can react by changing the study materials to a different set of materials. Also, the presenter **106** may change the presentation style accordingly, such as by reducing the speed of presentation through increasing the line spacing of the text or the size of the image to present to the student.

In yet another embodiment, due to the indication, the system asks the student a question. This question can stimulate the student, and help the student to re-focus in the study materials. Typically, the question is based on the study materials just presented to the student.

As a side note, while the controller **104** through the sensor **110** monitors the student's concentration-sensitive behavior, the controller **104** can also track the corresponding study materials being presented to the student. Such an embodiment has the added benefit of tying the indication with the corresponding study materials presented to the student.

Back to the embodiment that asks the student a question, this embodiment can be achieved, for example, through the selector **102** sending to the study-materials storage medium **108** the line-item root of the study materials just presented.

12

From the line-item root, a set of questions with the same line-item root is retrieved, and one of those question is randomly selected for the student. Other ways may be used to generate a question on materials just presented to the student. One simple way is to randomly select a sentence that has just been presented to the student, and change the syntax of that sentence into a question.

The embodiment on asking questions has a number of benefits. Even if the student does not know the answer to the question, typically, the student is stimulated by the question. Also, the question can be used to assess the student's understanding level on the materials just presented to the student. After the student answers the question, if the answer is correct, the controller **104** can praise the student appropriately. If the answer is not correct, the student may not understand what has just been presented. The controller **104** has a number of options. For example, the study materials just presented can be presented to the student again; the location as to where he can find the answer to the question can be presented to the student; the location of the answer can be hyperlinked to the location of the wrong answer if the student activates an icon shown on the presenter **106**; the presenter **106** presents study materials that are easier than the one just presented to the student, such as one with a lower difficulty level; or the presenter **106** can resume presenting, and ignore the wrong answer altogether.

The above embodiment on asking questions can be modified to focus on increasing the student's concentration level. FIG. **5** shows such an embodiment **350**. The system presents (step **352**) study materials to the student. Then, the system asks the student a question unexpectedly (step **354**). As an example, if the study material is presented through the monitor, unexpectedly, the entire screen changes. From a screen of study materials, the system suddenly changes the screen to display a question. The unexpected nature of the change, together with the displaying of the question stimulate the student. To further enhance the effect of stimulation, the system can spell out the question while displaying it. Typically the question is based on the study materials the student has been working on. After the student responds to the question, the system resumes (step **356**) presenting the study materials to the student.

The question stimulates. Right before the question is presented, the student may be concentrating or may not be concentrating. Either way, the student, unlikely to be aware that a question is coming, is suddenly confronted with a question. Independent of whether the student knows the answer, the question typically increases the student's concentration level. Also, responding to a question is an active learning approach, as compared to the passive learning approach of reading. The more active learning approach together with the unexpected nature of the question tend to increase the student's memory retention in the subject matter covered by the question.

Another benefit provided by the question is that the student's answer to the question provides an indication on the student's understanding level in the study materials. As described above, if the answer is wrong, the system can go over that part of the study materials, or can reduce the difficulty levels of the study materials to be presented to the student. In another embodiment, the question is just for increasing concentration; the system ignores the answer, and continues on with the presentation.

The student might have stopped working on the study materials altogether. For the embodiment that monitors the student's inputs, if there is no inputs for a predetermined

US 8,538,320 B2

**13**

amount of time, such as ten minutes, the system assumes that the student has totally stopped working on the study materials.

The present invention teaches sensing through different types of non-intrusive sensors, which are defined as sensors that do not cause the student physical pain and suffering when they are sensing the student's concentration-sensitive behavior. As technology progresses, sensors that are intrusive today can become non-intrusive in the future, for example, sensors that monitor the student's brain waves, which can be a type of concentration-sensitive behavior.

Rules are stored in the rules storage medium. However, in one embodiment, the rules have previously been embedded in the software implementing the present invention. With rules already embedded in the software, there is no need for accessing the rules, and there is no need for the system to have the rules storage medium.

In the above embodiments, the student's behavior is monitored more than once before the step of analysis. In another embodiment, the monitoring step and the analysis step are intermixed. Instead of monitoring more than once and then analyzing the results, in this embodiment, the sensor monitors one type of behavior, with the result analyzed. Then the sensor monitors the same or a different type of behavior, with the result analyzed.

In yet another embodiment, the steps in the present invention repeat. For example, after the step of reacting according to the indication (step **260**) or providing an indication (step **258**), the invention repeats from the step of monitoring automatically (step **254**). In this embodiment, study materials are continually presented to the student, although the study materials might be changed due to the reaction (step **260**).

The rules discussed can be self-adapting. In other words, the controller **104** can change a rule after applying the rule to a number of situations and after analyzing the results. This can be done, for example, in a fuzzy-logic system.

Other embodiments of the invention will be apparent to those skilled in the art from a consideration of this specification or practice of the invention disclosed herein. It is intended that the specification and examples be considered as exemplary only, with the true scope and spirit of the invention being indicated by the following claims.

We claim:

**1**. A computing system comprising:
a display;
an imaging sensor to sense a first feature of a user regarding a first volitional behavior of the user to produce a first set of measurements, the imaging sensor being detached from the first feature to sense the first feature, the first feature relating to the head of the user, and the first set of measurements including an image of the first feature, wherein the system further to sense a second feature of the user regarding a second volitional behavior of the user to produce a second set of measurements, the second feature not relating to the head of the user; and
a processor coupled to the imaging sensor and the display, the processor to:
analyze at least the first set and the second set of measurements; and
determine whether to change what is to be presented by the display in view of the analysis.

**2**. A computing system as recited in claim **1**, wherein the first feature includes a facial feature of the user.

**3**. A computing system as recited in claim **2**, wherein the facial feature includes a facial orientation.

**14**

**4**. A computing system as recited in claim **3**, wherein via the facial orientation, the system capable of determining if the user is looking away from the display.

**5**. A computing system as recited in claim **2**, wherein the facial feature includes at least one eye of the user.

**6**. A computing system as recited in claim **5**, wherein the facial feature includes the pupil of the at least one eye of the user.

**7**. A computing system as recited in claim **1**, wherein the imaging sensor capable of sensing multiple facial features of the user.

**8**. A computing system as recited in claim **7**, wherein the multiple facial features include a facial orientation and at least one eye of the user.

**9**. A computing system as recited in claim **1**, wherein the second feature includes an action by the user.

**10**. A computing system as recited in claim **9**, wherein the second set of measurements helps determine at least a position on the display.

**11**. A computing system as recited in claim **9**, wherein to analyze includes to analyze a speed of the user action.

**12**. A computing system as recited in claim **1**, wherein to analyze includes to analyze a speed of inputs to the system by the user.

**13**. A computing system as recited in claim **1**, wherein at least one of the sets of measurements capable of helping control movement of content on the display for the user to read.

**14**. A computing system as recited in claim **1**, wherein the imaging sensor capable of sensing the user periodically.

**15**. A computing system as recited in claim **1**, wherein the system capable of asking the user to be at a certain position relative to the display to sense the first feature.

**16**. A computing system as recited in claim **1**, wherein the system capable of associating at least some measurements from the imaging sensor to an identity of the user.

**17**. A computing system as recited in claim **1**, wherein the processor further capable of changing what is to be presented by the display in view of analysis of the first and the second set of measurements.

**18**. A computing system as recited in claim **17**, wherein changing what is to be presented includes changing a visual effect of what is to be presented.

**19**. A computing system as recited in claim **17**, wherein changing what is to be presented includes changing at least a portion of content to be presented.

**20**. A computing system as recited in claim **19**, wherein the at least a portion of content to be presented to be accessed via a network from another system.

**21**. A computing system as recited in claim **17**, wherein changing what is to be presented includes asking the user to respond to an inquiry.

**22**. A computing system as recited in claim **17**, wherein the system capable of producing a third set of measurements regarding a third volitional behavior of the user, and wherein the processor further capable of resuming what is to be presented by the display at least in view of the third set of measurements, after what is to be presented by the display has changed in view of analysis of the first and the second set of measurements.

**23**. A computing system as recited in claim **1**, wherein the system capable of promoting learning via the display.

**24**. A computing system as recited in claim **1**, wherein the system capable of providing an indication regarding whether the user is paying attention to content presented by the display.

US 8,538,320 B2

15

**25**. A computing system as recited in claim **1**, wherein the system capable of providing an indication regarding whether the user has stopped paying attention to content presented by the display.

**26**. A computing system as recited in claim **9**,
wherein the imaging sensor capable of sensing the user periodically, and
wherein to analyze includes to analyze a speed of the user action.

**27**. A computing system as recited in claim **26**, wherein to analyze includes at least to analyze whether the user has stopped paying attention to content presented by the display.

**28**. A computing system as recited in claim **27**, wherein the processor further configured to change what is to be presented by the display at least in view of the determination that what is to be presented by the display is to be changed.

**29**. A computing system as recited in claim **28**, wherein the system capable of producing a third set of measurements regarding a third volitional behavior of the user, and wherein the processor further capable of resuming what is to be presented by the display at least in view of the third set of measurements, after what is to be presented by the display has changed.

**30**. A computing system as recited in claim **29**, wherein the imaging sensor capable of sensing multiple facial features of the user, and wherein the multiple facial features include a facial orientation and at least one eye of the user.

**31**. A computing system as recited in claim **3**,
wherein the second feature includes an action by the user, and
wherein the second set of measurements helps determine at least a position on the display.

**32**. A computing system as recited in claim **31**,
wherein the first set of measurements includes more than one image of the first feature,
wherein the processor further configured to change what is to be presented by the display in view of the determination that what is to be presented by the display is to be changed, and
wherein to change what is to be presented includes to change a visual effect of what is to be presented.

**33**. A computing system as recited in claim **32**, wherein the system capable of producing a third set of measurements regarding a third volitional behavior of the user, and wherein the processor further capable of resuming what is to be presented by the display at least in view of the third set of measurements, after what is to be presented by the display has changed.

**34**. A computing system as recited in claim **33**, wherein the system capable of associating at least some measurements from the imaging sensor to an identity of the user.

**35**. A computing system comprising:
a display;
an optical sensor to sense a first feature of a user regarding a first volitional behavior of the user to produce a first set of measurements, the optical sensor being detached from the first feature to sense the first feature, the first feature being from the head of the user, and the first set of measurements including an image of the first feature;
a non-optical sensor to sense the user to produce a second set of measurements; and
a processor coupled to the optical sensor, the non-optical sensor, and the display, the processor to:
analyze at least the first set and the second set of measurements; and
determine whether to change what is to be presented by the display in view of the analysis.

16

**36**. A computing system as recited in claim **35**, wherein the optical sensor includes a camera.

**37**. A computing system as recited in claim **35**, wherein the first feature includes a facial feature of the user.

**38**. A computing system as recited in claim **37**, wherein the facial feature includes at least one eye of the user.

**39**. A computing system as recited in claim **38**, wherein the facial feature includes the pupil of the at least one eye of the user.

**40**. A computing system as recited in claim **35**, wherein the optical sensor capable of sensing multiple facial features of the user.

**41**. A computing system as recited in claim **40**, wherein the multiple facial features include a facial orientation and at least one eye of the user.

**42**. A computing system as recited in claim **35**, wherein the non-optical sensor capable of sensing a second feature of the user regarding a second volitional behavior of the user to produce the second set of measurements, the second feature not from the head of the user.

**43**. A computing system as recited in claim **42**, wherein the second feature includes an action the user.

**44**. A computing system as recited in claim **43**, wherein the second set of measurements helps determine at least a position on the display.

**45**. A computing system as recited in claim **44**, wherein to analyze includes to analyze at least a speed of the user action.

**46**. A computing system as recited in claim **35**, wherein the first set of measurements includes more than one image of the first feature.

**47**. A computing system as recited in claim **35**, wherein the optical sensor capable of sensing the user periodically.

**48**. A computing system as recited in claim **35**, wherein the system capable of associating at least some measurements from the optical sensor to an identity of the user.

**49**. A computing system as recited in claim **35**, wherein the processor further configured to change what is to be presented by the display at least in view of the determination that what is to be presented by the display is to be changed.

**50**. A computing system as recited in claim **49**, wherein to change what is to be presented includes to change a visual effect of what is to be presented.

**51**. A computing system as recited in claim **49**, wherein to change what is to be presented includes to change at least a portion of content to be presented.

**52**. A computing system as recited in claim **49**, wherein to change what is to be presented includes to ask the user to respond to an inquiry.

**53**. A computing system as recited in claim **49**, wherein the system capable of producing a third set of measurements regarding a third volitional behavior of the user, and wherein the processor further capable of resuming what is to be presented by the display at least in view of the third set of measurements, after what is to be presented by the display has changed.

**54**. A computing system as recited in claim **35**, wherein the system capable of providing an indication regarding whether the user is paying attention to content presented by the display.

**55**. A computing system as recited in claim **35**, wherein the system capable of providing an indication regarding whether the user has stopped paying attention to content presented by the display.

**56**. A computing system as recited in claim **50**, wherein the system capable of producing a third set of measurements regarding a third volitional behavior of the user, and wherein the processor further capable of resuming what is to be pre-

US 8,538,320 B2

17

sented by the display in view of the third set of measurements, after what is to be presented by the display has changed.

**57**. A computing system as recited in claim **53**, wherein the first set of measurements includes more than one image of the first feature.

**58**. A computing system as recited in claim **57**,

wherein the non-optical sensor capable of sensing a second feature of the user regarding a second volitional behavior of the user to produce the second set of measurements, and

wherein the second feature includes an action by the user.

**59**. A computing system as recited in claim **58**,

wherein the optical sensor includes a camera, and

wherein the optical sensor capable of sensing multiple facial features of the user.

**60**. A computing system as recited in claim **59**, wherein the multiple facial features include a facial orientation and at least one eye of the user.

**61**. A computing system as recited in claim **60**, wherein to analyze includes to analyze at least a speed of the user action.

**62**. A computing system as recited in claim **11**, wherein to analyze includes to compare the speed with a reference speed of the user, and wherein the reference speed is a static reference speed.

**63**. A computing system as recited in claim **11**, wherein to analyze includes to compare the speed with a reference speed of the user, and wherein the reference speed is a dynamic reference speed.

**64**. A computing system as recited in claim **1**, wherein the computing system capable of sensing features of different behaviors and capable of analyzing the sensed results in a manner that is intermixed.

18

**65**. A computing system as recited in claim **1**, wherein the processor further capable of providing an indication to the user regarding the system sensing the user.

**66**. A computing system as recited in claim **1**, wherein the processor capable of self-adapting based on at least the first set of measurements.

**67**. A computing system as recited in claim **45**, wherein to analyze includes to compare the speed with a reference speed of the user, and wherein the reference speed is a static reference speed.

**68**. A computing system as recited in claim **45**, wherein to analyze includes to compare the speed with a reference speed of the user, and wherein the reference speed is a dynamic reference speed.

**69**. A computing system as recited in claim **35**, wherein the computing system capable of sensing the user with the different sensors and capable of analyzing the sensed results in a manner that is intermixed.

**70**. A computing system as recited in claim **35**, wherein the processor further capable of providing an indication to the user regarding the system sensing the user.

**71**. A computing system as recited in claim **35**, wherein the processor capable self-adapting based on at least the first set of measurements.

**72**. A computing system as recited in claim **30**, wherein the system capable of associating at least some measurements from the imaging sensor to an identity of the user.

**73**. A computing system as recited in claim **61**,

wherein the system capable of associating at least some measurements from the optical sensor to an identity of the user, and

wherein the optical sensor capable of sensing the user periodically to produce multiple sets of measurements.

*    *    *    *    *



US008538321B2

(12) **United States Patent**
    Ho et al.

(10) Patent No.: **US 8,538,321 B2**
(45) Date of Patent: **\*Sep. 17, 2013**

(54) **COMPUTING METHOD AND SYSTEM USING DETACHED SENSOR**

(71) Applicant: **IpLearn-Focus, LLC**, Mountain View, CA (US)

(72) Inventors: **Chi Fai Ho**, Palo Alto, CA (US); **Peter P. Tong**, Mountain View, CA (US)

(73) Assignee: **IpLearn-Focus, LLC**, Mountain View, CA (US)

( \* ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **13/831,568**

(22) Filed: **Mar. 14, 2013**

(65) **Prior Publication Data**

US 2013/0201319 A1      Aug. 8, 2013

**Related U.S. Application Data**

(63) Continuation of application No. 13/481,821, filed on May 26, 2012, now Pat. No. 8,475,174, which is a continuation of application No. 10/694,706, filed on Oct. 28, 2003, now Pat. No. 8,398,407, which is a continuation of application No. 10/050,578, filed on Jan. 14, 2002, now Pat. No. 6,699,043, which is a continuation of application No. 09/385,795, filed on Aug. 30, 1999, now abandoned, which is a continuation of application No. 08/689,678, filed on Aug. 13, 1996, now Pat. No. 5,944,530.

(51) **Int. Cl.**
    *G09B 3/00*            (2006.01)

(52) **U.S. Cl.**
    USPC ............................ **434/350**; 434/322; 434/323

(58) **Field of Classification Search**
    USPC .......................................... 434/350, 323, 322
    See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,573,359 A | 4/1971 | Guisinger | |
| 3,685,169 A | 8/1972 | Blau et al. | |
| 4,006,539 A | 2/1977 | Slomski | |
| 4,037,332 A | 7/1977 | Petrusinsky | |
| 4,089,124 A | 5/1978 | Burtis et al. | |
| 4,464,121 A | 8/1984 | Perelli | |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| JP | 11276461 A | 10/1999 | |

OTHER PUBLICATIONS

Kanade, Takeo, *Computer Recognition of Human Faces*, 1977, cover and 2 additional pages, pp. i-iv, 1-87, 89-91, 93-96, and 2 additonal pages at the end.

(Continued)

*Primary Examiner* — Robert J Utama

(57)            **ABSTRACT**

One embodiment includes a computer-implemented method using a window environment of a display, with a detached imaging sensor, to enable a user to learn. Another embodiment includes a computer-implemented system helping a user learn using a detached imaging sensor. In yet another embodiment, a computer-implemented system monitors automatically more than once a user's behavior while the user is working on materials. Through monitoring the user's volitional or involuntary behavior, the system determines whether to change what is to be presented by the display. The change could include providing rewards, punishments, and stimulation; or changing the materials. The system can also react by asking the user a question. Based on the user's response, the system may change to more appropriate materials, or different presentation styles.

**52 Claims, 6 Drawing Sheets**



**US 8,538,321 B2**

Page 2

(56)                **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,705,479 | A | 11/1987 | Maron |
| 4,706,072 | A | 11/1987 | Ikeyama |
| 4,798,543 | A | 1/1989 | Spiece |
| 4,867,685 | A | 9/1989 | Brush et al. |
| 4,894,777 | A | 1/1990 | Negishi et al. |
| 5,035,625 | A | 7/1991 | Munson et al. |
| 5,211,563 | A | 5/1993 | Haga et al. |
| 5,267,865 | A | 12/1993 | Lee et al. |
| 5,286,036 | A | 2/1994 | Barabash |
| 5,295,491 | A | 3/1994 | Gevins |
| 5,306,154 | A | 4/1994 | Ujita et al. |
| 5,320,538 | A | 6/1994 | Baum |
| 5,333,272 | A | 7/1994 | Capek et al. |
| 5,339,826 | A | 8/1994 | Schmidt et al. |
| 5,362,069 | A | 11/1994 | Hall-Tipping |
| 5,370,399 | A | 12/1994 | Liverance |
| 5,372,507 | A | 12/1994 | Goleh |
| 5,437,553 | A | 8/1995 | Collins et al. |
| 5,458,494 | A | 10/1995 | Krohn et al. |
| 5,494,444 | A | 2/1996 | Thayer et al. |
| 5,535,422 | A | 7/1996 | Chiang et al. |
| 5,546,598 | A | 8/1996 | Yamaguchi et al. |
| 5,577,919 | A | 11/1996 | Collins et al. |
| 5,595,488 | A | 1/1997 | Gozlan et al. |
| 5,597,312 | A | 1/1997 | Bloom et al. |
| 5,681,170 | A | 10/1997 | Rieber et al. |
| 5,724,987 | A | 3/1998 | Gevins et al. |
| 5,727,950 | A | 3/1998 | Cook et al. |
| 5,730,604 | A | 3/1998 | Jay et al. |
| 5,738,527 | A | 4/1998 | Lundberg |
| 5,774,591 | A | 6/1998 | Black et al. |
| 5,788,504 | A | 8/1998 | Rice et al. |
| 5,797,754 | A | 8/1998 | Griswold et al. |
| 5,807,114 | A | 9/1998 | Hodges et al. |
| 5,829,983 | A | 11/1998 | Koyama et al. |
| 5,900,827 | A | 5/1999 | Graham et al. |
| 5,944,530 | A | 8/1999 | Ho et al. |
| 5,987,302 | A | 11/1999 | Driscoll et al. |
| 6,034,652 | A | 3/2000 | Freiberger et al. |
| 6,053,739 | A | 4/2000 | Stewart et al. |
| 6,149,438 | A | 11/2000 | Richard et al. |
| 6,149,441 | A | 11/2000 | Pellegrino et al. |
| 6,162,060 | A | 12/2000 | Richard et al. |
| 6,186,794 | B1 | 2/2001 | Brown et al. |

OTHER PUBLICATIONS

Restriction Requirement for U.S. Appl. No. 08/689,678, dated Sep. 15, 1997.
Office Action for U.S. Appl. No. 08/689,678, dated Jan. 8, 1998.
Office Communication for U.S. Appl. No. 08/689,678, dated Nov. 9, 1998.
Notice of Allowance for U.S. Appl. No. 08/689,678, dated Mar. 15, 1999.
Office Action for U.S. Appl. No. 09/385,795, dated May 10, 2000.
Notice of Abandonment for U.S. Appl. No. 09/385,795, dated Dec. 21, 2000.

Notice of Allowance for U.S. Appl. No. 09/385,795, dated Oct. 15, 2001.
Notice of Abandonment for U.S. Appl. No. 09/385,795, dated May 16, 2002.
Office Action for U.S. Appl. No. 10/050,578, dated Oct. 9, 2002.
Notice of Allowance for U.S. Appl. No. 10/050,578, dated Feb. 10, 2003.
Notice of Allowance for U.S. Appl. No. 10/050,578, dated Jul. 17, 2003.
Corrected Notice of Allowance for U.S. Appl. No. 10/050,578, dated Sep. 2, 2003.
Supplemental Notice of Allowance for U.S. Appl. No. 10/050,578, dated Jan. 21, 2004.
Restriction Requirement for U.S. Appl. No. 10/694,706, dated Jun. 21, 2004.
Office Action for U.S. Appl. No. 10/694,706, dated Dec. 1, 2004.
Notice of Non-Compliant Amendment for U.S. Appl. No. 10/694,706, dated Mar. 8, 2005.
Office Action for U.S. Appl. No. 10/694,706, dated Apr. 10, 2006.
Final Office Action for U.S. Appl. No. 10/694,706, dated Feb. 5, 2007.
Office Action for U.S. Appl. No. 10/694,706, dated Jun. 6, 2007.
Final Office Action for U.S. Appl. No. 10/694,706, dated Oct. 16, 2007.
Notice of Allowance for U.S. Appl. No. 10/694,706, dated Dec. 18, 2007.
Office Action for U.S. Appl. No. 10/694,706, dated Aug. 5, 2008.
Final Office Action for U.S. Appl. No. 10/694,706, dated Dec. 24, 2008.
Notice of Allowance for U.S. Appl. No. 10/694,706, dated Jun. 19, 2009.
Office Action for U.S. Appl. No. 10/694,706, dated Nov. 2, 2009.
Notice of Allowance for U.S. Appl. No. 10/694,706, dated Jun. 14, 2010.
Office Communication for U.S. Appl. No. 10/694,706, dated Aug. 20, 2010.
Notice of Allowance for U.S. Appl. No. 10/694,706, dated Dec. 17, 2010.
Notice of Allowance for U.S. Appl. No. 10/694,706, dated May 3, 2011.
Corrected Notice of Allowance for U.S. Appl. No. 10/694,706, dated May 25, 2011.
Notice of Allowance for U.S. Appl. No. 10/694,706, dated Jul. 11, 2011.
Notice of Allowance for U.S. Appl. No. 10/694,706, dated Feb. 15, 2012.
Notice of Allowance for U.S. Appl. No. 10/694,706, dated Apr. 9, 2012.
Response to Rule 312 Communication for U.S. Appl. No. 10/694,706, dated Apr. 26, 2012.
Notice of Allowance for U.S. Appl. No. 10/694,706, dated Oct. 1, 2012.
Office Action for U.S. Appl. No. 13/481,821, dated Jun. 29, 2012.
Notice of Allowance for U.S. Appl. No. 13/481,821, dated Feb. 20, 2013.



Figure 1



Figure 2A



Figure 2B



250

Present Study Materials ∼ 252

Monitor Student's Behavior ∼ 254
through Sensor

Analyze Monitored ∼ 256
Results with Rules

Provide Indication on ∼ 258
Student's Concentration

React According to ∼ 260
the Indication

Figure 3



Figure 4



350

Present Study Materials ∼ 352

Ask a Question Unexpectedly ∼ 354

Resume Presenting
Study Materials ∼ 356

Figure 5

**1**

# COMPUTING METHOD AND SYSTEM USING DETACHED SENSOR

## CROSS-REFERENCE TO RELATED APPLICATIONS

This is a continuation of co-pending U.S. patent application Ser. No. 13/481,821, filed on May 26, 2012, which is a continuation of co-pending U.S. patent application Ser. No. 10/694,706, filed on Oct. 28, 2003, which is a continuation of U.S. Pat. No. 6,699,043, filed on Jan. 14, 2002, which is a continuation of U.S. patent application Ser. No. 09/385,795, filed on Aug. 30, 1999, since abandoned, which is a continuation of U.S. patent Ser. No. 08/689,678, filed on Aug. 13, 1996, now U.S. Pat. No. 5,944,530; all incorporated by reference into this application.

## BACKGROUND OF THE INVENTION

The present invention relates generally to learning via a computing device, and more particularly to learning method and system using detached sensor.

Both at home and in schools, the computer is gradually becoming a major medium for education. There are many different reasons for this trend. One is the tremendous reduction in the price of a computer, causing it to permeate into almost every household. Though the price of a computer has been dropping, its computation and memory capacity have increased many folds, leading to computer programs with significantly more intelligence and improved user-friendliness. Another reason is that a computer-aided-education system can be very personalized; it can be tailored to the strengths and weaknesses of individual students. This is very hard to achieve in today's educational environment, in part due to the increase in the students-per-instructor ratio. Though computer-aided education system could be very useful, there is still a need for a system and method that could sense a student in a better manner.

## SUMMARY OF THE INVENTION

One embodiment of the invention includes computer-implemented method and system using a window environment of a display, with at least one detached sensor, to enable a user to learn. Another embodiment provides learning methods and systems that help a user learn using at least one detached imaging sensor. In yet another embodiment, the present invention provides a computer-aided-educational system and method that automatically consider a student's concentration-sensitive behavior while the student is working on materials.

In one embodiment, the present invention includes a display, a processor, and a detached imaging sensor to sense a first feature from the head of a user regarding a first volitional behavior of the user to produce a first set of data. The embodiment is further configured to sense a second feature of the user regarding a second volitional behavior of the user to produce a second set of data, the second feature not from the head of the user. The processor is configured to analyze the first set and the second set of data, with the analyzing being depending on the display, and to determine whether to change what is to be presented by the display in view of the analyzing to enable the user to learn.

In one embodiment, the present invention includes a presenter, a non-intrusive sensor, a controller and an indicator. The presenter presents study materials on a subject to the student; the non-intrusive sensor automatically monitors

**2**

more than once the student's concentration-sensitive behavior while the student is working on the materials; the controller analyzes the student's concentration-sensitive behavior based on one or more rules; and the indicator provides an indication on the student's concentration level based on the analysis. In another embodiment, the present invention reacts according to the indication.

There are a number of examples of the concentration-sensitive behavior that the sensor can monitor. In one embodiment, the sensor monitors the student's volitional behavior, such as his inputs into the computer, his facial expressions, his facial orientations and his eyes. In another embodiment, the sensor monitors the student's involuntary behavior, such as the sizes of his pupils.

The controller analyzes one or more of the above behavior based on one or more rules. These rules are similar to the instructor's "intuition." For example, one rule is as follows: The student has lost concentration in the study materials if for a predetermined period of time, the student's inputs through a mouse have been in a window that does not contain study materials. Another rule is that if the student is not looking at the monitor showing the study materials for a predetermined period of time, the student has lost concentration in the study materials. From the analysis, the system provides an indication on the student's concentration level.

Based on the indication, the system could react accordingly. Different reactions are applicable. Some examples include rewards, punishments, stimulation, and changing the study materials.

In another embodiment, due to the indication, the system asks the student a question, which can stimulate the student and can assess the student's understanding level in the study materials. From the student's response to the question, the system may change to more appropriate study materials and/or presentation style.

The question-asking approach in the above embodiment does not have to be a reaction to the indication. In one embodiment, as the system is presenting study materials to the student, unexpected by the student, the system asks the student a question. After the student responds to the question, the system resumes back to present study materials to the student. In such an embodiment, the question tends to increase the concentration level of the student in the study materials.

In yet another embodiment, the present invention also includes a calibrator, which calibrates the student's concentration-sensitive behavior before the behavior is being monitored to show concentration. One type of calibration establishes the student's behavior when the student is paying attention, and compares it with the student's behavior when the student is working on the study materials. Calibration typically improves the accuracy of the system.

Other aspects and advantages of the present invention will become apparent from the following detailed description, which, when taken in conjunction with the accompanying drawings, illustrates by way of example the principles of the invention.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** shows one embodiment of the present invention.

FIGS. **2**A-B show one embodiment of a system implementing the present invention.

FIG. **3** shows a set of steps to implement one embodiment of the present invention.

FIG. **4** shows examples of volitional behavior monitored by the sensor in the present invention.

US 8,538,321 B2

**3**

FIG. **5** shows another embodiment of the present invention.

Same numerals in FIGS. **1-5** are assigned to similar elements in all the figures. Embodiments of the invention are discussed below with reference to FIGS. **1-5**. However, those skilled in the art will readily appreciate that the detailed description given herein with respect to these figures is for explanatory purposes as the invention extends beyond these limited embodiments.

DETAILED DESCRIPTION OF THE INVENTION

FIG. **1** shows one embodiment of a computer-aided-educational system **100** of the present invention. As an overview of some of its components, the system **100** includes a selector **102**, which selects study materials from a study-materials storage medium **108** to be presented to a student through a presenter **106**. While the student is working on the study materials, a non-intrusive sensor **110** monitors the student's concentration-sensitive behavior, and sends its results back to a controller **104**. Then the controller **104** based on one or more rules from a rules storage medium **112** analyzes the monitored results to provide through an indicator **114**, an indication on the student's concentration level. In another embodiment, the selector is **102** also connected to the controller **104** to keep track of the study materials presented to the student.

FIG. **2A** shows one embodiment of a system **150** implementing the present invention, preferably in software and hardware. The system **150** includes a server computer **152** and a number of client computers, such as **154**, which can be a personal computer. Each client computer communicates to the server computer **152** through a dedicated communication link, or a computer network **156**.

FIG. **2B** shows one embodiment of a client computer **154**. It typically includes a bus **159** connecting a number of components, such as a processing unit **160**, a main memory **162**, an I/O controller **164**, a peripheral controller **166**, a graphics adapter **168** and a network interface adapter **170**. The I/O controller **164** is connected to components, such as a harddisk drive **172** and a floppy disk drive **174**. The peripheral controller **166** is connected to peripheral components, such as a keyboard **176**, a mouse **182**, and a digital camera **180**. The graphics adapter **168** is connected to a monitor **178**; and the network interface adapter **170** is connected to the network **120**. The network can be the Internet, an intranet, the world wide web and other forms of networks.

Different components of the present invention can be in different elements shown in FIGS. **2A-B**. For example, the presenter **106** and the sensor **110** can be in a client computer; the selector **102**, the controller **104**, the study-materials storage medium **108**, the rules storage medium **112** and the indicator **114** can be in the server computer **152**. In another embodiment, the selector **102**, the controller **104** and the indicator **114** are also in a client computer. Different components can be in different elements in the above description. Nonetheless, there is no restriction preventing all components to reside in one element, such as a client computer. A number of operations in the present invention can be implemented by software, which is controlled, for example, by the processing unit **160**. In yet another embodiment, the number of operations implemented by software can be stored in a storage medium, which can be, for example, the main memory **162** or a CD read-only-memory.

The present invention is applicable to teach any subject or materials that can be taught by a computer. The teaching period may last one semester or a year, or just one class session. The materials may cover inter-disciplinary areas, such as electrical engineering and thermodynamics, or com-

**4**

puter networking and programming techniques. The materials may just be for training a field engineer on a new product. In the following, mathematics is the subject used to illustrate the present invention.

In one embodiment, the subject is divided into major-topics, with each major-topic subdivided into minor-topics, and with each minor-topic further subdivided into line-items. Each line-item typically covers one well-defined area in the subject. In another embodiment, the subject is further divided into more levels below the line-items; and in a third embodiment, the subject is just divided into line-items.

As an example of line-items, if the major-topic is high school algebra, then it can be divided into the following line-items, with bracketed terms served as comments:

High School Algebra (the major-topic)
(Minor-topics under the major-topic)
Decimal Numbers
Polynomials
Linear Equations
Quadratic Equations
. . .
Integers
(Line-items under the minor-topic of integers)
Addition & Subtraction (Difficulty level 1)
Multiplication (Difficulty level 2)
Division (Difficulty level 2)
Prime Numbers (Difficulty level 3)
Factorization (Difficulty level 3)
Common Divisor (Difficulty level 4)
. . .
Fractions
(Line-items under the minor-topic of fractions)
Addition & Subtraction (+/−) with Common Denominator (Difficulty level 3)
+/− with Difficulty level 4)
+/− without Common Denominator (Difficulty level 5)
Multiplication and Divisions (*,/) with Integers (Difficulty level 5)
*,/ with fraction (Difficulty level 6)
Compound Fractions (Difficulty level 6)
Fraction Reduction (Difficulty level 7)
Ratios and Proportions (Difficulty level 7)
. . .

Another example with the minor topic being differential calculus is as follows:

Calculus (major topic)
Differential calculus (minor topic)
Fractions (Difficulty level 1)
Polynomials (Difficulty level 1)
Exponential Functions (Difficulty level 1)
Differentiation (Difficulty level 2)
Differentiate a sum (Difficulty level 3)
Differentiate a product (Difficulty level 3)
Differentiate a quotient (Difficulty level 4)

In one embodiment, each line-item has a difficulty level. The bracketed difficulty level next to each line-item in the above example indicates how difficult one line-item is relative to other line-items in the subject, or how significant one is relative to another. A line-item with a low difficulty level is a relatively easy line-item or a relatively less important line-item. Typically, a student learning a subject starts from learning line-items at the lowest difficulty level.

The lists of items in the above examples are generated based on expert knowledge on the subject of mathematics. With the proper instruction, such as through reading the present specification, generating such lists with the difficulty

US 8,538,321 B2

**5**

levels should be obvious to experts in the subject. The more knowledgeable the expert, the more complete the sets of items.

In one embodiment, each line-item is represented by a line-item root, which includes the line item and its root. In the above example, the root of a line-item includes its subject, its major topic and minor topic.

In one embodiment, the selector **102** starts the learning process by selecting a line-item with the lowest difficulty level. If there are a number of those, one of them is randomly selected. Study materials for that line-item are retrieved from the study-materials storage medium **108** to be presented to the student. After presentation, the selector **102** selects another line-item with the lowest difficulty level among all the unselected line-items, and the process repeats. For this embodiment, each line-item also includes a mode attribute, which is changed from the un-selected to the selected mode after the study materials for that line-item has been selected to be worked on by the student.

To select a set of study materials from the study-material storage medium **108**, the selector **102** sends the line-item root to the storage medium **108** to retrieve the corresponding study materials. Typically, there are a number of sets of study materials in the storage-medium **108**, and they can be in the following format:

(line-item root, mode, study materials)

The following serves as examples of study materials for differentiating polynomial:

First, the system teaches the approach to generate derivatives based on the basic principle in differentiation, such as:

$$df(x)/dx = lim_{h \to 0}((f(x*h) - f(x))/h)$$

Then the system teaches the generalized equation, such as:

$$((d\Sigma a_i x^i)/dx) = (\Sigma i * a_i x^{i-1})$$

Finally, the system teaches the importance of and the way to find optima and minima by solving the following equation:

$$((d\Sigma a_i x^i)/dx) = 0$$

Based on the line-item root, and with one set of study materials per line-item, the selector **102** retrieves from the study-materials storage-medium **108**, the corresponding set of study materials. Creating study materials on a subject should be obvious to experts in the subject, and will not be further discussed in this application.

The selector **102** then sends the retrieved study materials to the presenter **106**. The study materials can be a document with no questions, arranged as a list of screens. The presenter **106** typically includes the monitor **178**, which presents the study materials to the student, who can go from one screen to another with the keyboard **176**, or the mouse **182**. In another embodiment, the study materials are broadcast through a radio. As the student is working on the study materials presented through the radio, the student's concentration-sensitive behavior is monitored automatically.

In another embodiment, the study materials only have questions. Typically, students gain a better understanding on a subject through actively working on questions than through passively reading study materials. In one embodiment, each question is embedded in a question entry, which is of the following format:

(line-item root, mode, question-body, answer)

The term "question-body" describes the body of a question. The following serves as an example:

Subject: Mathematics.

Major-topic: High School Algebra.

Minor-topic: Fraction.

**6**

Line-item: +/− with common denominator

Mode: Un-selected

Answer Question-body

28/37 What is the sum of 2/37, 3/37, 8/37 and 15/37?

−2/43 17/43−25/43+6/43=?

The selector **102** sends to the study-materials storage medium **108** the line-item root to retrieve the set of questions with the same line-item root.

An example of study materials with questions are for the line-item of differentiating exponential functions. A number of questions are generated, including the question on expanding an exponential function based on Taylor expansion, the question on differentiating the Taylor-expanded exponential function, whose answer is the original Taylor-expanded exponential function, and the question on differentiating the exponential function, whose answer is the exponential function.

In another embodiment, the study materials include study materials with questions and study materials without questions.

Note that the formats of the study materials may change as the student progresses. The student can learn one line-item based on questions, and another based on study materials with no questions. As an example, for differential calculus, of the different line-items, all of them can be learnt through either study materials with or without questions, except for the line-item of differentiation, which is typically learnt without questions. That study-materials cover the general differentiation concept, such as the following:

$$df(x)/dx = lim_{h \to 0}((f(x+h) - f(x))/h)$$

FIG. **3** shows a set of steps **250** to implement one embodiment of the present invention. First, the presenter **106** presents (step **252**) the selected study materials to the student. As the student is working on the study materials, the sensor **110** monitors (step **254**) more than once the student's concentration-sensitive behavior, and feeds those monitored results to the controller. The controller **104** analyzes (step **256**) the results based on one or more rules to provide (step **258**) an indication on the student's concentration. Based on the indication, the system reacts (step **260**) accordingly.

A type of concentration-sensitive behavior is a type of behavior that is sensitive to one's concentration. As one's concentration changes, such a type of behavior changes accordingly. The behavior can be physical, psychological, biological, emotional and physiological.

In the step of monitoring (step **254**), the sensor automatically monitors more than once the student's concentration-sensitive behavior while the student is working on the study materials. Instead of just monitoring once to determine concentration level, monitoring more than once increases the accuracy in determining the student's concentration level. For example, a student is concentrating on the study materials. A mosquito lands on the back of his right hand. As the student is trying to hit the mosquito, the system monitors him. The indication based on that image alone is a correct indication of the student's concentration level in the study materials at that specific instant. However, the single measurement is not a good indication of the student's actual concentration level in the study materials—that single measurement is an outlying point that should be deleted. Instead of just one single result, this embodiment monitors more than once the student's behavior, which enhances identifying a pattern to eliminate outlying points.

The monitoring step does not have to stop after monitoring twice. The monitoring step can continue in a periodic manner, such as once every two seconds. In the embodiments of moni-

**7**

toring more than once or monitoring periodically, the results can be analyzed to identify patterns.

The behavior monitored more than once can be of the same type, or can be of different types. In one embodiment, in monitoring more than once, the sensor monitors the same type of behavior each time. In another embodiment, in monitoring more than once, the sensor monitors more than one type of behavior; for example, a first monitoring process is on one type of behavior, and a second monitoring process is on another type of behavior. In monitoring more than one type of behavior, the sensor may include more than one type of sensor, which can monitor more than one type of behavior substantially simultaneously. Monitoring more than one type of behavior is similar to monitoring one type of behavior more than once, in the sense that both approaches increase the accuracy in determining the student's concentration level.

FIG. **4** shows examples of different types of concentration-sensitive behavior, which are volitional **300**. In one embodiment, the sensor **110** monitors the student's volitional inputs entered into the computer (box **302**). One type of volitional inputs is entered through the keyboard **176** or the mouse **182**. The study materials can be presented to the student through the monitor **178**. As the student works on the study materials, he enters commands through the keyboard **176** or a position-pointing device, such as the mouse **182**, or arrow buttons of the keyboard **176**. The inputs may be the downward or upward arrows on the keyboard or the mouse, or may be the typing speed through the keyboard.

In one embodiment, the sensor **110** monitors the speed of inputs by the student as a function of time. There are different ways to monitor the speed of inputs, such as polling periodically the corresponding devices of those inputs. Such monitoring process should be obvious to those skilled in the art, and will not be further described.

As the student starts working on the study materials, the inputs are entered at a certain speed. As the student gets tired, or as the student loses concentration, this speed typically decreases. In this embodiment, the student's input speed is compared with a reference speed to identify changes.

There are a number of methods to determine the reference speed. In one embodiment, this reference speed is set through randomly sampling many students. Based on the students' responses on similar study materials, a reference speed is determined. In another embodiment, the student's initial speed becomes the reference speed. This initial speed may be found for example by averaging the student's speed across five minutes, such as from the first one minute to the first six minutes of the student's usage.

Different types of study materials typically have different reference speeds. For example, if the study materials include no pictures, the input speed may be slow because the student has to read an entire screen of text. If the student has to compose a sentence, the speed is likely to have frequent short pauses because the student has to think to compose the sentence. To accommodate such variations, in one embodiment, the reference speed is a function of the difficulty level of the study materials. As the student progresses in working on the study materials, the difficulty level of the study materials typically increases. In one embodiment, the reference speed is divided by the following factor:

(The difficulty level of the study material * a constant).

With the above equation, as the difficulty level increases, the reference speed decreases accordingly. In this embodiment, the reference speed tracks the difficulty level of the study materials.

**8**

As discussed above, by monitoring the speed of the student's inputs, the system **100** can provide an indication of the student's concentration. Thus, one rule is as follows:

If the speed of the student's volitional inputs across a predetermined period of time is significantly lower than the reference speed, the student has lost concentration in the study materials.

In one embodiment, the predetermined period of time is two minutes; and more than three times slower is considered as significantly lower.

In another embodiment, the study materials are presented through a multi-windows environment. The student enters inputs into the system, such as through a position-pointing device, like the mouse **182**, or through the keyboard **176**. In one embodiment, the sensor **110** in this embodiment is implemented through software, which periodically, such as every two seconds, polls the operating system or the device drivers of the position-pointing device. The polling determines if there have been any inputs. Writing such software to monitor such inputs to the system should be obvious to those skilled in the art, and will not be further described in this application. In such an embodiment, one rule is as follows:

If for a predetermined period of time, the inputs have been entered outside the window where the study materials reside, the student has lost concentration in the study materials.

In yet another embodiment, the study materials are presented in a window environment that has a focus window, and the sensor **110** can sense the focus window, for example as in the above embodiment. In such an embodiment, one rule is as follows:

If the study materials are not in the focus window for a predetermined period of time, the student has lost concentration in the study materials.

In one embodiment, the predetermined amount of time is more than one minute. If monitoring is performed every three seconds, in one minute, the system would have performed 20 measurements.

In yet another embodiment, the sensor **110** senses another type of volitional behavior, which is based on the student's face. In this embodiment, the monitor **178** presents study materials. The sensor **110** including the digital camera **180** are positioned adjacent to the monitor **178**, as shown, for example in FIG. 2A. With the camera positioned where it is, when the student is looking at the monitor to work on the study materials, the digital camera **180** could take digital images of the student's face. Taking the digital images to generate numerous bits of data should be obvious to those skilled in the art and will not be further described in this application.

To improve the performance of this embodiment, before the step of monitoring, the present invention includes the step of calibration through imaging. One calibration technique enters the student's image before the student works on the study materials, and uses that image as the reference to compare with other images. For example, before the student starts working on the study materials, he is asked to look at the monitor **178** with a message box having a message such as "LOOK AT ME," and with a picture of two eyes staring at the student. Then, the digital camera **180** takes a reference image of the student's face, who typically looks at the two eyes.

The reference image should be analyzed. That image includes not only the student's face, but also background information, such as the wall of a room. In one embodiment, the controller assumes that the student's two eyes are looking at the two eyes in the monitor. Based on this assumption, the student's face is determined. Such image recognition techniques are disclosed for example in "Computer Recognition

US 8,538,321 B2

9

of Human Faces," written by Takeo Kanada, and published by Birkhauser Verlag, Basel and Stuttgart, in 1977. Even if the distance between the monitor and the student's face increases, the relative distances among different features on his face remain the same. In one embodiment, the monitoring step focuses on relative distances to re-calibrate the student's face. Such image recognition techniques should be obvious to those skilled in the art, and will not be further described in the present application.

One type of facial information is the facial orientation (box **304**). The controller **104** connected to the digital camera **180** calibrates the facial orientation when the student is looking at the monitor **178**. This reference image could be just the oblong shape of the face. After calibration, when the student starts working on the study materials, the digital camera **180** regularly captures the facial image, such as once every few seconds. All information in that image is removed leaving behind the orientation of the face. These orientations are compared with the reference image to check for differences. The distance between the monitor and the student's face may change. To compensate for such changes, in one embodiment, the controller uses the ratio of the longest horizontal to the longest vertical distance of the oblong shape. If the captured facial orientation is significantly different from the reference facial orientation, the student is not looking at the monitor. The student may be looking away from the computer or drooping while falling asleep. In such an embodiment, one rule is as follows:

If the student's facial orientation is significantly different from its reference image as shown in two consecutive monitoring processes, the student has lost concentration in the study materials.

In one embodiment, two images are considered significantly different if their horizontal-to-vertical-distance ratios differ by more than 20%.

Another type of facial information is the condition of the eyes (box **306**). If the eyelids are covering significant portions of the irises, the student's eyes are closing. In such an embodiment, one rule is as follows:

If the eyelids cover more than **60%** of the irises as shown in two consecutive monitoring processes, the student has lost concentration in the study materials.

Another type of facial information is the student's facial expressions (box **308**), such as whether the student is frowning or not. In such an embodiment, one rule is as follows:

If the student frowns in two consecutive monitoring processes, the student is concentrating on the study materials.

Concentration-sensitive behavior can be involuntary. In one embodiment, the sensor **110** monitors the sizes of the student's pupils, assuming that a student's pupil dilates if the student loses focus and concentration. In such an embodiment, one rule is as follows:

If the average size of the student's pupils dilates by more than 20% as compared to the average size of the reference image for a predetermined amount of time, the student has lost concentration in the study materials.

Other examples of involuntary concentration-sensitive behavior include the student's heart beat, breathing rate, body temperature and whether the student's sweat has increased. With appropriate sensors and rules, these involuntary behavior can be monitored to provide indications on whether the student has lost concentration in the study materials.

There are many other types of concentration-sensitive behavior. Different types of behavior coupled with their corresponding sensors and rules should be able to indicate the student's concentration level.

10

More than one type of the student's concentration-sensitive behavior can be monitored by one or more sensors. In fact, one type can be volitional, with the other type involuntary. Including different types of behavior tends to increase the accuracy of identifying the student's concentration level. With more than one type of behavior being monitored, the system may not have to monitor each type of behavior more than once to identify the student's concentration level. An example of a rule for such an embodiment is as follows:

If the student's facial orientation is different from the reference image by more than 20% while the student's eyelids are covering more than 60% of the irises, the student has lost concentration in the study materials.

Such rules should be obvious to experts in the field of human perception, and will not be further described in this application.

The above embodiments describe whether the student has lost concentration or not. However, the invention is also applicable to indicate the student's degree of concentration, such as ranging from low, medium to high. For example, if the student has not lost concentration in the study materials for a long period of time, the student's concentration level is high. Another example is that if the student's eyes are wide open with his inputs through the mouse moving down the study materials in a fairly constant speed for a long duration of time, such as five minutes, the student's concentration level is also high.

In another embodiment, if the controller **104** decides that the student has not lost concentration for a long period of time, such as ten minutes, the controller **104** averages the captured results during that time frame—with outlying points removed--and treats the averaged results as the reference, which will be used to compare with subsequent captured results, to determine if the student has lost concentration in the study materials. The reference can be a reference image, such as the student's face, or the student's input speed, as appropriately modified by the study materials' difficulty level, or other monitored results. As the student continues working on study materials, this reference can be updated regularly by averaging it with subsequent captured results, which also show that the student has not lost concentration. Unlike many of the previously described references, which are static, this type of reference is typically not a constant, and is known as a dynamic reference. It is usually more closely tailored to the student. With more data used to generate the dynamic reference, its accuracy is typically better than the static references.

In yet another embodiment, the system **100** asks for the student's identity, such as the student's name, when the student starts working on the study materials. After the student enters his identity, it is stored in the system **100**. The student's reference information, whether static or dynamic, is stored with the student's identity in the memory of the system **100**, such as its harddisk. After the first working session, if the student wants to work on study materials through the system **100** again, the system retrieves from its memory the student's reference information. For such an embodiment, the retrieved reference information can replace the step of calibration. If the reference is of the dynamic type, the retrieved information is regularly updated.

Based on one or more of the above concentration-sensitive behavior coupled to one or more appropriate rules, the indicator **114** provides an indication on the student's concentration (step **258**), or the student's degree of concentration. Such indication can be as simple as changing the state of a register—a high logic level indicates the student has not lost concentration, while a low logic level indicates the student has.

US 8,538,321 B2

**11**

Another indication can be printing a report indicating that the student's degree of concentration in the study materials for a period of time.

In one embodiment, the system reacts according to the indication (step **260**). Some examples of reactions include stimulation, rewards, punishments or changing the study materials.

If the indication is that the student has lost concentration in the study materials, one way the controller **104** can help the student to re-focus on the study materials is through stimulation. This includes presenting a real-life application of the study materials that the student has lost concentration in. The stimulation can be through sound. It can be visual effects, including changing the screen temporarily and then restoring to the previous screen.

Another type of stimulation includes allowing the student to play a game. This stimulation is applicable if the student has been working on the study materials for a long duration of time, and should have a break. Thus, after the student has worked for a long period of time, such as 45 minutes, and is losing concentration in the study materials, the controller can pose the student a question, such as, "Do you want to take a break and play a game?" If the student wants to, in one embodiment, the controller accesses a game from the study-materials storage medium, which includes a number of games. The game serves as a diversion. Not only does it distract the student's mind for some time, the game also relaxes and entertains the student. After the game, presentation is resumed on the study materials.

Another form of reaction is a reward. If the student has been concentrating for a long period of time, at the end of a section in the study materials, the system reacts by praising the student audibly through a speaker, or visually through the monitor with words like "TIME FOR A SNACK!" Other examples of rewards include playing a short piece of music, presenting a joke, a factoid on an interesting subject, or playing a short animation or video clip.

A further form of reaction is punishment. This includes generating a report indicating that the student has lost concentration for a long period of time so that the student's supervisor can punish the student accordingly. Another punishment may be an audible reprimand, such as "PAY ATTENTION!"

The system can also change the study materials according to the monitored results. If the student has lost concentration in working on the study materials for a predetermined amount of time, the system can react by changing the study materials to a different set of materials. Also, the presenter **106** may change the presentation style accordingly, such as by reducing the speed of presentation through increasing the line spacing of the text or the size of the image to present to the student.

In yet another embodiment, due to the indication, the system asks the student a question. This question can stimulate the student, and help the student to re-focus in the study materials. Typically, the question is based on the study materials just presented to the student.

As a side note, while the controller **104** through the sensor **110** monitors the student's concentration-sensitive behavior, the controller **104** can also track the corresponding study materials being presented to the student. Such an embodiment has the added benefit of tying the indication with the corresponding study materials presented to the student.

Back to the embodiment that asks the student a question, this embodiment can be achieved, for example, through the selector **102** sending to the study-materials storage medium **108** the line-item root of the study materials just presented.

**12**

From the line-item root, a set of questions with the same line-item root is retrieved, and one of those question is randomly selected for the student. Other ways may be used to generate a question on materials just presented to the student. One simple way is to randomly select a sentence that has just been presented to the student, and change the syntax of that sentence into a question.

The embodiment on asking questions has a number of benefits. Even if the student does not know the answer to the question, typically, the student is stimulated by the question. Also, the question can be used to assess the student's understanding level on the materials just presented to the student. After the student answers the question, if the answer is correct, the controller **104** can praise the student appropriately. If the answer is not correct, the student may not understand what has just been presented. The controller **104** has a number of options. For example, the study materials just presented can be presented to the student again; the location as to where he can find the answer to the question can be presented to the student; the location of the answer can be hyperlinked to the location of the wrong answer if the student activates an icon shown on the presenter **106**; the presenter **106** presents study materials that are easier than the one just presented to the student, such as one with a lower difficulty level; or the presenter **106** can resume presenting, and ignore the wrong answer altogether.

The above embodiment on asking questions can be modified to focus on increasing the student's concentration level. FIG. **5** shows such an embodiment **350**. The system presents (step **352**) study materials to the student. Then, the system asks the student a question unexpectedly (step **354**). As an example, if the study material is presented through the monitor, unexpectedly, the entire screen changes. From a screen of study materials, the system suddenly changes the screen to display a question. The unexpected nature of the change, together with the displaying of the question stimulate the student. To further enhance the effect of stimulation, the system can spell out the question while displaying it. Typically the question is based on the study materials the student has been working on. After the student responds to the question, the system resumes (step **356**) presenting the study materials to the student.

The question stimulates. Right before the question is presented, the student may be concentrating or may not be concentrating. Either way, the student, unlikely to be aware that a question is coming, is suddenly confronted with a question. Independent of whether the student knows the answer, the question typically increases the student's concentration level. Also, responding to a question is an active learning approach, as compared to the passive learning approach of reading. The more active learning approach together with the unexpected nature of the question tend to increase the student's memory retention in the subject matter covered by the question.

Another benefit provided by the question is that the student's answer to the question provides an indication on the student's understanding level in the study materials. As described above, if the answer is wrong, the system can go over that part of the study materials, or can reduce the difficulty levels of the study materials to be presented to the student. In another embodiment, the question is just for increasing concentration; the system ignores the answer, and continues on with the presentation.

The student might have stopped working on the study materials altogether. For the embodiment that monitors the student's inputs, if there is no inputs for a predetermined

US 8,538,321 B2

**13**

amount of time, such as ten minutes, the system assumes that the student has totally stopped working on the study materials.

The present invention teaches sensing through different types of non-intrusive sensors, which are defined as sensors that do not cause the student physical pain and suffering when they are sensing the student's concentration-sensitive behavior. As technology progresses, sensors that are intrusive today can become non-intrusive in the future, for example, sensors that monitor the student's brain waves, which can be a type of concentration-sensitive behavior.

Rules are stored in the rules storage medium. However, in one embodiment, the rules have previously been embedded in the software implementing the present invention. With rules already embedded in the software, there is no need for accessing the rules, and there is no need for the system to have the rules storage medium.

In the above embodiments, the student's behavior is monitored more than once before the step of analysis. In another embodiment, the monitoring step and the analysis step are intermixed. Instead of monitoring more than once and then analyzing the results, in this embodiment, the sensor monitors one type of behavior, with the result analyzed. Then the sensor monitors the same or a different type of behavior, with the result analyzed.

In yet another embodiment, the steps in the present invention repeat. For example, after the step of reacting according to the indication (step **260**) or providing an indication (step **258**), the invention repeats from the step of monitoring automatically (step **254**). In this embodiment, study materials are continually presented to the student, although the study materials might be changed due to the reaction (step **260**).

The rules discussed can be self-adapting. In other words, the controller **104** can change a rule after applying the rule to a number of situations and after analyzing the results. This can be done, for example, in a fussy-logic system.

Other embodiments of the invention will be apparent to those skilled in the art from a consideration of this specification or practice of the invention disclosed herein. It is intended that the specification and examples be considered as exemplary only, with the true scope and spirit of the invention being indicated by the following claims.

We claim:

**1**. A computing device comprising:
a display;
an imaging sensor to sense a first feature of a user regarding a first volitional behavior of the user to produce a first set of measurements, the imaging sensor detached from the first feature to sense the first feature, the first feature being related to an attribute of the head of the user, and the first set of measurements including a plurality of images of the first feature; and
a processor coupled to the imaging sensor and the display, the processor to analyze at least the first set of measurements to identify a speed of the user to view content presented by the display.

**2**. A computing device as recited in claim **1**, wherein the processor capable to determine what is to be presented by the display in view of the analysis.

**3**. A computing device as recited in claim **2**, wherein to determine what is to be presented depends at least on comparing the speed with a reference speed.

**4**. A computing device as recited in claim **3**, wherein the reference speed comprises a speed of the user.

**5**. A computing device as recited in claim **4**, wherein the reference speed depends at least on at least a speed of another user.

**14**

**6**. A computing device as recited in claim **1**, wherein to analyze at least the first set of measurements includes to identify a width of the head.

**7**. A computing device as recited in claim **1**, wherein to analyze at least the first set of measurements includes to identify a height or a vertical distance of the head.

**8**. A computing device as recited in claim **6**, wherein to analyze at least the first set of measurements includes to determine a change in the identified width of the head based at least on two images of the user.

**9**. A computing device as recited in claim **8**, wherein what is to be presented by the display depends at least on the change determined.

**10**. A computing device as recited in claim **1**, wherein the computing device capable to allow the user to read content presented by the display at least based on the first set of measurements.

**11**. A computing device as recited in claim **1**,
wherein the imaging sensor capable to sense another feature of the user regarding another volitional behavior of the user to produce another set of measurements, the another feature being different from the first feature and the another feature being related to an attribute of at least one eye of the user, and
wherein the processor capable to determine, based at least on the first set of measurements and the another set of measurements, what is to be presented by the display.

**12**. A computing device as recited in claim **1**,
wherein the computing device capable to sense another feature of the user regarding another volitional behavior of the user to produce another set of measurements,
wherein the another set of measurements capable to control movement of content on the display as the content is presented by the display, and
wherein the processor capable to determine, based at least on the first set of measurements and the another set of measurements, what is to be presented by the display.

**13**. A computing device comprising:
a display to show content at least during some of the time the device is used by a user;
an imaging sensor to sense a first feature of the user regarding a first volitional behavior of the user to produce a first set of measurements, the imaging sensor detached from the first feature to sense the first feature, the first feature being related to an attribute of the head of the user, and the first set of measurements including an image of the first feature; and
a processor coupled to the imaging sensor and the display, the processor to:
analyze at least the first set of measurements;
determine whether to change what is to be presented by the display in view of the analysis;
change what is to be presented by the display at least in view of the determination; and
resume what is to be presented by the display at least in view of a second set of measurements from sensing the user by the device.

**14**. A computing device as recited in claim **13**, wherein to change includes to stop what the display has been presenting.

**15**. A computing device as recited in claim **13**, wherein the first set of measurements includes a plurality of images of the first feature.

**16**. A computing device as recited in claim **15**, wherein the processor capable to analyze the first set of measurements to identify a speed of the user to view content presented by the display.

US 8,538,321 B2

**15**

**17**. A computing device as recited in claim **16**, wherein to determine whether to change what is to be presented depends at least on comparing the speed with a reference speed.

**18**. A computing device as recited in claim **13**, wherein to change includes to change a visual effect of the display.

**19**. A computing device as recited in claim **18**, wherein to resume includes to restore the display back to a previous screen.

**20**. A computing device as recited in claim **13**, wherein the processor capable to associate the first set of measurements to an identity of the user.

**21**. A computing device as recited in claim **13**,

wherein the imaging sensor capable to sense another feature of the user regarding another volitional behavior of the user to produce another set of measurements, the another feature being different from the first feature and the another feature being related to an attribute of at least one eye of the user, and

wherein to determine whether to change also depends at least on the another set of measurements.

**22**. A computing device as recited in claim **21**, wherein the attribute of the at least one eye includes the pupil of the at least one eye.

**23**. A computing device as recited in claim **13**,

wherein the computing device capable to sense another feature of the user regarding another volitional behavior of the user to produce another set of measurements, and

wherein the another set of measurements capable to control movement of content on the display as the content is presented by the display.

**24**. A computing device as recited in claim **4**, wherein the reference speed comprises a static reference speed.

**25**. A computing device as recited in claim **4**, wherein the reference speed comprises a dynamic reference speed.

**26**. A computing device as recited in claim **11**, wherein the computing device capable to sense features of different behaviors and to analyze the sensed results in a manner that is intermixed.

**27**. A computing device as recited in claim **1**, wherein the processor capable to provide an indication to the user regarding the device sensing the user.

**28**. A computing device as recited in claim **1**, wherein the processor capable to self-adapt based at least on analyzing measurements from the imaging sensor to help determine what to present by the display.

**29**. A computing device as recited in claim **17**, wherein the reference speed comprises a static reference speed.

**30**. A computing device as recited in claim **17**, wherein the reference speed comprises a dynamic reference speed.

**31**. A computing device as recited in claim **21**, wherein the computing device capable to sense features of different behaviors and to analyze the sensed results in a manner that is intermixed.

**32**. A computing device as recited in claim **13**, wherein the processor capable to provide an indication to the user regarding the device sensing the user.

**33**. A computing device as recited in claim **13**, wherein the processor capable to self-adapt based at least on analyzing measurements from the imaging sensor to help determine what to present by the display.

**34**. A computing device comprising:

a display;

an imaging sensor, connected and positioned adjacent to, the display to sense a first feature of a user regarding a first volitional behavior of the user to produce a first set of measurements, the imaging sensor detached from the first feature to sense the first feature, the first feature

**16**

being related to an attribute of the head of the user, and the first set of measurements including a plurality of images of the first feature; and

a processor coupled to the imaging sensor and the display, the processor to analyze, relative to the display, at least the first set of measurements to identify whether the user is not paying attention to content presented by the display.

**35**. A computing device as recited in claim **34**, wherein the processor capable to determine what is to be presented by the display in view of the analysis.

**36**. A computing device as recited in claim **35**, wherein to determine what is to be presented depends at least on identifying a speed of an action by the user.

**37**. A computing device as recited in claim **36**, wherein identifying the speed of the action depends at least on a calibration process for a user action.

**38**. A computing device as recited in claim **37**, wherein the calibration process depends on at least a speed of an action of another user.

**39**. A computing device as recited in claim **34**, wherein to analyze at least the first set of measurements includes to identify a width of the head.

**40**. A computing device as recited in claim **39**, wherein to analyze at least the first set of measurements includes to identify a height or a vertical distance of the head.

**41**. A computing device as recited in claim **39**, wherein to analyze at least the first set of measurements includes to determine a change in the identified width of the head based at least on two images of the user.

**42**. A computing device as recited in claim **41**, wherein what is to be presented by the display depends at least on the change determined.

**43**. A computing device as recited in claim **34**, wherein the computing device capable to allow the user to read content presented by the display at least based on the first set of measurements.

**44**. A computing device as recited in claim **34**,

wherein the imaging sensor capable to sense another feature of the user regarding another volitional behavior of the user to produce another set of measurements, the another feature being different from the first feature and the another feature being related to an attribute of at least one eye of the user, and

wherein the processor capable to determine, based at least on the first set of measurements and the another set of measurements, what is to be presented by the display.

**45**. A computing device as recited in claim **34**,

wherein the computing device capable to sense another feature of the user regarding another volitional behavior of the user to produce another set of measurements,

wherein the another set of measurements capable to control movement of content on the display as the content is presented by the display, and

wherein the processor capable to determine, based at least on the first set of measurements and the another set of measurements, what is to be presented by the display.

**46**. A computing device as recited in claim **37**, wherein the calibration process comprises a static reference speed to be used in the calibration process.

**47**. A computing device as recited in claim **37**, wherein the calibration process comprises a dynamic reference speed to be used in the calibration process.

**48**. A computing device as recited in claim **45**, wherein the computing device capable to sense features of different behaviors and to analyze the sensed results in a manner that is intermixed.

US 8,538,321 B2

**17**

**18**

**49**. A computing device as recited in claim **34**, wherein the processor capable to provide an indication to the user regarding the device sensing the user.

**50**. A computing device as recited in claim **34**, wherein the processor capable to self-adapt based at least on analyzing measurements from the imaging sensor to help determine what to present by the display.

**51**. A computing device as recited in claim **34**, wherein the imaging sensor capable to sense the first feature in a first session, with at least some information regarding the first set of measurements to be stored, and wherein the device capable to retrieve the stored information in another session to help determine what to display in the another session.

**52**. A computing device as recited in claim **1**, wherein the speed of the user comprises an input speed of the user.

\*   \*   \*   \*   \*



US008475174B2

(12) **United States Patent** (10) Patent No.: **US 8,475,174 B2**
Ho et al. (45) Date of Patent: ***Jul. 2, 2013**

(54) **LEARNING METHOD AND SYSTEM USING DETACHED SENSOR**

(75) Inventors: **Chi Fai Ho**, Palo Alto, CA (US); **Peter Tong**, Mountain View, CA (US)

(73) Assignee: **IpLearn-Focus, LLC**, Mountain View, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **13/481,821**

(22) Filed: **May 26, 2012**

(65) **Prior Publication Data**

US 2012/0237920 A1     Sep. 20, 2012

**Related U.S. Application Data**

(63) Continuation of application No. 10/694,706, filed on Oct. 28, 2003, which is a continuation of application No. 10/050,578, filed on Jan. 14, 2002, now Pat. No. 6,699,043, which is a continuation of application No. 09/385,795, filed on Aug. 30, 1999, now abandoned, which is a continuation of application No. 08/689,678, filed on Aug. 13, 1996, now Pat. No. 5,944,530.

(51) **Int. Cl.**
*G09B 3/00* (2006.01)

(52) **U.S. Cl.**
USPC ........................... **434/322**; 434/323; 434/350

(58) **Field of Classification Search**
USPC ........................................ 434/322, 323, 350
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,573,359 A | | 4/1971 | Guisinger |
| 3,685,169 A | | 8/1972 | Blau et al. |
| 4,006,539 A | | 2/1977 | Slomski |
| 4,037,332 A | | 7/1977 | Petrusinsky |
| 4,089,124 A | | 5/1978 | Burtis et al. |
| 4,464,121 A | | 8/1984 | Perelli |
| 4,705,479 A | | 11/1987 | Maron |
| 4,706,072 A | * | 11/1987 | Ikeyama ...................... 340/576 |
| 4,798,543 A | | 1/1989 | Spiece |

(Continued)

FOREIGN PATENT DOCUMENTS

JP        11276461  A     10/1999

OTHER PUBLICATIONS

Kanede, et al. "Computer Recognition of Human Faces," 1977.

(Continued)

*Primary Examiner* — Robert J Utama

(57) **ABSTRACT**

One embodiment includes a computer-implemented method using a window environment of a display, with a detached sensor, to teach a user. Another embodiment includes a computer system helping teach a user using a detached imaging sensor. In yet another embodiment, a computer-aided-educational system considers a user's concentration level when teaching the user. The system monitors automatically more than once a user's concentration-sensitive behavior while the user is working on study materials. Through monitoring the user's volitional or involuntary behavior, the system provides an indication on the user's concentration level. Based on the indication, the system could react such as by providing rewards, punishments, and stimulation; or changing the study materials. The system can also react by asking the user a question to stimulate the user or to assess the user's understanding. Based on the user's response, the system may change to more appropriate study materials, or different presentation styles.

**58 Claims, 6 Drawing Sheets**



**US 8,475,174 B2**

Page 2

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,867,685 A | | 9/1989 | Brush et al. |
| 4,894,777 A | * | 1/1990 | Negishi et al. ............... 600/558 |
| 5,035,625 A | | 7/1991 | Munson et al. |
| 5,211,563 A | | 5/1993 | Haga et al. |
| 5,267,865 A | | 12/1993 | Lee et al. |
| 5,286,036 A | | 2/1994 | Barabash |
| 5,295,491 A | | 3/1994 | Gevins |
| 5,306,154 A | * | 4/1994 | Ujita et al. ................... 434/218 |
| 5,320,538 A | | 6/1994 | Baum |
| 5,333,272 A | | 7/1994 | Capek et al. |
| 5,339,826 A | | 8/1994 | Schmidt et al. |
| 5,362,069 A | | 11/1994 | Hall-Tipping |
| 5,370,399 A | | 12/1994 | Liverance |
| 5,372,507 A | * | 12/1994 | Goleh ............................ 434/118 |
| 5,437,553 A | * | 8/1995 | Collins et al. ................ 434/322 |
| 5,458,494 A | | 10/1995 | Krohn et al. |
| 5,494,444 A | * | 2/1996 | Thayer et al. ................ 434/362 |
| 5,535,422 A | | 7/1996 | Chiang et al. |
| 5,546,598 A | * | 8/1996 | Yamaguchi et al. .......... 345/501 |
| 5,577,919 A | | 11/1996 | Collins et al. |
| 5,595,488 A | * | 1/1997 | Gozlan et al. ................ 434/236 |
| 5,597,312 A | | 1/1997 | Bloom et al. |
| 5,681,170 A | | 10/1997 | Rieber et al. |
| 5,724,987 A | | 3/1998 | Gevins et al. |
| 5,727,950 A | * | 3/1998 | Cook et al. ................... 434/350 |
| 5,730,604 A | * | 3/1998 | Jay et al. ...................... 434/365 |
| 5,738,527 A | | 4/1998 | Lundberg |
| 5,774,591 A | | 6/1998 | Black et al. |
| 5,788,504 A | * | 8/1998 | Rice et al. .................... 434/219 |
| 5,797,754 A | * | 8/1998 | Griswold et al. ............. 434/322 |
| 5,807,114 A | | 9/1998 | Hodges et al. |
| 5,829,983 A | * | 11/1998 | Koyama et al. .............. 434/118 |
| 5,900,827 A | | 5/1999 | Graham et al. |
| 5,944,530 A | | 8/1999 | Ho et al. |
| 5,987,302 A | * | 11/1999 | Driscoll et al. .............. 434/353 |
| 6,034,652 A | * | 3/2000 | Freiberger et al. ........... 715/730 |
| 6,053,739 A | | 4/2000 | Stewart et al. |
| 6,149,438 A | * | 11/2000 | Richard et al. ............... 434/322 |
| 6,149,441 A | * | 11/2000 | Pellegrino et al. ........... 434/350 |
| 6,162,060 A | * | 12/2000 | Richard et al. ............... 434/118 |
| 6,186,794 B1 | | 2/2001 | Brown et al. |

### OTHER PUBLICATIONS

Restriction Requirement for U.S. Appl. No. 08/689,678, dated Sep. 15, 1997.
Office Action for U.S. Appl. No. 08/689,678, dated Jan. 8, 1998.
Office Communication for U.S. Appl. No. 08/689,678, dated Nov. 9, 1998.
Notice of Allowance for U.S. Appl. No. 08/689,678, dated Mar. 15, 1999.
Office Action for U.S. Appl. No. 09/385,795, dated May 10, 2000.
Notice of Abandonment for U.S. Appl. No. 09/385,795, dated Dec. 21, 2000.
Notice of Allowance for U.S. Appl. No. 09/385,795, dated Oct. 15, 2001.

Notice of Abandonment for U.S. Appl. No. 09/385,795, dated May 16, 2002.
Office Action for U.S. Appl. No. 10/050,578, dated Oct. 9, 2002.
Notice of Allowance for U.S. Appl. No. 10/050,578, dated Feb. 10, 2003.
Notice of Allowance for U.S. Appl. No. 10/050,578, dated Jul. 17, 2003.
Corrected Notice of Allowance for U.S. Appl. No. 10/050,578, dated Sep. 2, 2003.
Supplemental Notice of Allowance for U.S. Appl. No. 10/050,578, dated Jan. 21, 2004.
Restriction Requirement for U.S. Appl. No. 10/694,706, dated Jun. 21, 2004.
Office Action for U.S. Appl. No. 10/694,706, dated Dec. 1, 2004.
Notice of Non-Compliant Amendment for U.S. Appl. No. 10/694,706, dated Mar. 8, 2005.
Office Action for U.S. Appl. No. 10/694,706, dated Apr. 10, 2006.
Final Office Action for U.S. Appl. No. 10/694,706, dated Feb. 5, 2007.
Office Action for U.S. Appl. No. 10/694,706, dated Jun. 6, 2007.
Final Office Action for U.S. Appl. No. 10/694,706, dated Oct. 16, 2007.
Office Action for U.S. Appl. No. 10/694,706, dated Dec. 18, 2007.
Office Action for U.S. Appl. No. 10/694,706, dated Aug. 5, 2008.
Final Office Action for U.S. Appl. No. 10/694,706, dated Dec. 24, 2008.
Notice of Allowance for U.S. Appl. No. 10/694,706, dated Jun. 19, 2009.
Office Action for U.S. Appl. No. 10/694,706, dated Nov. 2, 2009.
Notice of Allowance for U.S. Appl. No. 10/694,706, dated Jul. 19, 2010.
Office Communication for U.S. Appl. No. 10/694,706, dated Aug. 20, 2010.
Notice of Allowance for U.S. Appl. No. 10/694,706, dated Dec. 17, 2010.
Notice of Allowance for U.S. Appl. No. 10/694,706, dated May 3, 2011.
Corrected Notice of Allowance for U.S. Appl. No. 10/694,706, dated May 25, 2011.
Notice of Allowance for U.S. Appl. No. 10/694,706, dated Jul. 11, 2011.
Notice of Allowance for U.S. Appl. No. 10/694,706, dated Feb. 15, 2012.
Notice of Allowance for U.S. Appl. No. 10/694,706, dated Apr. 9, 2012.
Response to Rule 312 Communication for U.S. Appl. No. 10/694,706, dated Apr. 26, 2012.
Notice of Allowance for U.S. Appl. No. 10/694,706, dated Oct. 1, 2012.

* cited by examiner



**Figure 1**



Figure 2A



Figure 2B



250

Present Study Materials    ∼ 252

Monitor Student's Behavior    ∼ 254
through Sensor

Analyze Monitored    ∼ 256
Results with Rules

Provide Indication on    ∼ 258
Student's Concentration

React According to    ∼ 260
the Indication

Figure 3



Figure 4

350



Present Study Materials ∼ 352

Ask a Question Unexpectedly ∼ 354

Resume Presenting
Study Materials ∼ 356

Figure 5

**1**

# LEARNING METHOD AND SYSTEM USING DETACHED SENSOR

## CROSS-REFERENCE TO RELATED APPLICATIONS

This is a continuation of co-pending U.S. patent application Ser. No. 10/694,706, filed on Oct. 28, 2003, which is a continuation of U.S. Pat. No. 6,699,043, filed on Jan. 14, 2002, which is a continuation of U.S. patent application Ser. No. 09/385,795, filed on Aug. 30, 1999, since abandoned, which is a continuation of U.S. patent Ser. No. 08/689,678, filed on Aug. 13, 1996, now U.S. Pat. No. 5,944,530; all incorporated by reference into this application.

## BACKGROUND OF THE INVENTION

The present invention relates generally to learning via a computing device, and more particularly to learning method and system using detached sensor.

Both at home and in schools, the computer is gradually becoming a major medium for education. There are many different reasons for this trend. One is the tremendous reduction in the price of a computer, causing it to permeate into almost every household. Though the price of a computer has been dropping, its computation and memory capacity have increased many folds, leading to computer programs with significantly more intelligence and improved user-friendliness. Another reason is that a computer-aided-education system can be very personalized; it can be tailored to the strengths and weaknesses of individual students. This is very hard to achieve in today's educational environment, in part due to the increase in the students-per-instructor ratio.

One weakness of a computer-aided-educational system is that it typically ignores a student's concentration level. In contrast, a good instructor teaches according to the student's attention span. She can sense whether or not the student is paying attention. Normally, she attributes her sensitivity to her "intuition," based on years of her teaching experience. One "intuition" is that when the student's pupils start to dilate, the student has lost focus. Another "intuition" is that when the student frowns, he is concentrating. Such "intuition" is very useful in teaching. A good instructor constantly observes such concentration-sensitive behavior, and dynamically adjusts her teaching materials and style accordingly. If most of the students are looking elsewhere instead of at her for a certain period of time, the instructor might stop teaching and tell a joke. This helps the students re-focus back at the instructor. If a student is drooping, the instructor might directly ask her a question to "wake her up." Such important "intuition" is missing in today's computer-aided-educational systems.

It should be apparent from the foregoing that there is a need for a computer-aided-educational system and method that consider the student's concentration level, while the student is working on the study-materials.

## SUMMARY OF THE INVENTION

One embodiment of the invention includes computer-implemented method and system using a window environment of a display, with at least one detached sensor, to teach a user. Another embodiment provides learning methods and systems that help teach a user using at least one detached imaging sensor. In yet another embodiment, the present invention provides a computer-aided-educational system and

**2**

method that automatically consider a student's concentration-sensitive behavior while the student is working on study materials.

In one embodiment, the present invention includes a presenter, a non-intrusive sensor, a controller and an indicator. The presenter presents study materials on a subject to the student; the non-intrusive sensor automatically monitors more than once the student's concentration-sensitive behavior while the student is working on the materials; the controller analyzes the student's concentration-sensitive behavior based on one or more rules; and the indicator provides an indication on the student's concentration level based on the analysis. In another embodiment, the present invention reacts according to the indication.

There are a number of examples of the concentration-sensitive behavior that the sensor can monitor. In one embodiment, the sensor monitors the student's volitional behavior, such as his inputs into the computer, his facial expressions, his facial orientations and his eyes. In another embodiment, the sensor monitors the student's involuntary behavior, such as the sizes of his pupils.

The controller analyzes one or more of the above behavior based on one or more rules. These rules are similar to the instructor's "intuition." For example, one rule is as follows: The student has lost concentration in the study materials if for a predetermined period of time, the student's inputs through a mouse have been in a window that does not contain study materials. Another rule is that if the student is not looking at the monitor showing the study materials for a predetermined period of time, the student has lost concentration in the study materials. From the analysis, the system provides an indication on the student's concentration level.

Based on the indication, the system could react accordingly. Different reactions are applicable. Some examples include rewards, punishments, stimulation, and changing the study materials.

In another embodiment, due to the indication, the system asks the student a question, which can stimulate the student and can assess the student's understanding level in the study materials. From the student's response to the question, the system may change to more appropriate study materials and/or presentation style.

The question-asking approach in the above embodiment does not have to be a reaction to the indication. In one embodiment, as the system is presenting study materials to the student, unexpected by the student, the system asks the student a question. After the student responds to the question, the system resumes back to present study materials to the student. In such an embodiment, the question tends to increase the concentration level of the student in the study materials.

In yet another embodiment, the present invention also includes a calibrator, which calibrates the student's concentration-sensitive behavior before the behavior is being monitored to show concentration. One type of calibration establishes the student's behavior when the student is paying attention, and compares it with the student's behavior when the student is working on the study materials. Calibration typically improves the accuracy of the system.

Other aspects and advantages of the present invention will become apparent from the following detailed description, which, when taken in conjunction with the accompanying drawings, illustrates by way of example the principles of the invention.

US 8,475,174 B2

3

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** shows one embodiment of the present invention.

FIGS. **2**A-B show one embodiment of a system implementing the present invention.

FIG. **3** shows a set of steps to implement one embodiment of the present invention.

FIG. **4** shows examples of volitional behavior monitored by the sensor in the present invention.

FIG. **5** shows another embodiment of the present invention.

Same numerals in FIGS. **1**-**5** are assigned to similar elements in all the figures. Embodiments of the invention are discussed below with reference to FIGS. **1**-**5**. However, those skilled in the art will readily appreciate that the detailed description given herein with respect to these figures is for explanatory purposes as the invention extends beyond these limited embodiments.

## DETAILED DESCRIPTION OF THE INVENTION

FIG. **1** shows one embodiment of a computer-aided-educational system **100** of the present invention. As an overview of some of its components, the system **100** includes a selector **102**, which selects study materials from a study-materials storage medium **108** to be presented to a student through a presenter **106**. While the student is working on the study materials, a non-intrusive sensor **110** monitors the student's concentration-sensitive behavior, and sends its results back to a controller **104**. Then the controller **104** based on one or more rules from a rules storage medium **112** analyzes the monitored results to provide through an indicator **114**, an indication on the student's concentration level. In another embodiment, the selector is **102** also connected to the controller **104** to keep track of the study materials presented to the student.

FIG. **2**A shows one embodiment of a system **150** implementing the present invention, preferably in software and hardware. The system **150** includes a server computer **152** and a number of client computers, such as **154**, which can be a personal computer. Each client computer communicates to the server computer **152** through a dedicated communication link, or a computer network **156**.

FIG. **2**B shows one embodiment of a client computer **154**. It typically includes a bus **159** connecting a number of components, such as a processing unit **160**, a main memory **162**, an I/O controller **164**, a peripheral controller **166**, a graphics adapter **168** and a network interface adapter **170**. The I/O controller **164** is connected to components, such as a harddisk drive **172** and a floppy disk drive **174**. The peripheral controller **166** is connected to peripheral components, such as a keyboard **176**, a mouse **182**, and a digital camera **180**. The graphics adapter **168** is connected to a monitor **178**; and the network interface adapter **170** is connected to the network **120**. The network can be the Internet, an intranet, the world wide web and other forms of networks.

Different components of the present invention can be in different elements shown in FIGS. **2**A-B. For example, the presenter **106** and the sensor **110** can be in a client computer; the selector **102**, the controller **104**, the study-materials storage medium **108**, the rules storage medium **112** and the indicator **114** can be in the server computer **152**. In another embodiment, the selector **102**, the controller **104** and the indicator **114** are also in a client computer. Different components can be in different elements in the above description. Nonetheless, there is no restriction requiring all components to reside in one element, such as a client computer. A number of operations in the present invention can be implemented by software, which is controlled, for example, by the processing

4

unit **160**. In yet another embodiment, the number of operations implemented by software can be stored in a storage-medium, which can be, for example, the main memory **162** or a CD read-only-memory.

The present invention is applicable to teach any subject or materials that can be taught by a computer. The teaching period may last one semester or a year, or just one class session. The materials may cover inter-disciplinary areas, such as electrical engineering and thermodynamics, or computer networking and programming techniques. The materials may just be for training a field engineer on a new product. In the following, mathematics is the subject used to illustrate the present invention.

In one embodiment, the subject is divided into major-topics, with each major-topic subdivided into minor-topics, and with each minor-topic further subdivided into line-items. Each line-item typically covers one well-defined area in the subject. In another embodiment, the subject is further divided into more levels below the line-items; and in a third embodiment, the subject is just divided into line-items.

As an example of line-items, if the major-topic is high school algebra, then it can be divided into the following line-items, with bracketed terms served as comments:

High School Algebra (the major-topic)
(Minor-topics under the major-topic)
Decimal Numbers
Polynomials
Linear Equations
Quadratic Equations
. . .
Integers
(Line-items under the minor-topic of integers)
Addition & Subtraction (Difficulty level 1)
Multiplication (Difficulty level 2)
Division (Difficulty level 2)
Prime Numbers (Difficulty level 3)
Factorization (Difficulty level 3)
Common Divisor (Difficulty level 4)
. . .
Fractions
(Line-items under the minor-topic of fractions)
Addition & Subtraction (+/−) with Common Denominator (Difficulty level 3)
+/− with Integers (Difficulty level 4)
+/− without Common Denominator (Difficulty level 5)
Multiplication and Divisions (*,/) with Integers (Difficulty level 5)
*,/ with fraction (Difficulty level 6)
Compound Fractions (Difficulty level 6)
Fraction Reduction (Difficulty level 7)
Ratios and Proportions (Difficulty level 7)
. . .

Another example with the minor topic being differential calculus is as follows:

Calculus (major topic)
Differential calculus (minor topic)
Fractions (Difficulty level 1)
Polynomials (Difficulty level 1)
Exponential Functions (Difficulty level 1)
Differentiation (Difficulty level 2)
Differentiate a sum (Difficulty level 3)
Differentiate a product (Difficulty level 3)
Differentiate a quotient (Difficulty level 4)

In one embodiment, each line-item has a difficulty level. The bracketed difficulty level next to each line-item in the above example indicates how difficult one line-item is relative to other line-items in the subject, or how significant one is

US 8,475,174 B2

**5**

relative to another. A line-item with a low difficulty level is a relatively easy line-item or a relatively less important line-item. Typically, a student learning a subject starts from learning line-items at the lowest difficulty level.

The lists of items in the above examples are generated based on expert knowledge on the subject of mathematics. With the proper instruction, such as through reading the present specification, generating such lists with the difficulty levels should be obvious to experts in the subject. The more knowledgeable the expert, the more complete the sets of items.

In one embodiment, each line-item is represented by a line-item root, which includes the line item and its root. In the above example, the root of a line-item includes its subject, its major topic and minor topic.

In one embodiment, the selector **102** starts the learning process by selecting a line-item with the lowest difficulty level. If there are a number of those, one of them is randomly selected. Study materials for that line-item are retrieved from the study-materials storage medium **108** to be presented to the student. After presentation, the selector **102** selects another line-item with the lowest difficulty level among all the un-selected line-items, and the process repeats. For this embodiment, each line-item also includes a mode attribute, which is changed from the un-selected to the selected mode after the study materials for that line-item has been selected to be worked on by the student.

To select a set of study materials from the study-material storage medium **108**, the selector **102** sends the line-item root to the storage medium **108** to retrieve the corresponding study materials. Typically, there are a number of sets of study materials in the storage-medium **108**, and they can be in the following format:

(line-item root, mode, study materials)

The following serves as examples of study materials for differentiating polynomial:

First, the system teaches the approach to generate derivatives based on the basic principle in differentiation, such as:

$$df(x)/dx=lim_{h\to 0}((f(x+h)-f(x))/h)$$

Then the system teaches the generalized equation, such as:

$$((d\Sigma a_i x^i)/dx)=(\Sigma i^* a_i x^{i-1})$$

Finally, the system teaches the importance of and the way to find optima and minima by solving the following equation:

$$((d\Sigma a_i x^i)/dx)=0$$

Based on the line-item root, and with one set of study materials per line-item, the selector **102** retrieves from the study-materials storage-medium **108**, the corresponding set of study materials. Creating study materials on a subject should be obvious to experts in the subject, and will not be further discussed in this application.

The selector **102** then sends the retrieved study materials to the presenter **106**. The study materials can be a document with no questions, arranged as a list of screens. The presenter **106** typically includes the monitor **178**, which presents the study materials to the student, who can go from one screen to another with the keyboard **176**, or the mouse **182**. In another embodiment, the study materials are broadcast through a radio. As the student is working on the study materials presented through the radio, the student's concentration-sensitive behavior is monitored automatically.

In another embodiment, the study materials only have questions. Typically, students gain a better understanding on a subject through actively working on questions than through

**6**

passively reading study materials. In one embodiment, each question is embedded in a question entry, which is of the following format:

(line-item root, mode, question-body, answer).

The term "question-body" describes the body of a question. The following serves as an example:

Subject: Mathematics.
Major-topic: High School Algebra.
Minor-topic: Fraction.
Line-item: +/− with common denominator
Mode: Un-selected
Answer Question-body
28/37 What is the sum of 2/37, 3/37, 8/37 and 15/37?
−2/43 17/43−25/43+6/43=?

The selector **102** sends to the study-materials storage medium **108** the line-item root to retrieve the set of questions with the same line-item root.

An example of study materials with questions are for the line-item of differentiating exponential functions. A number of questions are generated, including the question on expanding an exponential function based on Taylor expansion, the question on differentiating the Taylor-expanded exponential function, whose answer is the original Taylor-expanded exponential function, and the question on differentiating the exponential function, whose answer is the exponential function.

In another embodiment, the study materials include study materials with questions and study materials without questions.

Note that the formats of the study materials may change as the student progresses. The student can learn one line-item based on questions, and another based on study materials with no questions. As an example, for differential calculus, of the different line-items, all of them can be learnt through either study materials with or without questions, except for the line-item of differentiation, which is typically learnt without questions. That study-materials cover the general differentiation concept, such as the following:

$$df(x)/dx=lim_{h\to 0}((f(x+h)-f(x))/h)$$

FIG. **3** shows a set of steps **250** to implement one embodiment of the present invention. First, the presenter **106** presents (step **252**) the selected study materials to the student. As the student is working on the study materials, the sensor **110** monitors (step **254**) more than once the student's concentration-sensitive behavior, and feeds those monitored results to the controller. The controller **104** analyzes (step **256**) the results based on one or more rules to provide (step **258**) an indication on the student's concentration. Based on the indication, the system reacts (step **260**) accordingly.

A type of concentration-sensitive behavior is a type of behavior that is sensitive to one's concentration. As one's concentration changes, such a type of behavior changes accordingly. The behavior can be physical, psychological, biological, emotional and physiological.

In the step of monitoring (step **254**), the sensor automatically monitors more than once the student's concentration-sensitive behavior while the student is working on the study materials. Instead of just monitoring once to determine concentration level, monitoring more than once increases the accuracy in determining the student's concentration level. For example, a student is concentrating on the study materials. A mosquito lands on the back of his right hand. As the student is trying to hit the mosquito, the system monitors him. The indication based on that image alone is a correct indication of the student's concentration level in the study materials at that specific instant. However, the single measurement is not a good indication of the student's actual concentration level in

US 8,475,174 B2

**7**

the study materials—that single measurement is an outlying point that should be deleted. Instead of just one single result, this embodiment monitors more than once the student's behavior, which enhances identifying a pattern to eliminate outlying points.

The monitoring step does not have to stop after monitoring twice. The monitoring step can continue in a periodic manner, such as once every two seconds. In the embodiments of monitoring more than once or monitoring periodically, the results can be analyzed to identify patterns.

The behavior monitored more than once can be of the same type, or can be of different types. In one embodiment, in monitoring more than once, the sensor monitors the same type of behavior each time. In another embodiment, in monitoring more than once, the sensor monitors more than one type of behavior; for example, a first monitoring process is on one type of behavior, and a second monitoring process is on another type of behavior. In monitoring more than one type of behavior, the sensor may include more than one type of sensor, which can monitor more than one type of behavior substantially simultaneously. Monitoring more than one type of behavior is similar to monitoring one type of behavior more than once, in the sense that both approaches increase the accuracy in determining the student's concentration level.

FIG. **4** shows examples of different types of concentration-sensitive behavior, which are volitional **300**. In one embodiment, the sensor **110** monitors the student's volitional inputs entered into the computer (box **302**). One type of volitional inputs is entered through the keyboard **176** or the mouse **182**. The study materials can be presented to the student through the monitor **178**. As the student works on the study materials, he enters commands through the keyboard **176** or a position-pointing device, such as the mouse **182**, or arrow buttons of the keyboard **176**. The inputs may be the downward or upward arrows on the keyboard or the mouse, or may be the typing speed through the keyboard.

In one embodiment, the sensor **110** monitors the speed of inputs by the student as a function of time. There are different ways to monitor the speed of inputs, such as polling periodically the corresponding devices of those inputs. Such monitoring process should be obvious to those skilled in the art, and will not be further described.

As the student starts working on the study materials, the inputs are entered at a certain speed. As the student gets tired, or as the student loses concentration, this speed typically decreases. In this embodiment, the student's input speed is compared with a reference speed to identify changes.

There are a number of methods to determine the reference speed. In one embodiment, this reference speed is set through randomly sampling many students. Based on the students' responses on similar study materials, a reference speed is determined. In another embodiment, the student's initial speed becomes the reference speed. This initial speed may be found for example by averaging the student's speed across five minutes, such as from the first one minute to the first six minutes of the student's usage.

Different types of study materials typically have different reference speeds. For example, if the study materials include no pictures, the input speed may be slow because the student has to read an entire screen of text. If the student has to compose a sentence, the speed is likely to have frequent short pauses because the student has to think to compose the sentence. To accommodate such variations, in one embodiment, the reference speed is a function of the difficulty level of the study materials. As the student progresses in working on the study materials, the difficulty level of the study materials

**8**

typically increases. In one embodiment, the reference speed is divided by the following factor:

(The difficulty level of the study material*a constant).

With the above equation, as the difficulty level increases, the reference speed decreases accordingly. In this embodiment, the reference speed tracks the difficulty level of the study materials.

As discussed above, by monitoring the speed of the student's inputs, the system **100** can provide an indication of the student's concentration. Thus, one rule is as follows:

If the speed of the student's volitional inputs across a predetermined period of time is significantly lower than a reference speed, the student has lost concentration in the study materials.

In one embodiment, the predetermined period of time is two minutes; and more than three times slower is considered as significantly lower.

In another embodiment, the study materials are presented through a multi-windows environment. The student enters inputs into the system, such as through a position-pointing device, like the mouse **182**, or through the keyboard **176**. In one embodiment, the sensor **110** in this embodiment is implemented through software, which periodically, such as every two seconds, polls the operating system or the device drivers of the position-pointing device. The polling determines if there have been any inputs. Writing such software to monitor such inputs to the system should be obvious to those skilled in the art, and will not be further described in this application. In such an embodiment, one rule is as follows:

If for a predetermined period of time, the inputs have been entered outside the window where the study materials reside, the student has lost concentration in the study materials.

In yet another embodiment, the study materials are presented in a window environment that has a focus window, and the sensor **110** can sense the focus window, for example as in the above embodiment. In such an embodiment, one rule is as follows:

If the study materials are not in the focus window for a predetermined period of time, the student has lost concentration in the study materials.

In one embodiment, the predetermined amount of time is more than one minute. If monitoring is performed every three seconds, in one minute, the system would have performed 20 measurements.

In yet another embodiment, the sensor **110** senses another type of volitional behavior, which is based on the student's face. In this embodiment, the monitor **178** presents study materials. The sensor **110** including the digital camera **180** are positioned adjacent to the monitor **178**, as shown, for example in FIG. **2A**. With the camera positioned where it is, when the student is looking at the monitor to work on the study materials, the digital camera **180** could take digital images of the student's face. Taking the digital images to generate numerous bits of data should be obvious to those skilled in the art and will not be further described in this application.

To improve the performance of this embodiment, before the step of monitoring, the present invention includes the step of calibration through imaging. One calibration technique enters the student's image before the student works on the study materials, and uses that image as the reference to compare with other images. For example, before the student starts working on the study materials, he is asked to look at the monitor **178** with a message box having a message such as "LOOK AT ME," and with a picture of two eyes staring at the

US 8,475,174 B2

9

student. Then, the digital camera **180** takes a reference image of the student's face, who typically looks at the two eyes.

The reference image should be analyzed. That image includes not only the student's face, but also background information, such as the wall of a room. In one embodiment, the controller assumes that the student's two eyes are looking at the two eyes in the monitor. Based on this assumption, the student's face is determined. Such image recognition techniques are disclosed for example in "Computer Recognition of Human Faces," written by Takeo Kanada, and published by Birkhauser Verlag, Basel and Stuttgart, in 1977. Even if the distance between the monitor and the student's face increases, the relative distances among different features on his face remain the same. In one embodiment, the monitoring step focuses on relative distances to re-calibrate the student's face. Such image recognition techniques should be obvious to those skilled in the art, and will not be further described in the present application.

One type of facial information is the facial orientation (box **304**). The controller **104** connected to the digital camera **180** calibrates the facial orientation when the student is looking at the monitor **178**. This reference image could be just the oblong shape of the face. After calibration, when the student starts working on the study materials, the digital camera **180** regularly captures the facial image, such as once every few seconds. All information in that image is removed leaving behind the orientation of the face. These orientations are compared with the reference image to check for differences. The distance between the monitor and the student's face may change. To compensate for such changes, in one embodiment, the controller uses the ratio of the longest horizontal to the longest vertical distance of the oblong shape. If the captured facial orientation is significantly different from the reference facial orientation, the student is not looking at the monitor. The student may be looking away from the computer or drooping while falling asleep. In such an embodiment, one rule is as follows:

If the student's facial orientation is significantly different from its reference image as shown in two consecutive monitoring processes, the student has lost concentration in the study materials.

In one embodiment, two images are considered significantly different if their horizontal-to-vertical-distance ratios differ by more than 20%.

Another type of facial information is the condition of the eyes (box **306**). If the eyelids are covering significant portions of the irises, the student's eyes are closing. In such an embodiment, one rule is as follows:

If the eyelids cover more than 60% of the irises as shown in two consecutive monitoring processes, the student has lost concentration in the study materials.

Another type of facial information is the student's facial expressions (box **308**), such as whether the student is frowning or not. In such an embodiment, one rule is as follows:

If the student frowns in two consecutive monitoring processes, the student is concentrating on the study materials.

Concentration-sensitive behavior can be involuntary. In one embodiment, the sensor **110** monitors the sizes of the student's pupils, assuming that a student's pupil dilates if the student loses focus and concentration. In such an embodiment, one rule is as follows:

If the average size of the student's pupils dilates by more than 20% as compared to the average size of the reference image for a predetermined amount of time, the student has lost concentration in the study materials.

Other examples of involuntary concentration-sensitive behavior include the student's heart beat, breathing rate, body temperature and whether the student's sweat has increased.

10

With appropriate sensors and rules, these involuntary behavior can be monitored to provide indications on whether the student has lost concentration in the study materials.

There are many other types of concentration-sensitive behavior. Different types of behavior coupled with their corresponding sensors and rules should be able to indicate the student's concentration level.

More than one type of the student's concentration-sensitive behavior can be monitored by one or more sensors. In fact, one type can be volitional, with the other type involuntary. Including different types of behavior tends to increase the accuracy of identifying the student's concentration level. With more than one type of behavior being monitored, the system may not have to monitor each type of behavior more than once to identify the student's concentration level. An example of a rule for such an embodiment is as follows:

If the student's facial orientation is different from the reference image by more than 20% while the student's eyelids are covering more than 60% of the irises, the student has lost concentration in the study materials.

Such rules should be obvious to experts in the field of human perception, and will not be further described in this application.

The above embodiments describe whether the student has lost concentration or not. However, the invention is also applicable to indicate the student's degree of concentration, such as ranging from low, medium to high. For example, if the student has not lost concentration in the study materials for a long period of time, the student's concentration level is high. Another example is that if the student's eyes are wide open with his inputs through the mouse moving down the study materials in a fairly constant speed for a long duration of time, such as five minutes, the student's concentration level is also high.

In another embodiment, if the controller **104** decides that the student has not lost concentration for a long period of time, such as ten minutes, the controller **104** averages the captured results during that time frame—with outlying points removed—and treats the averaged results as the reference, which will be used to compare with subsequent captured results, to determine if the student has lost concentration in the study materials. The reference can be a reference image, such as the student's face, or the student's input speed, as appropriately modified by the study materials' difficulty level, or other monitored results. As the student continues working on study materials, this reference can be updated regularly by averaging it with subsequent captured results, which also show that the student has not lost concentration. Unlike many of the previously described references, which are static, this type of reference is typically not a constant, and is known as a dynamic reference. It is usually more closely tailored to the student. With more data used to generate the dynamic reference, its accuracy is typically better than the static references.

In yet another embodiment, the system **100** asks for the student's identity, such as the student's name, when the student starts working on the study materials. After the student enters his identity, it is stored in the system **100**. The student's reference information, whether static or dynamic, is stored with the student's identity in the memory of the system **100**, such as its harddisk. After the first working session, if the student wants to work on study materials through the system **100** again, the system retrieves from its memory the student's reference information. For such an embodiment, the retrieved

US 8,475,174 B2

11

reference information can replace the step of calibration. If the reference is of the dynamic type, the retrieved information is regularly updated.

Based on one or more of the above concentration-sensitive behavior coupled to one or more appropriate rules, the indicator **114** provides an indication on the student's concentration (step **258**), or the student's degree of concentration. Such indication can be as simple as changing the state of a register—a high logic level indicates the student has not lost concentration, while a low logic level indicates the student has. Another indication can be printing a report indicating that the student's degree of concentration in the study materials for a period of time.

In one embodiment, the system reacts according to the indication (step **260**). Some examples of reactions include stimulation, rewards, punishments or changing the study materials.

If the indication is that the student has lost concentration in the study materials, one way the controller **104** can help the student to re-focus on the study materials is through stimulation. This includes presenting a real-life application of the study materials that the student has lost concentration in. The stimulation can be through sound. It can be visual effects, including changing the screen temporarily and then restoring to the previous screen.

Another type of stimulation includes allowing the student to play a game. This stimulation is applicable if the student has been working on the study materials for a long duration of time, and should have a break. Thus, after the student has worked for a long period of time, such as 45 minutes, and is losing concentration in the study materials, the controller can pose the student a question, such as, "Do you want to take a break and play a game?" If the student wants to, in one embodiment, the controller accesses a game from the study-materials storage medium, which includes a number of games. The game serves as a diversion. Not only does it distract the student's mind for some time, the game also relaxes and entertains the student. After the game, presentation is resumed on the study materials.

Another form of reaction is a reward. If the student has been concentrating for a long period of time, at the end of a section in the study materials, the system reacts by praising the student audibly through a speaker, or visually through the monitor with words like "TIME FOR A SNACK!" Other examples of rewards include playing a short piece of music, presenting a joke, a factoid on an interesting subject, or playing a short animation or video clip.

A further form of reaction is punishment. This includes generating a report indicating that the student has lost concentration for a long period of time so that the student's supervisor can punish the student accordingly. Another punishment may be an audible reprimand, such as "PAY ATTENTION!"

The system can also change the study materials according to the monitored results. If the student has lost concentration in working on the study materials for a predetermined amount of time, the system can react by changing the study materials to a different set of materials. Also, the presenter **106** may change the presentation style accordingly, such as by reducing the speed of presentation through increasing the line spacing of the text or the size of the image to present to the student.

In yet another embodiment, due to the indication, the system asks the student a question. This question can stimulate the student, and help the student to re-focus in the study materials. Typically, the question is based on the study materials just presented to the student.

12

As a side note, while the controller **104** through the sensor **110** monitors the student's concentration-sensitive behavior, the controller **104** can also track the corresponding study materials being presented to the student. Such an embodiment has the added benefit of tying the indication with the corresponding study materials presented to the student.

Back to the embodiment that asks the student a question, this embodiment can be achieved, for example, through the selector **102** sending to the study-materials storage medium **108** the line-item root of the study materials just presented. From the line-item root, a set of questions with the same line-item root is retrieved, and one of those question is randomly selected for the student. Other ways may be used to generate a question on materials just presented to the student. One simple way is to randomly select a sentence that has just been presented to the student, and change the syntax of that sentence into a question.

The embodiment on asking questions has a number of benefits. Even if the student does not know the answer to the question, typically, the student is stimulated by the question. Also, the question can be used to assess the student's understanding level on the materials just presented to the student. After the student answers the question, if the answer is correct, the controller **104** can praise the student appropriately. If the answer is not correct, the student may not understand what has just been presented. The controller **104** has a number of options. For example, the study materials just presented can be presented to the student again; the location as to where he can find the answer to the question can be presented to the student; the location of the answer can be hyperlinked to the location of the wrong answer if the student activates an icon shown on the presenter **106**; the presenter **106** presents study materials that are easier than the one just presented to the student, such as one with a lower difficulty level; or the presenter **106** can resume presenting, and ignore the wrong answer altogether.

The above embodiment on asking questions can be modified to focus on increasing the student's concentration level. FIG. **5** shows such an embodiment **350**. The system presents (step **352**) study materials to the student. Then, the system asks the student a question unexpectedly (step **354**). As an example, if the study material is presented through the monitor, unexpectedly, the entire screen changes. From a screen of study materials, the system suddenly changes the screen to display a question. The unexpected nature of the change, together with the displaying of the question stimulate the student. To further enhance the effect of stimulation, the system can spell out the question while displaying it. Typically the question is based on the study materials the student has been working on. After the student responds to the question, the system resumes (step **356**) presenting the study materials to the student.

The question stimulates. Right before the question is presented, the student may be concentrating or may not be concentrating. Either way, the student, unlikely to be aware that a question is coming, is suddenly confronted with a question. Independent of whether the student knows the answer, the question typically increases the student's concentration level. Also, responding to a question is an active learning approach, as compared to the passive learning approach of reading. The more active learning approach together with the unexpected nature of the question tend to increase the student's memory retention in the subject matter covered by the question.

Another benefit provided by the question is that the student's answer to the question provides an indication on the student's understanding level in the study materials. As described above, if the answer is wrong, the system can go

**13**

over that part of the study materials, or can reduce the difficulty levels of the study materials to be presented to the student. In another embodiment, the question is just for increasing concentration; the system ignores the answer, and continues on with the presentation.

The student might have stopped working on the study materials altogether. For the embodiment that monitors the student's inputs, if there is no inputs for a predetermined amount of time, such as ten minutes, the system assumes that the student has totally stopped working on the study materials.

The present invention teaches sensing through different types of non-intrusive sensors, which are defined as sensors that do not cause the student physical pain and suffering when they are sensing the student's concentration-sensitive behavior. As technology progresses, sensors that are intrusive today can become non-intrusive in the future, for example, sensors that monitor the student's brain waves, which can be a type of concentration-sensitive behavior.

Rules are stored in the rules storage medium. However, in one embodiment, the rules have previously been embedded in the software implementing the present invention. With rules already embedded in the software, there is no need for accessing the rules, and there is no need for the system to have the rules storage medium.

In the above embodiments, the student's behavior is monitored more than once before the step of analysis. In another embodiment, the monitoring step and the analysis step are intermixed. Instead of monitoring more than once and then analyzing the results, in this embodiment, the sensor monitors one type of behavior, with the result analyzed. Then the sensor monitors the same or a different type of behavior, with the result analyzed.

In yet another embodiment, the steps in the present invention repeat. For example, after the step of reacting according to the indication (step **260**) or providing an indication (step **258**), the invention repeats from the step of monitoring automatically (step **254**). In this embodiment, study materials are continually presented to the student, although the study materials might be changed due to the reaction (step **260**).

The rules discussed can be self-adapting. In other words, the controller **104** can change a rule after applying the rule to a number of situations and after analyzing the results. This can be done, for example, in a fuzzy-logic system.

Other embodiments of the invention will be apparent to those skilled in the art from a consideration of this specification or practice of the invention disclosed herein. It is intended that the specification and examples be considered as exemplary only, with the true scope and spirit of the invention being indicated by the following claims.

We claim:

**1**. A computer-implemented method for a user using at least a first window of a display, with at least some of the space outside of the first window being viewable via the display, with the space outside of the first window including at least a part of another window at least partially viewable via the display, the method comprising:

acquiring data, by a computing device, regarding a volitional input of the user, the data from a sensor sensing a physical attribute associated with the user, the sensor being configured to be detached from the physical attribute associated with the user to sense at least the physical attribute;

analyzing the data by the computing device, which is coupled to the sensor and the display;

determining by the computing device from the analyzing of the data whether the volitional input suggests the user

**14**

paying attention to materials in the first window or not to materials in the first window, whereby the volitional input suggesting the user not paying attention to materials in the first window indicates a change in situation from the volitional input suggesting the user paying attention to materials in the first window; and

adjusting, by the computing device, materials for presenting to the user if the determining determines that the volitional input suggests the user not paying attention to materials in the first window,

wherein the sensor includes an imaging sensor.

**2**. A computer-implemented method as recited in claim **1** further comprising waiting for a period of time before adjusting,

wherein the adjusting comprises switching to alternative materials that are different from materials that would have been presented,

wherein the alternative materials include materials on a product, and

wherein at least a portion of the alternative materials are configured to be retrieved by the computing device, via a network, from another computing device.

**3**. A computer-implemented method for a user using at least a first window of a display, with at least some of the space outside of the first window being viewable via the display, with the space outside of the first window including at least a part of another window at least partially viewable via the display, the method comprising:

acquiring data, by a computing device, regarding a volitional input of the user, the data from a sensor sensing a physical attribute associated with the user, the sensor being configured to be detached from the physical attribute associated with the user to sense at least the physical attribute;

analyzing the data by the computing device, which is coupled to the sensor and the display; and

determining by the computing device from the analyzing of the data whether the volitional input suggests the user paying attention to materials in the first window or not to materials in the first window, whereby the volitional input suggesting the user not paying attention to materials in the first window indicates a change in situation from the volitional input suggesting the user paying attention to materials in the first window,

wherein the volitional input depends on at least facial information of the user, and

wherein the sensor includes an imaging sensor.

**4**. A computer-implemented method as recited in claim **3** wherein the facial information includes the user frowning.

**5**. A computer-implemented method for enabling a user to learn via a first window of a display, with at least some of the space outside of the first window being viewable via the display, with the space outside of the first window including at least a part of another window at least partially viewable via the display, the method comprising:

acquiring data, by a computing device, regarding a volitional input of the user, the data from a sensor sensing a physical attribute associated with the user, the sensor being configured to be detached from the physical attribute associated with the user to sense at least the physical attribute;

analyzing the data by the computing device, which is coupled to the sensor and the display;

determining by the computing device from the analyzing of the data whether the volitional input suggests the user paying attention to materials in the first window or not to materials in the first window, whereby the volitional

US 8,475,174 B2

15

input suggesting the user not paying attention to materials in the first window indicates a change in situation from the volitional input suggesting the user paying attention to materials in the first window; and

using a rule regarding a speed of the user to analyze a volitional input of the user to help the user learn.

**6**. A computer-implemented method as recited in claim **1** wherein the method further comprises determining understanding of the user in materials presented to the user.

**7**. A computer-implemented method as recited in claim **1** further comprising, in view of the analyzing, having materials retrieved to be presented to the user to help the user learn.

**8**. A computer-implemented method as recited in claim **3**, wherein the facial information is related to an eye behavior of the user.

**9**. A computer-implemented method as recited in claim **1** further comprising asking the user a question in view of the analyzing to help the user.

**10**. A computer-implemented method as recited in claim **3**, wherein the sensor includes a camera, and

wherein the data includes an image of the user.

**11**. A computer-implemented method as recited in claim **10** further comprising analyzing more than one image of the user produced by the camera to determine whether the volitional input suggests the user paying attention to materials in the first window or not to materials in the first window.

**12**. A computer-implemented method as recited in claim **10** further comprising asking the user to be in front of the camera for producing the data.

**13**. A computer-implemented method as recited in claim **1**, wherein the method is configured to electronically sense and analyze another volitional input of the user using another sensor to help determine what to present to the user, the another volitional input being of a type different from the volitional input of the user.

**14**. A computer-implemented method for a user using at least a first window of a display, with at least some of the space outside of the first window being viewable via the display, with the space outside of the first window including at least a part of another window at least partially viewable via the display, the method comprising:

acquiring data, by a computing device, regarding a volitional input of the user, the data from a sensor sensing a physical attribute associated with the user, the sensor being configured to be detached from the physical attribute associated with the user to sense at least the physical attribute;

analyzing the data by the computing device, which is coupled to the sensor and the display; and

determining by the computing device from the analyzing of the data whether the volitional input suggests the user paying attention to materials in the first window or not to materials in the first window, whereby the volitional input suggesting the user not paying attention to materials in the first window indicates a change in situation from the volitional input suggesting the user paying attention to materials in the first window,

wherein the sensor includes an imaging sensor configured to produce data regarding volitional inputs of the user at different times, and

wherein the method further comprises having materials retrieved for the user, based upon changes in the volitional inputs of the user from the sensor sensing at least the physical attribute associated with the user.

**15**. A computer-implemented method for enabling a user to learn via a first window of a display, with at least some of the space outside of the first window being viewable via the

16

display, with the space outside of the first window including at least a part of another window at least partially viewable via the display, the method comprising:

acquiring data, by a computing device, regarding a volitional input of the user, the data from a sensor sensing a physical attribute associated with the user, the sensor being configured to be detached from the physical attribute associated with the user to sense at least the physical attribute;

analyzing the data by the computing device, which is coupled to the sensor and the display;

determining by the computing device from the analyzing of the data whether the volitional input suggests the user paying attention to materials in the first window or not to materials in the first window, whereby the volitional input suggesting the user not paying attention to materials in the first window indicates a change in situation from the volitional input suggesting the user paying attention to materials in the first window;

acquiring, in a session, another piece of data regarding another volitional input of the user, the another piece of data being produced by the sensor sensing the physical attribute associated with the user, the sensor being configured to be detached from the physical attribute associated with the user to sense at least the physical attribute; and

comparing the another piece of data with the data to enable the user to learn materials during the session.

**16**. A computer system for a user comprising:

an imaging sensor configured to produce data regarding volitional behaviors of the user at different times;

computer memory having materials for the user to view; and

a controller associated with the computer memory, the controller configured to communicate with the sensor and analyze the data to help determine what to present to the user based upon changes in the volitional behaviors,

wherein the sensor is configured to be detached from an area of the user to sense at least the area for producing the data,

wherein the volitional behaviors depend on at least facial information of the user, and

wherein the system is configured to sense and analyze another volitional behavior of the user using another sensor to help determine what to present to the user, the another volitional behavior being of a type different from the volitional behaviors of the user.

**17**. A computer system as recited in claim **16**,

wherein the sensor includes a camera, and

wherein the data includes an image of the user.

**18**. A computer system as recited in claim **16**, wherein the facial information is related to an eye behavior of the user.

**19**. A computer-implemented method to enable a user to learn materials comprising:

capturing in a session, a first piece of information regarding a volitional input of the user, by a sensor monitoring a physical attribute associated with the user, the sensor being configured to be detached from the physical attribute associated with the user to monitor at least the physical attribute;

linking by a computing device, which includes the sensor, the first piece of information to an identity of the user;

storing the first piece of information with the identity of the user in a memory device;

capturing in another session, a second piece of information regarding another volitional input of the user, by the sensor monitoring the physical attribute associated with

US 8,475,174 B2

| 17 | 18 |

the user, the sensor being configured to be detached from the physical attribute associated with the user to monitor at least the physical attribute;

retrieving, by the computing device, the first piece of information from the memory device; and

comparing, by the computing device, the second piece of information with the first piece of information to help the user learn materials,

wherein the first piece of information includes at least an image of the user.

**20**. A computer-implemented method as recited in claim **19** further comprising adjusting materials for presenting to the user in view of the comparing.

**21**. A computer system as recited in claim **16**, wherein the system includes a display with a window, and the controller is configured to determine if the volitional behaviors of the user suggest the user paying attention to materials in the window.

**22**. A computer system for a user comprising:

an imaging sensor configured to produce data regarding volitional behaviors of the user at different times;

computer memory having materials for the user; and

a controller associated with the computer memory, the controller configured to communicate with the imaging sensor and analyze the data to have materials retrieved for the user, based upon changes in the volitional behaviors,

wherein the imaging sensor is configured to be detached from an area of the user to sense at least the area for producing the data, and

wherein the controller is further configured to use a rule regarding a speed of the user to analyze the volitional behaviors of the user to help determine what to present to the user.

**23**. A computing system for a user comprising:

a display having a first window, with at least some of the space outside of the first window being viewable via the display, and with the space outside of the first window including at least a part of another window at least partially viewable via the display;

a sensor configured to sense an area of the user to produce data regarding a volitional behavior of the user, the sensor being configured to be detached from the area of the user to sense the area, wherein the sensor includes a camera and the data includes an image of the user; and

a processor coupled to the sensor and the display, the processor configured to:

analyze, relative to the display, at least the data;

determine from the analysis whether the volitional behavior to suggest the user paying attention to materials in the first window or not to materials in the first window, whereby the volitional behavior to suggest the user not paying attention to materials in the first window to indicate a change in situation from the volitional behavior to suggest the user paying attention to materials in the first window; and

adjust what is to be presented by the display in view of the determination that the volitional behavior to suggest the user not paying attention to materials in the first window, and resume what is to be presented by the display in view of a subsequent volitional behavior to suggest the user paying attention to materials in the first window,

wherein the subsequent volitional behavior to suggest the user paying attention is based on analysis, relative to the display, of data from the sensor.

**24**. A computing system as recited in claim **23**, wherein the sensor is configured to sense the user periodically to help

determine if the user is paying attention to materials in the first window or not to materials in the first window.

**25**. A computing system as recited in claim **23** wherein to adjust includes to adjust a visual effect.

**26**. A computing system as recited in claim **23**, wherein the volitional behavior to depend on whether the user has drooped.

**27**. A computing system as recited in claim **23**, wherein the volitional behavior to depend on a head orientation of the user.

**28**. A computing system as recited in claim **23**,

wherein the volitional behavior to depend on at least facial information of the user, and

wherein the facial information to include information regarding an eye of the user.

**29**. A computing system as recited in claim **23**,

wherein the volitional behavior to depend on at least facial information of the user, and

wherein the facial information to include information regarding an eyelid of the user.

**30**. A computing system as recited in claim **23**, wherein in view of the subsequent volitional behavior to suggest the user paying attention to materials in the first window, the processor is configured to restore the display back to a previous screen.

**31**. A computing system as recited in claim **23**,

wherein the sensor is configured to sense the area to produce the data in a session,

wherein the sensor, in another session, is configured to sense an area of the user to produce another piece of data regarding another volitional behavior of the user, the sensor being configured to be detached from the area of the user where the sensor is sensing, and

wherein the another piece of data is to be electronically linked to an identity of the user.

**32**. A computing system as recited in claim **31**, wherein the identity is to be provided by the user upon a request by the computing system.

**33**. A computing system as recited in claim **24**, wherein to adjust includes to adjust a visual effect.

**34**. A computing system as recited in claim **33**,

wherein the volitional behavior to depend on a head orientation of the user, and

wherein to resume what is to be presented by the display includes to restore the display back to a previous screen.

**35**. A computing system as recited in claim **34**,

wherein the sensor is configured to sense the area to produce the data in a session,

wherein the sensor, in another session, is configured to sense an area of the user to produce another piece of data regarding another volitional behavior of the user, the sensor being configured to be detached from the area of the user where the sensor is sensing,

wherein the another piece of data is to be electronically linked to an identity of the user,

wherein the identity is to be provided by the user upon a request by the computing system, and

wherein the computing system is configured to direct the user to face the display to sense the area of the user in the another session.

**36**. A computing system as recited in claim **32**,

wherein the sensor is configured to sense the user periodically in the session to help determine if the user is paying attention to materials in the first window or not to materials in the first window,

US 8,475,174 B2

19

wherein the processor is configured to identify materials to present to the user at least based on the another piece of data, and

wherein to produce the another piece of data, the computing system is configured to direct the user to face the display.

**37**. A computing system for a user using a display that is configured to display a first window, with at least some of the space outside of the first window being viewable via the display, and with the space outside of the first window including at least a part of another window at least partially viewable via the display, the computing system comprising:

a sensor configured to:

sense, in a session, an area of the user to produce a first piece of data regarding a volitional behavior of the user, the first piece of data being electronically linked to an identity of the user, with the sensor being configured to be detached from the area of the user to sense the area; and

sense, in another session, an area of the user to produce a second piece of data regarding another volitional behavior of the user, with the sensor being configured to be detached from the area of the user to sense the area; and

a processor coupled to the sensor and the display, the processor configured to compare at least the first piece of data with the second piece of data to help identify materials for presenting to the user via the display,

wherein the sensor includes a camera, and

wherein the first piece of data includes an image of the user.

**38**. A computing system as recited in claim **37** wherein the sensor is configured to sense the user periodically to help identify materials for presenting to the user via the display.

**39**. A computing system as recited in claim **37** wherein the identified materials are retrieved via a network external to the computing system for presenting to the user via the display.

**40**. A computing system as recited in claim **37**, wherein the processor is configured to direct the user to be in front of the computing system to help the sensor sense the area of the user to produce the piece of data regarding the volitional behavior of the user in the session.

**41**. A computing system as recited in claim **37**, wherein the materials include materials on a product.

**42**. A computing system as recited in claim **37**, wherein certain materials are identified for presenting to the user via the display based not only on the piece of data and the another piece of data from the two sessions, but also on an additional piece of data produced by the sensor regarding an additional volitional behavior of the user in an additional session.

**43**. A computing system as recited in claim **37**, wherein the processor is configured to use a rule regarding a speed of the user to help determine a progress of the user in learning.

**44**. A computing system as recited in claim **43**, wherein the rule depends on comparing the speed of the user with another speed of the user.

**45**. A computing system as recited in claim **37**, wherein the processor is configured to:

analyzing a different piece of data from the sensor;

determining whether a result from the analyzing suggests the user paying attention to materials in the first window or not to materials in the first window; and

adjusting what is to be presented by the display in view of the determining determines that the result suggests the user not paying attention to materials in the first window.

**46**. A computing system as recited in claim **45**, wherein the processor is configured to resuming what is to be presented by the display in view of a piece of data produced by the sensor

20

subsequent to the different piece of data, the piece of data suggesting the user paying attention to materials in the first window.

**47**. A computing system as recited in claim **37**, wherein the system includes the display.

**48**. A computing system as recited in claim **38**, wherein the processor is configured to direct the user to be in front of the computing system to help the sensor sense the area of the user in the session.

**49**. A computing system as recited in claim **48**,

wherein the processor is configured to use a rule regarding a speed of the user to help determine a progress of the user in learning, and

wherein the rule depends on comparing the speed of the user with another speed of the user.

**50**. A computing system as recited in claim **49**, wherein certain materials are identified for presenting to the user via the display based not only on the piece of data and the another piece of data from the two sessions, but also on an additional piece of data produced by the sensor regarding an additional volitional behavior of the user in an additional session.

**51**. A computing system as recited in claim **50**, wherein the processor is configured to:

analyzing a different piece of data from the sensor;

determining whether a result from the analyzing suggests the user paying attention to materials in the first window or not to materials in the first window; and

adjusting what is to be presented by the display in view of the determining determines that the result suggests the user not paying attention to materials in the first window.

**52**. A computing system as recited in claim **51**, wherein the processor is configured to resuming what is to be presented by the display in view of a piece of data produced by the sensor subsequent to the different piece of data, the piece of data suggesting the user paying attention to materials in the first window.

**53**. A computing system as recited in claim **52**, wherein the processor is configured to resuming what is to be presented after receiving a response from the user to an inquiry from the computing system.

**54**. A computing system as recited in claim **52**, wherein the system includes the display.

**55**. A computing system as recited in claim **48**, wherein the processor is configured to:

analyzing a different piece of data from the sensor;

determining whether a result from the analyzing suggests the user paying attention to materials in the first window or not to materials in the first window; and

adjusting what is to be presented by the display in view of the determining determines that the result suggests the user not paying attention to materials in the first window.

**56**. A computing system as recited in claim **55**, wherein the processor is configured to resuming what is to be presented by the display in view of a piece of data produced by the sensor subsequent to the different piece of data, the piece of data suggesting the user paying attention to materials in the first window.

**57**. A computing system as recited in claim **56**, wherein the system includes the display.

**58**. A computing system for a user using a display that is configured to display a first window, with at least some of the space outside of the first window being viewable via the display, and with the space outside of the first window including at least a part of another window at least partially viewable via the display, the computing system comprising:

a sensor configured to sense an area of the user to produce data regarding a volitional behavior of the user, the sen-

US 8,475,174 B2

**21**

**22**

sor being configured to be detached from the area of the user to sense the area, wherein the sensor includes a camera and the data includes an image of the user; and a processor coupled to the sensor and the display, the processor configured to:

analyzing, relative to the display, the data;

determining from analyzing the data whether the volitional behavior suggests the user paying attention to materials in the first window or not to materials in the first window, whereby the volitional behavior suggesting the user not paying attention to materials in the first window indicates a change in situation from the volitional behavior suggesting the user paying attention to materials in the first window; and

adjusting what is to be presented by the display if the determining determines that the volitional behavior suggests the user not paying attention to materials in the first window, wherein the adjusting includes asking the user to respond to an inquiry.

\*    \*    \*    \*    \*

**FORM 30. Certificate of Service**

# UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

# CERTIFICATE OF SERVICE

I certify that I served a copy on counsel of record on | 9/28/15
by:

☐ US mail
☐ Fax
☐ Hand
☒ Electronic Means
   (by email or CM/ECF)

| Matthew D. Powers | | /s/ Matthew D. Powers |
| Name of Counsel | | Signature of Counsel |

Law Firm | Tensegrity Law Group LLP

Address | 555 Twin Dolphin Drive, Suite 650

City, State, ZIP | Redwood Shores, CA

Telephone Number | (650) 802-6000

FAX Number | (650) 802-6001

E-mail Address | matthew.powers@tensegritylawgroup.com

NOTE: For attorneys filing documents electronically, the name of the filer under whose log-in and password a document is submitted must be preceded by an "/s/" and typed in the space where the signature would otherwise appear. Graphic and other electronic signatures are discouraged.

**Form 19**

    **FORM 19.  Certificate of Compliance With Rule 32(a)**

---

### CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

    1.    This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) or Federal Rule of Appellate Procedure 28.1(e).

    ☑    The brief contains [    *12,206*    ] words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), or

    ☐    The brief uses a monospaced typeface and contains [    ] lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

    2.    This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Rule of Appellate Procedure 28.1(e) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

    ☑    The brief has been prepared in a proportionally spaced typeface using [    *Microsoft Word for Mac 2011*    ] in [    *14 point Times New Roman Font*    ], or

    ☐    The brief has been prepared in a monospaced typeface using [    ] with [    ].

    /s/ Matthew D. Powers
             (Signature of Attorney)

Matthew D. Powers
             (Name of Attorney)

Appellant
  (State whether representing appellant, appellee, etc.)

9/28/2015
             (Date)

---

[ Reset Fields ]